**EXHIBIT A**

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| **BLUE FIRE CAPITAL, LLC,** | ) | |
| **805 Main Street** | ) | |
| **Paris, Kentucky 40361** | ) | **Case No.** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PIES & PINTS DEVELOPMENT** | ) | |
| **PARTNERS, LLC,** | ) | |
| **8462 Grennan Woods Drive** | ) | |
| **Powell, Ohio 43065** | ) | |
| | ) | |
| **Also Serve:** | ) | |
| **PIES & PINTS DEVELOPMENT** | ) | |
| **PARTNERS, LLC,** | ) | |
| **c/o Capitol Services, Inc.** | ) | |
| **1675 S. State Street, Ste. B** | ) | |
| **Dover, DE 19901** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ROBERT A. LINDEMAN,** | ) | |
| **8462 Grennan Woods Drive** | ) | |
| **Powell, Ohio 43065** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## VERIFIED COMPLAINT FOR TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

---

Plaintiff Blue Fire Capital, LLC states as follows for its Verified Complaint against Defendants Pies & Pints Development Partners, LLC and Robert A. Lindeman.

### **PARTIES**

1.     Plaintiff Blue Fire, LLC ("Blue Fire"), is a Kentucky limited liability company with its principal place of business at 805 Main Street, Paris, Kentucky 40361.

2. Defendant Pies & Pints Development Partners, LLC ("PPDP") is a Delaware limited liability company with its principal place of business located at 8462 Grennan Woods Drive, Powell, Ohio 43065. PPDP can be served with process by serving its registered agent, Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901.

3. Defendant Robert A. Lindeman is a resident of Ohio residing at 8462 Grennan Woods Drive, Powell, Ohio 43065.

## JURISDICTION AND VENUE

4. This Court had jurisdiction over this lawsuit because the damages and relief sought are within the jurisdictional limits and authority of this Court. Venue is proper in Franklin County, Ohio because a substantial part of the events giving rise to this action occurred in Franklin County, Ohio.

## FACTS

5. This dispute involves several entities and individuals involved in the development and operations of twelve restaurants under the "Pies & Pints" brand. The entities and individuals involved are identified on the following chart:



6.    As the chart shows, Blue Fire is a Kentucky limited liability company that holds a 50% interest in PPDP.  Mr. Michael Sloane is the manager of Blue Fire.

7.    PPDP is a Delaware limited liability company that holds a 60% membership interest in Pies & Pints Management Company, LLC ("PPMC").  In this action, Blue Fire Seeks, *inter alia*, to enjoin PPDP and its sole manager, Defendant Lindeman, from taking further unlawful actions as the sole manager of PPDP and as an officer and manager of PPMC that pose an imminent existential threat to PPMC and Blue Fire's indirect interest in PPMC.

8.    PPDP was formed on August 25, 2011 for the purpose of investing in and developing the Pies & Pints restaurant brand.

9.    PPDP is governed by an operating agreement that became effective on September 1, 2011.  A true and correct copy of that PPDP operating agreement is attached hereto as Exhibit 1.

10.     On the date the operating agreement became effective, PPDP appointed Defendant Lindeman as the sole manager of PPDP.  A true and correct copy of the written consent of the members of PPDP appointing Defendant Lindeman is attached as hereto Exhibit 2.

11.     PPMC's original operating agreement became effective July 31, 2012.  A true and correct copy of that PPMC operating agreement is attached hereto as Exhibit 3.  PPMC has two members, PPDP, which holds a 60% ownership interest in PPMC, and KSDB, LLC ("KSDB"), which holds a 40% interest.  The members of KSDB are Ms. Kimberly Shingledecker and Mr. David Bailey.

12.     Defendant Lindeman has served as the sole manager of PPDP and as the manager of PPMC since 2011.

13.     PPMC amended its original operating agreement in early 2020.  A true and correct copy of the Amended Restated Limited Liability Company Operating Agreement of PPMC effective December 31, 2019 (the "Amended Agreement") is attached hereto as Exhibit 4.

14.     Prior to the execution of the Amended Agreement, the management of PPMC was controlled by Defendant Lindeman as the sole manager of PPDP and as a manager of PPMC.

15.     In 2019, Blue Fire sought to change the governance of PPMC so that Defendant Lindeman was no longer in sole control of PPMC because it determined that the interests of the beneficial owners of PPMC were not being represented by Defendant Lindeman on key issues relating to the management of the Company.  For example, Blue Fire was concerned about Defendant Lindeman's lack of transparency in the management of PPMC and certain conflicts of interest.

16.     Thus, the Amended Agreement was drafted for the purpose of changing the governance so that PPMC was exclusively controlled by a board of four managers, all of whom

4

have a financial interest in the Company, and so that it would no longer be controlled solely by Defendant Lindeman.

17.    It was important to Blue Fire to ensure that, once the four-member board was in place, the managers on board could not be easily removed. Thus, the Amended Agreement was drafted in a manner that guaranteed that the managers serving on the Board would have strong protection from removal and could not be removed through the actions of a single person. In order to provide even greater protection for the Board, one Amended Agreement was drafted to prohibit the removal of a member of the Board without the specific consent of the entity, such as Blue Fire, that designated the manager to the Board. [Exhibit 4, Amended Agreement ("Am. Agmt.") § 11.2(c).]

18.    After the Amended Agreement was finalized, Defendant Lindeman executed an Employment Agreement dated January 1, 2020. A true and correct copy of that agreement is attached hereto as Exhibit 5.

19.    In March 2020, Mr. Sloan, Ms. Shingledecker and Mr. Bailey, who serve as managers on PPMC's Board and who represent a majority of the Board of PPMC, took action to terminate Defendant Lindeman's employment as president of PPMC and to hire Mr. Martin O'Dowd as PPMC's president effective March 16, 2020. A true and correct copy of the Action by Written Consent of the Managers Without a Meeting dated March 16, 2020 (the "March 2020 Manager Action") documenting that action is attached hereto as Exhibit 6.

20.    The actions by PPMC's Board terminating Defendant Lindeman's employment and hiring Mr. O'Dowd as president were authorized by the Amended Agreement and carried out in accordance with its terms.

5

21.     On April 1, 2020, Defendant Lindeman as the sole manager of PPDP, purported to cause PPMC to take certain actions by written consent of the members of PPMC without a meeting (the "April 2020 Member Action").  A true and correct copy of the April 2020 Member Action is attached as Exhibit 7.  [Exhibit 7, 1.]

22.     Through the April 2020 Member Action, Defendant Lindeman has illegally attempted to unilaterally undo the March 2020 Manager Action and seize control of PPMC.  [Id.] Through the April 2020 Member Action, Defendant Lindeman purported to: (1) amend the Amended Agreement to become the Second Amended and Restated PPMC Limited Liability Company Operating Agreement dated April 1, 2020 (the "Second Amended Agreement"); (2) reduce the Board of Managers from four to one by unilaterally repealing Sections 6.1(c)(ii)-(iii) of the Amended Agreement; (3) elect himself as the sole Manager of PPMC; (4) terminate Martin O'Dowd as President of the Company; and (5) hire himself as President and CEO of PPMC.  [Id.]

23.     Defendant Lindeman claims that he is authorized to take these actions by a "Majority Vote of the Members" under Section 6.3(b) of the Amended Agreement. [See Letter By Attorney Wcislo Dated April 1, 2020 ("Wcislo Letter"), attached hereto at Exhibit 8.]

24.     Defendant Lindeman has taken these illegal actions in direct violation of the Amended Agreement at the worst possible time -- during the COVID-19 pandemic.  It is imperative for PPMC to have stable, independent leadership in place that will follow the Board's directives so that it can successfully navigate in the current environment.

25.     The actions by Defendants Lindeman and PPDP have placed PPMC and Blue Fire's interest in it at immediate risk of irreparable harm because they have created internal and external turmoil and confusion on the basic issue of who is running PPMC -- the Board and its duly-

appointed president, Mr. DO'Dowd, or Mr. Lindeman – resulting in a leadership emergency as the Company works to survive the pandemic.

26. In order for PPMC to survive, it is critical that the Company maintain its relationships and have clear communication with its stakeholders, i.e. its employees, owners, landlords, banks, lender, investors, and vendors. These stakeholders must know who is running the Company and work with it to survive. The actions by Defendants Lindeman and PPDP put the Company and Blue Fire's interest in it at imminent risk of loss by causing the Company's stakeholders to lose confidence in its management thereby jeopardizing those relationships at a time the Company is fighting to survive.

27. The actions by Mr. Lindeman and PPDP violate the terms and the intent of the Amended Agreement. The Amended Agreement was drafted for the purpose of changing the governance of the Company so that it would no longer be controlled solely by Mr. Lindeman, but rather exclusively by a Board of four managers, all of whom have a financial interest in the Company.

28. As PPDP's sole manager, Defendant Lindeman owes Blue Fire the fiduciary duties of care and loyalty in all dealings and transactions relating to PPDP. The actions by Defendant Lindeman not only violate the terms and intent of the Amended Agreement, they also breach fiduciary duties that Defendant Lindeman owes to PPDP and its other member, Blue Fire, as PPDP's sole manager. Defendant Lindeman has single-handedly placed PPMC at imminent risk of failure and Blue Fire at risk of losing its interest in PPMC. Defendants Lindeman and PPDP must be enjoined from doing further harm.

7

## COUNT ONE
## TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

29.     Blue Fire restates the foregoing allegations in paragraphs 1 through 28 as if specifically set forth here.

30.     Defendant Lindeman's illegal actions taken as the sole manager of PPDP have placed Blue Fire at imminent risk of irreparable harm.  Defendants' actions place PPMC at immediate risk of failure, thereby placing Blue Fire at immediate risk of losing its interest in PPMC.

31.     Granting Blue Fire the temporary, preliminary and permanent injunctive relief that it seeks will prevent immediate and irreparable harm to Blue Fire.

32.     Granting Blue Fire's request for injunctive relief will not harm third parties. To the contrary, it will benefit all of the persons and entities that have an interest in PPMC.

33.     Blue Fire is entitled to the injunctive relief it requests because it is likely to succeed on the merits as stated in its Motion for Temporary Restraining Order and Preliminary Injunction and the Affidavit of Michael Sloane which are filed contemporaneously herewith and incorporated herein by reference.

34.     The public interest will be served by granting Blue Fire's request for injunctive relief because the public, the employees of PPMC's twelve Pies & Pints restaurants, and the entities that own interests in PPMC will all benefit if PPMC has stable, independent management in place to navigate the COVID-19 pandemic.

35.     The Court should, therefore, grant Blue Fire's request for temporary and preliminary and permanent injunctive relief as requested and its Motion for Temporary Restraining Order and Preliminary Injunction.  The Court should also grant Blue Fire's request for permanent injunctive relief at the conclusion of this action.

## COUNT TWO
## DECLARATORY JUDGMENT

36.     Blue Fire restates the foregoing allegations in paragraphs 1 through 35 as if specifically set forth here.

37.     An actual and justiciable controversy exists between Blue Fire and Defendants Lindeman and PPDP requiring this Court declare the rights and obligations of the parties of the Amended Agreement.

38.     Entering a declaratory judgment in this action will serve a useful purpose in that it will clarify and settle the legal issues presented and provide relief from the uncertainty, insecurity, and controversy that Defendants' illegal actions have caused.

39.     The Court is requested to review the provisions of the Amended Agreement set forth below and grant Blue Fire the declaratory relief it seeks.

40.     Blue Fire has the right under the Amended Agreement to designate a Manager to serve on PPMC's Board.  Blue Fire has designated Michael Sloane as the Blue Fire Manager on the Board.  [Exhibit 4, Am. Agmt. § 6.1(c)(ii).]

41.     The Amended Agreement specifically grants PPMC's Board with full and exclusive control of PPMC and provides the managers with ironclad protection from removal. With regard to the Board's exclusive control, the Amended Agreement provides:

> (a) Board.  Except as otherwise specifically provided in this Agreement or by applicable law, **the Board will have full, complete and exclusive authority to manage, direct and control the business, affairs and properties of the Company** and to perform any other acts or activities customary or incident to the management of Company's activities; provided however, the officers of the Company shall be responsible for the day-to-day operation of the Company, except for actions requiring a Majority Vote of the Board as set forth in Section 6.1(m) or a Majority Vote of the Members as set forth in Section 6.3(b) and except as decided by the Unanimous Vote of the Managers or Unanimous Vote of the Members.

9

[Exhibit 4, Am. Agmt. § 6.1(a) (emphasis supplied).]

42.     The Amended Agreement ensures that the Board will control the management of PPMC by preventing the removal of the Managers designated by Blue Fire, R&M and KSDB from the Board without the designating entity's specific consent.  For example, the Amended Agreement states that the "Blue Fire Manager [Mr. Sloane] may only be removed, with or without cause, by the affirmative vote of the Members holding a majority of the total Membership Interests of **Blue Fire**."  [Exhibit 4, Am. Agmt. § 6.1(c)(ii) (emphasis supplied).]

43.     The reservation of the Board's exclusive control of the Company is further reinforced in Section 6.3(b), the same provision relied upon by Defendants PPDP and Lindeman as support for their illegal actions, and Section 11.2(c).  Section 6.3(b) provides:

> (b)  Events Requiring Member Approval.  The Company shall not, either directly or indirectly by amendment, merger, consolidation, **or otherwise**, do any of the following without (**in addition to any other vote required by** law, the Articles or **this Agreement**) a Majority Vote of the Members:

> *       *       *

> (ii)   Amend, alter or repeal any provision of this Agreement or the Certificate of Formation;

> *       *       *

> (v)    Increase or decrease the size of the Board.

[Exhibit 4, Am. Agmt. § 6.3(b)(i) and (v) (emphasis supplied).]

44.     One of the "other votes" required to be taken before Defendants Lindeman and PPDP could cause PPMC to take the actions set forth in the April 2020 Member Action by a Majority Vote of Members is set forth in Section 11.2 titled "Amendments". The provision in this section which prevents and disallows the actions described in the April 2020 Member Action is Section 11.2(c) which states:

> **Notwithstanding anything contained in Section 11.2 or any other provision of this Agreement to the contrary,** and **except in the case of a Unanimous Vote of the Members,** Section 6.1(c)(i) shall not be amended without the consent of R&M Advisors, LLC; Section 6.1(c)(ii) shall not be amended without the consent of Blue Fire Capital, LLC; and Section 6.1(c)(iii) shall not be amended with the consent of KSDB, LLC.

[Am. Agmt. § 11.2(c) (emphasis supplied).]

45.     The inclusion of Section 11.2(c) ensures that none of the Managers designated by R&M, Blue Fire or KSDB can be removed without **both** a Unanimous Vote of the Members **and** the specific consent of the particular entity that designated its Manager.

46.     Notwithstanding this stark prohibition and the protection of the Managers from removal provided by Section 6.1(c) and Section 11.2(c), Defendant Lindeman and PPDP purported to amend the Amended Agreement through the April 1, 2020 ("the April 2020 Member Action") that asserts it was a "Amendment of Company's Amended and Restated Limited Liability Company Agreement dated December 31, 2019."  [Exhibit 7, 1.]

47.     By taking the actions set forth in the April 2020 Member Action, Defendants Lindeman and PPDP have breached the Amended Agreement to the detriment of Blue Fire.

48.     Therefore, this Court should declare that Defendants' breach of the Amended Agreement has been the direct and proximate cause of harm to Blue Fire and Blue Fire is entitled to the relief it has requested in its Prayer for Relief.

## COUNT THREE
## BREACH OF FIDUCIARY DUTY

49.     Blue Fire restates the foregoing allegations in paragraphs 1 through 48 as if specifically set forth here.

50.     Defendant Lindeman owes Blue Fire fiduciary duties of care and loyalty as the sole manager of PPDP.

11

51.     Defendant Lindeman has breached the fiduciary duties that he owes to Blue Fire by recklessly taking actions as the sole manager of PPDP and as a manager and officer of PPMC in bad faith that usurp the authority of PPMC's Board to serve his own interests while placing PPMC at imminent risk of failure and Blue Fire at immediate risk of losing its interest in PPMC.

52.     In taking the illegal actions which violate his fiduciary duties, Defendant Lindeman has acted while he has a conflict of interest through which he is illegally placing his own personal interests above the interests of Blue Fire.

53.     Blue Fire has suffered damages as a direct and proximate result of Defendant Lindeman's breaches of fiduciaries duties.

54.     Blue Fire is, therefore, entitled to all relief that it has requested in its Prayer for Relief.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Blue Fire respectfully requests that this Court grant it:

(A)     The temporary and preliminary injunctive relief which it has requested through its Motion for Temporary Restraining Order and Preliminary Injunction as follows:

Restraining and enjoining PPDP in its capacity as a member of PPMC, Defendant Robert Lindeman, in his capacity as sole manager of PPDP, and as an officer and/or manager of PPMC, and all persons and entities acting in concert with them from:

(1) interfering with the operations and management of PPMC or with the work of any employee, other person or entity affiliated with PPMC, specifically including PPMC's President/CEO, Mr. Martin O'Dowd; and (2) taking any action that would prevent Mr. O'Dowd from fully performing his duties as President/CEO of PPMC; and (3) carrying out, performing or causing the enforcement of any actions

purportedly taken by PPDP, as a member of PPMC, and Mr. Lindeman, as an officer or manager of PPMC, referenced in the Action By Written Consent of the Members Without a Meeting dated April 1, 2020 which is attached hereto as Exhibit 7.

(B)     A permanent injunction enjoining Defendants Lindeman and PPDP from taking the actions set forth in Blue Fire's Motion for Temporary Restraining Order and Preliminary Injunction;

(C)     A declaratory judgment declaring that Defendants Lindeman and PPDP breached the Amended Agreement by taking the actions set forth in the April 2020 Member Action and that those actions are null and void;

(D)     Compensatory damages due to Defendant Lindeman's breaches of fiduciary duty;

(E)     Its costs, attorneys' fees, and expenses incurred in prosecuting its claims against Defendants Lindeman and PPDP;

(F)     Prejudgment interest and post-judgment interest; and

(G)     All such and further relief to which the Court deems Blue Fire is entitled.

Of Counsel:

Donald Aho, BPR No. 011975
*Pro Hac Vice Motion Pending*
Miller & Martin PLLC
Suite 1200, Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402
Telephone: (423) 756-6600
Fax: (423) 785-8480
Email:  don.aho@millermartin.com

Respectfully Submitted,

*/s/ Katherine C. Ferguson*
Katherine C. Ferguson (0079207)
Lindsay M. Nelson (0095560)
Kooperman Mentel Ferguson Yaross Ltd.
100 South 4th Street, Suite 100
Columbus, Ohio 43215
Telephone: (614) 344-4800
Facsimile: (614) 344-4801
Email: kferguson@kmfylaw.com
Email: lnelson@kmfylaw.com

*Counsel for Plaintiff Blue Fire Capital, LLC*

13

## VERIFICATION

STATE OF FLORIDA　　　　　　)
　　　　　　　　　　　　　　　)
COUNTY OF WALTON　　　　　 )

　　　I, Michael Sloane, having first been duly sworn, state that I am the Manager of Blue Fire Capital, LLC and that I have read the foregoing Verified Complaint. On behalf of Blue Fire Capital, LLC, I state that the allegations and statements contained therein are true and correct to the best of my knowledge, information and belief. I further state that the copies of the exhibits attached hereto are true and correct copies.

　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Michael Sloane
　　　　　　　　　　　　　　　　　　　　　　Manager of Blue Fire Capital, LLC

Sworn before me and subscribed in my presence this 11th day of May, 2020.

　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Notary Public

> Notary Public State of Florida
> Alice M Barrett
> My Commission GG 297719
> Expires 03/16/2023

14

# EXHIBIT 1

LIMITED LIABILITY COMPANY
OPERATING AGREEMENT
OF
PIES & PINTS DEVELOPMENT PARTNERS, LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (hereinafter referred to as the "Agreement"), dated as of 1st day of September, 2011 (hereinafter referred to as the "Effective Date"), is entered into by and between R&M Advisors, LLC, an Ohio Limited Liability Company, and Blue Fire Capital, LLC, a Kentucky Limited Liability Company, as the sole members (hereinafter referred to as the "Members").

RECITALS:

WHEREAS, the Members have agreed to form PIES & PINTS DEVELOPMENT PARTNERS, LLC (hereinafter referred to as the "Company") in order to invest in and develop a gourmet pizza and craft beer business and to be operated in accordance with the terms hereof, and subject to the conditions set forth in, this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

ARTICLE 1. DEFINED TERMS

Capitalized terms used in this Agreement shall, unless otherwise noted or unless the context otherwise requires, have the following meanings:

"Act" means the Delaware Revised Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended from time to time.

"Additional Members" has the meaning assigned to such term in Section 6.11.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account in any amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, with respect to a specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified. For purposes of this Agreement, the term "control" (including its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Agreement" means this Limited Liability Company Agreement of PIES & PINTS DEVELOPMENT PARTNERS, LLC, as amended, supplemented, or otherwise modified from time to time.

"Asset Value" means, with respect to any asset of the Company, the adjusted basis of such asset for Federal income tax purposes, except that:

(a) the initial Asset Value of any asset contributed by a Member to the Company shall be the Gross Fair Market Value of such asset;

(b) upon the distribution in kind of any Company asset, the Asset Value of such asset shall be adjusted immediately prior to such distribution to equal its Gross Fair Market Value;

(c)        to the extent that Members holding at least a majority of the Percentage Interests agree, the Asset Values of all Company assets shall be adjusted to equal their respective Gross Fair Market Values as of the following times:  (i) upon the acquisition of an interest in the Company by a new Member or an additional interest by an existing Member in exchange for more than a *de minimis* capital contribution; and (ii) upon the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company;

(d)        if the Asset Value of an asset has been determined or adjusted in accordance with clauses (a), (b) or (c) above, such Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profit and Loss; and

(e)        to the extent not otherwise provided in this Agreement, the Asset Value of any Company asset shall be adjusted so that the Capital Account of each Member is determined and maintained in accordance with the capital accounting rules in Treasury Regulations Section 1.704-1(b)(2)(iv).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the State of Delaware are authorized or required by law to close.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 3.6.

"Capital Contribution" means, with respect to any Member, the amount of money and the Gross Fair Market Value of any property (other than money) contributed to the Company by such Member, reduced by the amount of any liabilities of such Member assumed by the Company in connection with the contribution or secured by any contributed property.

"Certificate" has the meaning assigned to such term in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means PIES & PINTS DEVELOPMENT PARTNERS, LLC, the limited liability company formed under the Act and pursuant to this Agreement.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Gross Fair Market Value" means, with respect to any asset of the Company, the fair market value of such asset determined in the case of any asset contributed by a Member to the Company, by the contributing Member, unreduced by any liabilities.

"Indemnitee" means the officers of the Company, if any, and (b) any other Person (including Affiliates or the Company) as the Members may designate from time to time, in their sole and absolute discretion.

"Interest" means the ownership interest of a Member in the Company, consisting of such Member's (a) Percentage Interest, (b) share of the Profits and Losses and other items of income, gain, deduction and loss of the Company and the Member's right to receive distributions of the Company's assets, (c) right to vote and to grant or withhold consents with respect to Company matters as provided in this Agreement or in the Act, and (d) other rights and privileges as provided in this Agreement.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(a)        such Member makes an assignment for the benefit of creditors;

(b)        such Member files a voluntary petition of bankruptcy;

(c)        such Member is adjudged bankrupt or insolvent or has entered against such Member an order for relief in any bankruptcy or insolvency proceeding;

2

(d)　　　such Member files a petition or answer seeking for such Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(e)　　　such Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding described in clauses (a) through (d) above;

(f)　　　such Member seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties; or

(g)　　　120 days after commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation if the proceeding has not been dismissed, or if within 90 days after the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties, the appointment is not vacated or stayed, or if within 90 days after the expiration of any such stay, the appointment is not vacated.

"Member" means any Person who (a) is or becomes a Member pursuant to the terms of this Agreement and (b) has not ceased to be a Member.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Net Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any mortgage or other financing or refinancing, or from any sale, exchange, condemnation or other disposition (other than in the ordinary course of business) of the Company's property or interest therein, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness associated therewith, all as determined by the Members.

"Net Cash Flow" means all cash received from Company operations, other than amounts received as Capital Contributions or Net Capital Proceeds, reduced by all cash paid, or amounts used to establish reasonable reserves, for all Company expenses, debt payments, capital improvements, replacements or other contingencies, all as determined by the Members.

"Percentage Interest" means, with respect to a Member, the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time in accordance with this Agreement. A Percentage Interest may be evidenced by a certificate issued by the Company, and expressed on a certificate as "Units".

"Permitted Transfer" means a Transfer of an Interest in compliance with Section 9.1, 9.2 or 9.3.

"Person" means any individual, corporation, partnership, limited partnership, firm, joint venture, association, business entity, joint stock company, trust, estate, limited liability company, unincorporated association, government or regulatory body (or any agency or political subdivision thereof) or other entity.

"Profit" and "Loss" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)　　　any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such income or loss;

3

(b)        any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from such taxable income or loss;

(c)        in the event the Asset Value of any Company asset is adjusted in accordance with subsection (b) or (c) of the definition of Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss of the fiscal year in which such adjustment occurs;

(d)        gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Asset Value;

(e)        depreciation, amortization and other cost recovery deductions shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g); and

(f)        any items which are specially allocated pursuant to the provisions of Section 4.2 shall not be taken into account in computing Profit or Loss.  Nevertheless, such items shall be taken into account in adjusting Capital Accounts pursuant to Section 3.6.

"Transfer" means any actual or proposed disposition of all or a portion of an interest (legal or equitable) by any means, direct or indirect, absolute or conditional, voluntary or involuntary, including by sale, assignment, put, transfer, pledge, hypothecation, mortgage or other encumbrance, court order, operation of law, distribution, settlement, exchange, waiver, abandonment, gift, alienation, bequest or disposal.

"Treasury Regulations" means the income tax regulations, including any temporary regulations, promulgated under the Code from time to time.

"Unreturned Capital Contribution" means, with respect to any Interest, the total Capital Contributions made with respect to that Interest, less all amounts actually distributed with respect to that Interest pursuant to Sections 5.1(a) and 5.2(a) & (b) of this Agreement.

"Voluntarily Withdraw" or "Voluntary Withdrawal" means a Member's dissociation from the Company other than in connection with a Permitted Transfer or Involuntary Withdrawal.

Other Defined Terms; Interpretation.  Capitalized terms used in this Agreement and not defined in Section 1.1 shall have the meanings assigned to them elsewhere in this Agreement.  The definitions shall apply equally to both the singular and the plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE 2. ORGANIZATIONAL MATTERS

2.1.    <u>Formation</u>.  The Members have organized the Company as a limited liability company under the Act and hereby (a) confirm the Members' status as all of the existing members of the Company, and (b) execute and enter into this Agreement as the Limited Liability Company Agreement of the Company.  The Members have caused a Certificate of Formation (the "Certificate") in the form of "Exhibit D" attached to be signed and filed with the Secretary of State of the State of Delaware in accordance with the provisions of the Act.  The Company's existence began on the date on which the Certificate was filed with and accept by the State of Delaware and shall continue unless otherwise terminated in accordance with the provisions of this Agreement or the Act.

2.2.    <u>Name</u>.  The name of the Company is "PIES & PINTS DEVELOPMENT PARTNERS, LLC."  The Company may do business under that name and any other name as determined by the Members, subject to any restrictions imposed by law.  The Members may change the name of the Company at any time and from time to time and shall give prompt notice of any such change to each Officer, if any, and all Members, if not already notified.

2.3.    <u>Principal Place of Business</u>.  The principal place of business of the Company shall be 8462 Grennan Woods Drive, Powell, Ohio 43065, or such other place as the Members may from time to time designate.

2.4.    Registered Office; Registered Agent.  The registered agent of the Company is Capitol Services Inc. and the registered office of the Company within the State of Delaware is 1675 South State Street, Suite B, Dover, Delaware 19901.  The Members may change the registered office and/or the registered agent of the Company in accordance with the Act and shall give prompt notice of any such change to to each Officer, if any, and all Members, if not already notified.

2.5.    Purposes.  The business and purpose of the Company is to own an interest in PIES & PINTS FRANCHISING COMPANY, LLC, and to invest in and develop a gourmet pizza and craft beer restaurant concept.  The Company may engage in any and all activities necessary, incidental, related or desirable to the foregoing or as may be agreed to by the Members holding a majority of the Interests.  The Company shall not engage in any other business or activity without the prior written consent of the Members holding a majority of the Interests.

2.6.    Powers.  Subject to all of the terms, covenants, conditions and limitations contained in this Agreement and any other agreement entered into by the Company, the Company shall have the power and authority to do any and all acts and things necessary, appropriate, proper, advisable, desirable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Company, including all power and authority, directly or through its ownership interest in other entities, to enter into and perform contracts of any kind, and borrow money and issue evidences of indebtedness, whether or not secured by a mortgage, deed of trust, pledge or other lien.

2.7.    Qualification in Other Jurisdictions.  The Members shall take any and all actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware.  Before conducting business in any jurisdiction other than the State of Delaware, the Company shall file all forms and take all other actions required under applicable laws, including the tax laws, of that jurisdiction in order to conduct such business.

2.8.    Members.  The name, mailing address and Percentage Interest of each Member is set forth on "Exhibit A," attached hereto.  The Members shall update "Exhibit A" from time to time as necessary to reflect changes to the information therein.  An amendment or revision to "Exhibit A" made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to "Exhibit A" shall be deemed a reference to "Exhibit A" as it may be amended and in effect from time to time.

2.9.    Title to Property.  The Company shall at all times, hold title to all of its property in the name of the Company and not in the name of any Member, and no Member shall have any ownership interest in such property in such Member's individual name.  Each Member's Interest shall be personal property for all purposes.

2.10.    Payments of Individual Obligations.  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for, or in payment of, any individual obligation of any Member.

## ARTICLE 3.  CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1.    Initial Capital Contributions.  On or prior to the date hereof, each Member shall contribute to the capital of the Company the cash and/or property set forth opposite such Member's name on "Exhibit B" hereto, the terms of which exhibit are incorporated herein by reference.  The Capital Contributions (if any) required to be made by Additional Members shall be determined pursuant to Section 6.11.

3.2.    Additional Contributions.  Except as otherwise provided herein and by applicable law, the Members shall be liable only to make their Capital Contributions pursuant to Section 3.1, and no Member shall be required to lend any funds to the Company or, after a Member's Capital Contribution has been fully paid pursuant to Section 3.1, to make any additional capital contributions to the Company.

3.3.    Return of Capital Contributions.  No Member shall have the right to receive the return of any Capital Contribution except as otherwise provided in this Agreement or the Act.

3.4.    No Interest on Capital Contributions.  Except as otherwise provided in this Agreement, the Members shall not be paid interest on their Capital Contributions.

3.5.     Limitation of Liability.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

3.6.     Capital Accounts.

(a)     Establishment and Maintenance of Capital Accounts.  A separate Capital Account shall be established and maintained for each Member in accordance with applicable Treasury Regulations as promulgated and in effect on the effective date of this Agreement as well as in accordance with all subsequent amendments to such Treasury Regulations which by their terms are binding on the Company, and to the extent the Company is permitted to elect the manner in which any item affects the Capital Accounts as they are specified in this Section 3.6(a), such election shall, except as otherwise provided in this Agreement, be made by the Members.

(b)     No Restoration.  No Member shall have any obligation at any time to restore a deficit balance in such Member's Capital Account.

3.7.     Loans.  A Member may, at any time, make a loan or cause a loan to be made to the Company in such amount and on such terms as the Members may agree.  No such loan shall increase a Member's Capital Account or Percentage Interest.  Any such loan shall be payable and collectable only out of Company assets, and no other Member shall be personally obligated to repay any part thereof.  No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor.  Notwithstanding anything herein to the contrary, profit allocations and other distributions to Members shall be subordinate to the repayment of Member loans to the Company.

## ARTICLE 4.  ALLOCATIONS

4.1.     Allocations of Profit and Loss.

(a)     Profit.  Profit of the Company for each taxable year shall be allocated:

(i)     first, in the same proportions as the aggregate Loss (if any) for all previous years was allocated among the Members pursuant to Section 4.1(b)(ii), until the aggregate Profit allocated to each Member pursuant to this Section 4.1(a)(i) for such year and all previous years is equal to the aggregate Loss allocated to such Member pursuant to Section 4.1(b)(ii) for all previous years; and

(ii)     thereafter, the balance, if any, to the Members in proportion to their Percentage Interests.

(b)     Loss.  Loss of the Company for each taxable year shall be allocated:

(i)     first, in the same proportions as the aggregate Profit (if any) for all previous years was allocated among the Members pursuant to Section 4.1(a)(ii), until the aggregate Loss allocated to each Member pursuant to this Section 4.1(b)(i) for such year and all previous years is equal to the aggregate Profit allocated to such Member pursuant to Section 4.1(a)(ii) for all previous years; and

(ii)     thereafter, the balance, if any, to the Members in proportion to their Percentage Interests.

4.2.     Special Allocation Rules.  Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article 4, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance

6

with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 4, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 4.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset.  If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section I.704-I(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain) shall be allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 4.2(c) were not in the Agreement.  This Section 4.2(c) is intended to comply with the qualified income offset requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied consistently therewith.

(d)     Nonrecourse Deductions.  Nonrecourse deductions (as defined in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

(e)     Member Nonrecourse Deductions.  Member Nonrecourse Deductions for each taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(f)     Curative Allocations.

(i)     General Curative Allocations.  The allocations set forth in Sections 4.2(a), (b), (c), (d) and (e) and Section 4.3 (the "Regulatory Allocations") are intended to comply with Treasury Regulations Section 1.704-1(b).  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.2(f)(i).  Therefore, the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Members determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.1.

(ii)     Audit Adjustment Curative Allocations.  In the event there is a final administrative or judicial determination for Federal income tax purposes for any taxable year that changes the Capital Account balances of the Members from the Capital Account balances for such taxable year as previously computed by the Company (an "Adjustment"), then, notwithstanding anything contained in Section 4.1, Profit, Loss, and other items of income, gain, loss, and deduction for that taxable year and, if necessary, subsequent taxable years, shall be allocated among the Members so that, to the extent possible, the Capital Account balances of the Members (taking into account such Adjustment) for that taxable year, and all subsequent taxable years, are the same as they would have been had such Adjustment not occurred.  The reallocation described in the preceding sentence shall not be made to the extent that the Adjustment constitutes the correction of an arithmetic or computational error.

4.3.     Loss Limitation.  Losses allocated pursuant to Section 4.1 shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year (or any other period).  In the event some but not all Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1, the limitation set forth in this Section 4.3 shall be applied on a Member by Member basis and Losses not allocable to a particular Member as a result of such limitation shall be allocated to the other Members in accordance with the

7

positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

4.4.　　Allocations with Respect to Contributed Property; Asset Value Adjustments.

(a)　　Contributed Property. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction (and any item thereof) with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation at the time of contribution between the adjusted basis of such property to the Company for Federal income tax purposes and the Asset Value of the contributed property ("Section 704(c) Allocations"). The method under which Section 704(c) Allocations will be made for each item of contributed property shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Members.

(b)　　Asset Value Adjustments. In the event the Asset Value of any Company property is adjusted pursuant to subparagraph (c) of the definition of Asset Value so as to differ from its adjusted basis for Federal income tax purposes, subsequent allocations of income, gain, loss, and deduction (and any item thereof) with respect to such property shall, in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4), take account of any variation between the adjusted basis of such asset for Federal income tax purposes and the Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder ("Reverse Section 704(c) Allocations"). The method under which Reverse Section 704(c) Allocations will be made for each item of property whose Asset Value is adjusted shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Members.

(c)　　Tax Allocations Only. Allocations pursuant to this Section 4.4 are solely for tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, share of Profit, Loss, or other items, or distributions pursuant to any provision of this Agreement.

4.5.　　Depreciation Recapture. Pursuant to Treasury Regulations Sections 1.1245-1(e) and 1.1250-1(f), to the extent the Company recognizes gain as a result of a sale, exchange, or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members. In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement. Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange, or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

4.6.　　Other Allocation Rules.

(a)　　Binding Agreement. The Members are aware of the Federal income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their shares of Company income, gain, loss, deduction and credits for Federal income tax purposes.

(b)　　Excess Nonrecourse Liabilities. Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Percentage Interests.

4.7.　　Tax Savings Clause. The allocations of Company income, gain, loss, deduction, and credits for Federal income tax purposes described in this Agreement are intended to be recognized under Code Section 704(b) or Code Section 704(c). To the extent that any of such allocations are not recognized under Code Section 704(b) or Code Section 704(c), the Company shall make appropriate adjustments to such allocations (and, if necessary, adjustments to any Member's Capital Account) so as to cause all of such allocations to be recognized under Code Section 704(b) or Code Section 704(c), to the extent possible.

## ARTICLE 5. DISTRIBUTIONS

5.1.　　Net Cash Flow Distributions. Except as otherwise provided in Section 10.2, Net Cash Flow, if any, shall be distributed to the Members at such times as the Members shall determine in proportion to their percentage interests.

8

5.2.   Net Capital Proceeds. Except as provided in Section 10.2 hereof or as otherwise determined by the Members, Net Capital Proceeds shall be distributed not more than 90 days following the receipt of such proceeds by the Company to the Members in the following order and priority in proportion to their Percentage Interests.

5.3.   Tax Distributions. Except as prohibited by applicable law, the Members may, in their sole discretion, cause the Company to distribute to each Member, with respect to any fiscal year of the Company, either during such fiscal year or within 90 days thereafter, in cash an amount equal to (a) 40% multiplied by (b) the lesser of (i) the taxable income of the Company for such fiscal year allocated to such Member or (ii) the cumulative taxable income of the Company for such fiscal year and all preceding fiscal years of the Company allocated to such Member.

5.4.   Restrictions on Making Distributions. No distribution shall be made by the Company if, after giving effect to the distribution, the Company would be unable to pay its debts as they become due in the usual course of business.

## ARTICLE 7. MANAGEMENT

6.1.   Manager-Managed. The business and affairs of the Company shall be managed under the direction and control of the Managers. If no other standard is provided, any Company action requiring a vote of the Managers shall be possible only with the consent of the majority in interest.

6.2.   Authority to Bind the Company. Except as provided in this Agreement, the Certificate or the Act, only the Manager, any officers designated by the Manager in accordance with Section 6.9, and any other agents of the Company authorized by the Manager shall have the authority to bind the Company. Each Manager shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action of such Manager.

6.3.   Powers of the Managers. Subject to all of the terms, covenants, conditions and limitations contained in this Agreement and any other agreement entered into by the Company and subject to the limitations imposed by law, including the Act, the Managers shall have the power, on behalf of the Company, to do or to direct to be done all things necessary or convenient to carry out the business and affairs of the Company, including:

(a)   the institution, prosecution and defense of any proceeding in the Company's name;

(b)   the purchase, receipt, lease or other acquisition, ownership, holding, improvement or use of, and other dealing with, any property of the Company, wherever located;

(c)   the sale, conveyance, mortgage, pledge, lease, exchange and other disposition of any property of the Company;

(d)   the execution of contracts and guaranties, incurrence of liabilities, borrowing money (including refinancing, recasting, extending, compromising or otherwise dealing with any such loan), issuance of notes, bonds and other obligations, and the securing of any of the Company's obligations by mortgage or pledge of any of the Company's property or income;

(e)   the lending of money, investment and reinvestment of the Company's funds, and receipt and holding of property as security for repayment, including the loaning of money to Members, officers, employees, and agents;

(f)   the purchase of assets or securities of another Person;

(g)   the making of any capital investment or other capital expenditure or commitment;

(h)   the conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company within or without the State of Delaware;

(i)   the appointment of officers, employees and agents of the Company, the defining of their duties, and the establishment of their compensation;

(j)   the opening and maintaining of bank accounts for the Company's funds;

9

        (k)    the payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, officers, employees and agents of the Company;

        (l)    the making of donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

        (m)    the payment of compensation to any or all Members, officers and employees on account of services previously rendered to the Company, whether or not an agreement to pay such compensation was made before such services were rendered;

        (n)    the purchase of insurance on the life any of the Company's Members, officers or employees for the benefit of the Company;

        (o)    the participation in partnership agreements, joint ventures or other associations of any kind with any other Person; and

        (p)    any other act that furthers the business and affairs of the Company.

6.4.    <u>Compensation; Reimbursement</u>.  The Company may pay reasonable compensation to the Managers for services rendered to the Company in amounts determined from time to time by the affirmative vote of Members holding at least a majority of the Percentage Interests. Each Manager shall also be reimbursed for such Manager's reasonable out-of-pocket expenses incurred in connection with the management of the Company.

6.5.    <u>Designation of Officers</u>.  The officers of the Company, if any, shall be responsible for the day-to-day business affairs of the Company, subject to the overall direction and control of the Managers.  The officers shall include a President, a Secretary, and such other officers as the Managers may from time to time determine. Any two or more offices may be held by the same individual.

6.6.    <u>Initial Officers; Election and Removal of Officers</u>.  The current officers of the Company are the individuals set forth on "Exhibit C" hereto. Each such person shall be deemed duly elected to the office or offices set forth opposite his or her name as of the date of this Agreement. Subject to the rights, if any, of an officer under a contract of employment, officers may be removed, replacements elected and officer vacancies filled by the Managers. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect on the date of receipt of that notice by the Managers or at any later time specified in that notice and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

6.7.    <u>Duties of Officers</u>.

        (a)    <u>President</u>.  The President shall be responsible for the day-to-day operations of the Company, and shall report directly to the Managers. Without limiting the generality of the foregoing, the President shall be authorized to execute on behalf of the Company any and all contracts, subcontracts, purchase orders, leases, bonds, insurance policies, bills of sale and other instruments or other documents pertaining to the Company, subject to Section 6.11(e) and except as such authorization may be modified or restricted by the Managers or this Agreement.

        (b)    <u>Treasurer</u>.  The Treasurer shall act under the direction of the President. Subject to the direction of the President, he or she shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers or by the proper officers of the Company. The Treasurer shall disburse the funds of the Company as may be ordered by the proper officers of the Company or the Managers, taking proper vouchers for such disbursements, and shall render to the President, and the Managers when they so require, an account of all his or her transactions as Treasurer and of the financial condition of the Company.

        (c)    <u>Secretary</u>.  The Secretary shall be responsible for recording the minutes of meetings of the Members or Managers, maintaining the official records of the Company, and performing other duties as generally pertain to the office of Secretary.

(d)     Other Officers. The other officers of the Company shall have such powers and duties in the management of the Company as may be prescribed by the Managers and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Managers and the President.

(e)     Specific Authority. The President and the Treasurer shall each have authority to execute on behalf of the Company any and all contracts, subcontracts, purchase orders, leases, bonds, insurance policies, bills of sale and other instruments or other documents pertaining to the Company, and to sign checks, drafts and other orders affecting the Company, in an amount or obligating the Company up to $500.00 in each instance, without obtaining the consent of the Managers.

6.8.     Liability of the Managers.

(a)     Good Faith Acts or Omissions. Notwithstanding anything to the contrary set forth in this Agreement, no Manager shall be liable for monetary damages to the Company or to any other Manager for losses sustained or liabilities incurred as a result of errors in judgment or of any act or omission if the Manager acted in good faith.

(b)     Agents. Subject to their obligations and duties as Managers set forth in this Article 6, the Managers may exercise any of the powers granted to them by this Agreement and perform any of the duties imposed upon them hereunder either directly or by or through their agents. The Managers shall not be responsible for any misconduct or negligence on the part of any such agent appointed by them in good faith.

(c)     Amendments. Any amendment, modification or repeal of this Section 6.7 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the Managers' liability to the Company and the Managers under this Section 6.7 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

6.9.     Other Matters Concerning the Managers.

(a)     Reliance. The Managers may rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(b)     Advisers. The Managers may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion of such Persons as to matters which such a Manager reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith.

6.10.     Indemnification.

(a)     Indemnification Rights. The Company shall indemnify each Indemnitee from and against any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and other legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, that relate to the operations of the Company as set forth in this Agreement in which such Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, unless it is established that (i) the act or omission of the Indemnitee was material to the matter giving rise to the proceedings and constituted gross negligence, was committed in bad faith or was the result of active and deliberate misconduct or dishonesty; (ii) the Indemnitee actually received an improper personal benefit in money, property or services; or (iii) in the case of any criminal proceeding, the Indemnitee had reasonable cause to believe that the act or omission was unlawful. The termination of any proceeding by civil judgment, order or settlement does not create a presumption that the Indemnitee did not meet the requisite standard of conduct for indemnification set forth in this Section 6.10(a). The termination of any proceeding by conviction or upon a plea of *nolo contendere* or its equivalent by an Indemnitee, or an entry of an order of probation against an indemnitee prior to judgment, creates a rebuttable presumption that such Indemnitee acted in a manner contrary to that specified in this Section 6.10(a) with respect to the subject matter of such proceeding.

(b)     Advancement of Expenses. The right to indemnification conferred in this Section 6.10 shall be a contract right and shall include the right of each Indemnitee to be paid by the Company the expenses incurred in defending any such proceeding in advance of its final disposition; provided, however, that the payment of such expenses in advance of the final disposition

of a proceeding shall be made only upon delivery to the Company of (i) a written affirmation of the Indemnitee of his or her good faith belief that the standard of conduct necessary for indemnification by the Company pursuant to this Section 6.9 has been met, and (ii) a written undertaking by or on behalf of the Indemnitee to repay all amounts so advanced if it shall ultimately be determined that the standard of conduct has not been met.

(c)     Survival. The Indemnification provided pursuant to this Section 6.9 shall continue as to a Person who has ceased to have the status of an Indemnitee pursuant to clause (a) of the definition of "Indemnitee" herein and shall inure to the benefit of the heirs, successors, assigns, executors and administrators of any such Person, or to a Person whose status as an Indemnitee was originally established pursuant to clause (b) of such definition and was later terminated for any reason other than the affirmative decision of the Managers to terminate such status; provided, however, that, except as provided in Section 6.10(d) with respect to proceedings seeking to enforce rights to indemnification, the Company shall indemnify any such Person seeking indemnification in connection with a proceeding (or part thereof) initiated by such Person only if such proceeding (or part thereof) was authorized by the Managers.

(d)     Enforcement. If a claim under Section 6.9(a) is not paid in full by the Company within 30 calendar days after a written claim has been received by the Company, the Indemnitee making such claim may at any time thereafter (but prior to the payment of the claim) bring suit against the Company to recover the unpaid amount of the claim and, if successful, in whole or in part, such Indemnitee shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Company) that the Indemnitee has not met the standard of conduct set forth above that makes it permissible for the Company to indemnify the Indemnitee for the amount claimed, but the burden of proving such defense shall be on the Company. Neither the failure of the Company to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth herein, nor an actual determination by the Company that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct.

(e)     Not Exclusive. The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section 6.10 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute or agreement, or pursuant to any vote of the Managers, or otherwise.

(f)     Insurance; Other Agreements. The Company may purchase and maintain insurance, at its expense, on its own behalf and on behalf of any Indemnitee and of such other Persons as the Managers shall determine, against any liability (including expenses) that may be asserted against and incurred by such Person in connection with the Company's activities pursuant to this Agreement, whether or not the Company would have the power to indemnify such Person against such liability under the terms of this Agreement. In addition, the Company may enter into indemnification agreements with one or more of the Indemnitees pursuant to which the Company shall agree to indemnify such Indemnitee(s) to the fullest extent permitted by law, and advance to such Indemnitee(s) all related expenses, subject to reimbursement if it is subsequently determined that indemnification is not permitted.

(g)     Interested Transactions. An Indemnitee shall not be denied indemnification in whole or in part pursuant to this Section 6.10 because such Indemnitee has an interest in the transaction to which the indemnification relates if the transaction otherwise was permitted by the terms of this Agreement.

(h)     No Third Party Beneficiaries; Amendment. The provisions of this Section 6.10 are for the benefit of the Indemnitees, their heirs, successors, assigns, executors and administrators, and shall not be deemed to create any rights for the benefit of any other Person. Any amendment or repeal of this Section 6.10 or any provision hereof shall be prospective only and shall not in any way affect the Company's obligation to indemnify any Indemnitee under this Section 6.10 as in effect immediately prior to such amendment or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment or repeal, regardless of when such claims may arise or be asserted.

## ARTICLE 7. MEMBERS

7.1.     Meetings of and Voting by Members.

(a)     Procedure. A meeting of the Members may be called at any time by one or more Members holding at least 20% of the Percentage Interests entitled to vote at such meeting. Meetings of the Members shall be held at the Company's

principal place of business or at any other place within or without the State of Delaware designated by the Member(s) calling such meeting. The Member(s) calling the meeting, as applicable, shall give at least one Business Days' prior written notice of the meeting to the other Members, stating the time and place of the meeting. A Member may waive notice of a meeting by delivering a written waiver to the other Members. A Member's attendance at or participation in a meeting waives any required notice of such meeting, unless at the beginning of such meeting or promptly upon such Member's arrival, such Member objects to holding the meeting or transacting business at the meeting, and does not thereafter vote for or assent to action taken at the meeting. Unless otherwise required by law or by this Agreement, a notice need not specify the business to be transacted at, or the purpose of, any meeting of the Members; provided, however, if such notice does specify the business to be transacted at, or the purpose of, a meeting of the Members, such notice shall not limit the actions the Members may take at such meeting.

(b)     Exercise of Voting Rights.  A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

(c)     Quorum.  At any meeting of the Members, Members holding a majority of the Percentage Interests, present in person or represented by proxy, shall constitute a quorum for the transaction of business, except as otherwise provided by law, the Certificate or this Agreement.

(d)     Action by Members.  Except as otherwise provided in this Agreement or the Act, the affirmative vote of Members holding a majority of the Percentage Interests present in person or represented by proxy at a meeting of the Members at which a quorum is present shall be required to approve any matter coming before the Members.

(e)     Action by Written Consent.  In lieu of holding a meeting, the Members may vote or otherwise take action by a written consent executed by Members holding the minimum Percentage Interests required to approve the matters being voted or acted upon by the Members. Any action taken by the written consent of the Members shall have the same force and effect as if taken by the Members at a meeting.

(f)     Telephonic Meetings.  Members may participate in any meeting of the Members by means of a conference telephone or similar communication equipment by which all Members participating in the meeting can hear each other at the same time. Such participation shall constitute presence in person at the meeting.

7.2.     Personal Services.  No Member shall be required to perform services for the Company solely by virtue of being a Member. The Company may purchase or provide goods or services from or to a Member; provided that, unless otherwise agreed by the Members, the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises that are not Members. The foregoing authorization shall also apply to a sale or disposition of substantially all of the Company's assets to a Member prior to or following dissolution or upon the winding up or liquidation of the Company. Amounts paid to a Member for goods or services in transactions authorized pursuant to this Section 7.2 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by a Member from any such transaction shall belong to such Member and not to the Company. Unless approved by the Members, no Member shall otherwise receive any compensation for services rendered to the Company except for such fees, commissions and other compensation expressly provided for in this Agreement. However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

7.3.     Additional Members.

(a)     Admission.  With the consent of Members holding a majority of the Percentage Interests, the Company may at any time admit additional Members ("Additional Members").

(b)     Time of Admission.  An Additional Member shall be deemed admitted as a Member at the time such Person has executed and delivered to the Company a counterpart to this Agreement.

(c)     Required Contribution.  The Members shall determine what, if any, Capital Contribution each Additional Member need make and the Percentage Interest to be issued to such Member. Any admission of an Additional Member shall dilute, pro rata, the Percentage Interests allocated to Members. The Members may provide that the required contribution may be paid prior to, at the time of, or subsequent to, the issuance of an Interest to such Member and that any subsequent contribution may be made

13

from distributions paid or payable in respect of such interest. If any portion of a required contribution is payable after the issuance of the Interest to such Member, the Company may determine that any rights otherwise incident to such Interest (including voting, distribution, inspection and transfer rights) will not come into effect until such required contribution has been made.

## ARTICLE 8. ACCOUNTING, BOOKS AND RECORDS

8.1.    Accounting, Books and Records.

(a)    Maintenance.  The Company shall keep separate books of account, which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with this Agreement.  The books of account and other Company records shall be available for inspection and copying by any Member (or such Member's agent).

(b)    Methodology; Examination.  The Members shall select a method of accounting for preparation of the Company's financial reports and for tax purposes and shall keep the Company's books and records accordingly.  The books and records of the Company shall be available at the Company's principal office for examination by a Member or the Member's duly authorized representative at reasonable times during normal business hours.  The rights granted to a Member pursuant to this Section 8.1(b) are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established or amended from time to time.

8.2.    Reports; Other Tax Information.

(a)    Financial Statements.  The Company shall cause to be delivered to each Member the financial statements listed in clauses (i) and (ii) below, prepared, in each case (other than with respect to Members' Capital Accounts, which shall be prepared in accordance with this Agreement), in accordance with GAAP consistently applied (subject to normal year-end audit adjustments).

(i)    As soon as practicable following the end of each fiscal year of the Company (and in any event not later than 90 days after the end of such fiscal year):

(A)    a balance sheet of the Company as of the end of such fiscal year and the related statements of operations, Members' Capital Accounts and changes therein, and cash flows for such fiscal year, together with appropriate notes to such financial statements and supporting schedules, all of which shall be audited and certified by the Company's accountants; and

(B)    necessary tax information for such fiscal year.

(ii)    As soon as practicable following the end of each fiscal quarter of the Company (and in any event not later than 60 days after the end of each such fiscal quarter), an unaudited balance sheet of the Company as of the end of such fiscal quarter and the related statements of operations and cash flows for such fiscal quarter.

(b)    Other Reports.  The Company shall cause to be delivered to a Member such other reports as such Member may reasonably request from time to time.

8.3.    Taxation as a Partnership.  The Members intend that, pursuant to the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code, the Company shall be treated as a partnership for Federal income tax purposes.  None of the Company or the Members shall take any action that would cause the Company to be excluded from the application of any provision of Subchapter K, Chapter 1 of Subtitle A of the Code or any similar provision of any state tax laws.  The Company and the Members shall not elect classification of the Members for Federal tax purposes as other than a partnership under Treasury Regulations Section 301.7701-3.  The Members may determine whether to make or fail to make any corresponding election for state or local tax purposes.

8.4.    Tax Elections.  The Members shall, in their sole and absolute discretion, (a) determine whether to make any available election (including the election under Section 754 of the Code) or choose any available reporting method pursuant to the Code or state or local tax law, and (b) have the right to seek to revoke any such election (including the election under Section 754 of the Code) or change any reporting method upon the Members' determination, in their sole and absolute discretion, that such revocation is in the best interests of all of the Members.

8.5.   Tax Matters Partner.

(a)   Designation.  R&M Advisors, LLC (Rob Lindeman) shall be the "tax matters partner" of the Company for federal income tax purposes.  Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service ("IRS") of the beginning of an administrative proceeding with respect to the Company, the tax matters partner shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

(b)   Authority.  The tax matters partner is authorized, but not required:

(i)   to enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the tax matters partner may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (A) that (within the time prescribed pursuant to the Code and Regulations) files a statement with the IRS providing that the tax matters partner shall not have the authority to enter into a settlement agreement on behalf of such Member or (B) that is a "notice partner" (as defined in Section 6231 of the Code) or a Member of a "notice group" (as defined in Section 6223(b)(2) of the Code);

(ii)   in the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the tax matters partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located;

(iii)   to intervene in any action brought by any other Member for judicial review of a final adjustment;

(iv)   to file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request;

(v)   to enter into an agreement with the IRS to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item; and

(vi)   to take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

The taking of any action and the incurring of any expense by the tax matters partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the tax matters partner and the provisions relating to indemnification set forth in Section 6.10 of this Agreement shall be fully applicable to the tax matters partner in its capacity as such.

(c)   Compensation; Reimbursement.  The tax matters partner shall receive no compensation for its services.  The Company shall bear all third party costs and expenses incurred by the tax matters partner in performing its duties as such (including legal and accounting fees).  Nothing herein shall be construed to restrict the Company from engaging an accounting firm to assist the tax matters partner in discharging his duties hereunder.

8.6.   Withholding.  Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of Federal, state, local, or foreign taxes that the Members determine that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including any taxes required to be withheld or paid by the Company pursuant to Sections 1441, 1442, 1445 or 1446 of the Code.  Any amount paid on behalf of or with respect to a Member shall constitute a loan by the Company to such Member, which loan shall be repaid by such Member within 15 days after notice from the Members that such payment must be made unless (a) the Company withholds such payment from a distribution that would otherwise be made to the Member, or (b) the Members determine, in their sole and absolute

15

discretion, that such payment may be satisfied out of the available funds of the Company that would, but for such payment, be distributed to the Member. Any amounts withheld pursuant to the foregoing clauses (a) or (b) shall be treated as having been distributed to such Member, and each Member hereby grants to the Company a security interest in the Interest held by such Member to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 8.6. If a Member fails to pay any amounts owed to the Company pursuant to this Section 8.6 when due, the Members may, in their sole and absolute discretion, elect to make the payment to the Company on behalf of such defaulting Member, and in such event shall be deemed to have loaned such amount to such defaulting Member and, until repayment of such loan, shall succeed to all rights and remedies of the Company as against such defaulting Member (including the right to receive distributions). Any amounts payable by a Member hereunder shall bear interest at the base rate on corporate loans at large United States money center commercial banks, as published from time to time in the Wall Street Journal, plus four percentage points (but not higher than the maximum lawful rate) from the date such amount is due (i.e., 15 days after demand) until such amount is paid in full. Each Member shall take such actions as the Company or the Members shall request in order to perfect or enforce the security interest created hereunder.

## ARTICLE 9. TRANSFERS

9.1.     <u>Restrictions on Transfer</u>.

(a)     <u>General Restriction</u>.  No Member may Transfer, directly or indirectly, or by operation of law or otherwise, any Interest, except as hereinafter set forth in this Article 9 or upon the prior written consent of each Member and the Company, which consent may be granted or withheld in the sole and absolute discretion of each Member or the Company.

(b)     <u>Transfers to Affiliates</u>.  Notwithstanding Section 9.1(a), and notwithstanding anything to the contrary contained in Section 9.2, each Member may, during such Member's lifetime or upon the Member's death or dissolution, Transfer all or any part of the Interest held by such Member to any of the following:

(i)     a spouse, parent, descendant, brother or sister of such Member (or, if such Member is a trust, any of the aforementioned family members as the beneficiaries of such trust);

(ii)     a trust for the benefit of such Member or any of the permitted persons named in subsection (i) above;

(iii)     any other Member; or

(iv)     any Affiliate of a Member,

<u>provided</u>, <u>however</u>, that no Member may Transfer any Interest to any Person that competes, directly or indirectly, with the business of the Company;- <u>further provided</u> that, notwithstanding anything to the contrary contained in this Agreement, no Member may Transfer any Interest to any Person without the prior consent of the other Members if such Transfer, when considered alone or with other Transfers, would terminate the Company within the meaning of Code Section 708(b)(1)(B).

(c)     <u>Transferees</u>.  Any transferee of an Interest pursuant to Section 9.1(b) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest and shall be considered an Assignee under Section 9.6 unless all of the conditions set forth in Section 9.5 with respect to such transferee have been satisfied.

9.2.     <u>Right of First Refusal</u>.

(a)     <u>Voluntary Transfers of Interests</u>.  Except as herein provided, no Member (a "Selling Member") may voluntarily Transfer all or any portion of such Member's Interest except (x) with the prior written consent of each other Member and the Company, which consent may be granted or withheld in the sole and absolute discretion of each such other Member or the Company, or (y) in compliance with the following provisions:

(i)     <u>Notice</u>.  The Selling Member shall first deliver a written notice (a "<u>Voluntary Transfer Notice</u>") to the Company and the other Members stating (A) that the Selling Member desires to Transfer all or a specified portion of the Selling Member's Interest and (B) the price and other material terms of the proposed Transfer.  The Voluntary Transfer Notice shall be accompanied by a certificate of the Selling Member certifying that it has received from a third party a <u>bona fide</u> offer to acquire such Interest at such price and on such terms as are set forth in the Voluntary Transfer Notice and shall identify such third party.

      (ii)    <u>Member Right</u>. Within 15 days after receipt of a Voluntary Transfer Notice (the "<u>Member Period</u>"), each Member may elect, by delivering to the Selling Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest specified in the Voluntary Transfer Notice, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company). If a Member does not respond to the Voluntary Transfer Notice within the Member Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

      (iii)    <u>Company Right</u>. If one or more Members do not exercise their respective right to purchase their pro rata portion of the Interest specified in the Voluntary Transfer Notice within the Member Period, then, within five business days after the expiration of the Member Period (the "<u>Company Period</u>"), the Company may elect, by delivering to the Selling Member written notice of the Company's election, to purchase all of the Interest specified in the Voluntary Transfer Notice that the Members have not elected to purchase, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company). If the Company does not respond to the Voluntary Transfer Notice within the Company Period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

      (iv)    <u>Consummation</u>. If the Members and/or the Company elect to acquire all of the Interest specified in the Voluntary Transfer Notice pursuant to this Section 9.2(a), the applicable Members and/or the Company and the Selling Member shall consummate the sale and purchase of such Interest within 30 days after expiration of the Member Period, on the same terms and conditions specified in the Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company).

      (v)    <u>Selling Member Right</u>. If the Members and the Company do not exercise their respective rights under this Section 9.2(a) to purchase all of the Interest specified in the Voluntary Transfer Notice within the specified time periods, then, within five days after the expiration of the Company Period, the Selling Member shall deliver to the other Members a copy of the Voluntary Transfer Notice, and such other Members shall be entitled to participate in such Transfer of Interests as provided in Section 9.3. The Selling Member and the Tag-Along Members (as defined below) shall be permitted to sell their Interests to the offeror specified in the Voluntary Transfer Notice within the time and on the terms provided in Section 9.3.

    (b)    <u>Involuntary Transfer of Interests</u>.

      (i)    <u>Notice</u>. Within 15 days of any involuntary Transfer of an Interest or the appointment of a personal representative for a Member who has died, the Member or the Member's personal representative (the "<u>Transferring Member</u>") shall send written notice to the Company and the other Members of such involuntary Transfer (including the nature and details thereof) or the Member's death, as applicable (an "<u>Involuntary Transfer Notice</u>").

      (ii)    <u>Member Right</u>. Within 30 days after receipt of an Involuntary Transfer Notice (the "<u>Member Involuntary Transfer Period</u>"), each Member may elect, by delivering to the Transferring Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest to which the Involuntary Transfer Notice refers. If a Member does not respond to the Involuntary Transfer Notice within the Member Involuntary Transfer Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

      (iii)    <u>Company Right</u>. If one or more Members do not exercise their respective rights to purchase their pro rata portion of the Interest to which the Involuntary Transfer Notice refers within the Member Involuntary Transfer Period, then, within 30 days after the expiration of the Member Involuntary Transfer Period, the Company may elect, by delivering to the Transferring Member written notice of the Company's election, to purchase all of the Interest to which the Involuntary Transfer Notice refers that the Members have not elected to purchase. If the Company does not respond to the Involuntary Transfer Notice within such 30-day period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

      (v)    <u>Consummation</u>. If the Members and/or the Company elect to acquire all of the Interest to which the Involuntary Transfer Notice refers pursuant to this Section 9.2(b), the applicable Members and/or Company and the Transferring Member shall consummate the sale and purchase of such Interest within 60 days after expiration of the Member

Involuntary Transfer Period, at a price equal to (A) the Percentage Interest represented by the Interest specified in the Involuntary Transfer Notice, multiplied by (B) the difference between (x) the aggregate Asset Value of all assets of the Company and (y) the outstanding liabilities of the Company, payable in cash or on such other terms as the applicable Members and/or the Company (as the case may be) and the Transferring Member agree.

(v) <u>Transferring Member Right</u>. If the Members and the Company do not exercise their respective rights under this Section 9.2(b) to purchase all of the Interest specified in the Involuntary Transfer Notice within the specified time periods, then such Interest may be held by the transferee of such disposed interest (or in case of a trustee in bankruptcy or a deceased Member's personal representative, such Interest may be further disposed of by such trustee or personal representative), provided that (x) no transferee of such Interest shall become a substituted Member without first satisfying the conditions set forth in Section 9.5 and (y) such transferee shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.3.    <u>Tag-Along Rights</u>.

(a)    <u>Exercise of Tag-Along Rights</u>. If the Members and/or the Company do not purchase all the Interest subject to a third party offer pursuant to Section 9.2(a), then the other Members shall be entitled to participate in any Transfer of the Interest by the Selling Member pursuant to such third party offer (a "<u>Tag-Along Right</u>"). Each Member may elect to exercise its Tag-Along Right by delivering written notice to the Selling Member (a "<u>Tag-Along Notice</u>"), within 10 days following receipt of the notice described in Section 9.2(a)(v), that such Member desires to participate in the proposed Transfer upon the price, terms and conditions set forth in the Voluntary Transfer Notice and specifying the Interest such Member desires to include in such Transfer. If any Members elect to exercise Tag-Along Rights (each, a "<u>Tag-Along Member</u>"), each Tag-Along Member shall be entitled to sell an Interest equal to the lesser of (i) the amount specified by such Tag-Along Member in its Tag-Along Notice or (ii) such Tag-Along Member's pro rata portion of the Interests being Transferred based on the ratio which the Percentage Interest held by such Tag-Along Member bears to the aggregate Percentage Interests held by all Tag-Along Members and the Selling Member.

(b)    <u>No Tag-Along Members</u>. If none of the Members gives a timely Tag-Along Notice with respect to the Transfer proposed in the Voluntary Transfer Notice, then the Selling Member shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may have been given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; <u>provided</u>, <u>however</u>, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The purchaser of any Interest so sold (i) must satisfy the conditions set forth in Section 9.5 to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

(c)    <u>Tag-Along Members</u>. If one or more Members gives a timely Tag-Along Notice, then the Selling Member shall use all reasonable efforts to obtain the agreement of the offeror to the participation of the Tag-Along Members in the sale on the terms set forth in the Voluntary Transfer Notice. The Selling Member shall not Transfer any Interest to the offeror if such offeror declines to allow the participation of the Tag-Along Members on such basis. The Selling Member and the Tag-Along Members shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may be given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; <u>provided</u>, <u>however</u>, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The Interest to be sold by each Tag-Along Member shall be as determined pursuant to Section 9.3(a), and the Selling Member shall provide the remaining Interest to be sold. The purchaser of any Interest so sold (i) must comply with the provisions of Section 9.5 in order to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.4.    <u>Prohibited Transfers</u>.

(a)    <u>Non-Compliant Transfer</u>. Any purported Transfer of an Interest that is not in compliance with this Article 9 shall be null and void and of no force or effect; <u>provided</u> that if the Company is required to recognize any such Transfer, the Interest Transferred shall be strictly limited to the transferor's right to allocations and distributions as provided by this Agreement with respect to the Transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts or liabilities for damages that the transferor or transferee may have to the Company, and shall not include the right to any information or accounting of the affairs of the Company, the right to inspect the books or records of the Company, and/or any of the other rights of a Member under the Act or this Agreement.

      (b)    Indemnity. In the case of a Transfer or attempted Transfer of an Interest that is not in compliance with this Article 9, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability and damage that the Company and any such indemnified Members may incur (including incremental tax liabilities, attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

    9.5.    Admission of Substituted Members. Transferees of Interests pursuant to this Article 9 who are already Members shall be automatically admitted as substituted Members with respect to such acquired Interests. Subject to the other provisions of this Article 9, a transferee of an Interest, other than a transferee who is already a Member, may be admitted to the Company as a substituted Member only upon satisfaction of the following conditions:

      (a)    the Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

      (b)    the transferee of the Interest shall, by written instrument in form and substance reasonably satisfactory to the Members, (i) accept and adopt the terms and provisions of this Agreement, including this Article 9, and (ii) assume the obligations of the transferor Member under this Agreement with respect to the Transferred Interest. The transferor Member shall be released from all such assumed obligations, except those obligations or liabilities of the transferor Member arising out of a breach of this Agreement or based on events occurring, arising or maturing prior to the Transfer; and

      (c)    the transferee of the Interest pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Interest.

    9.6.    Rights of Unadmitted Assignees. A Person who acquires an Interest but who is not admitted as a substituted Member pursuant to Section 9.5 (an "Assignee") shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to become (or exercise any right of) a Member. The Interest of an Assignee shall be deemed to be voted on all matters in the same proportion as the remaining Interest was voted. An Assignee is entitled, to the extent of the Percentage Interest assigned, only to allocations of Profit, Loss and other tax items of the Company and to distributions from the Company.

    9.7.    Compliance with Securities Laws. If any Interest is to be transferred, either (a) such Interest shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) at the request of the Members, the transferor shall provide an opinion of counsel, satisfactory to the Members, that the proposed Transfer is exempt from such registration requirements. The Company and the Members have no obligation or intention whatsoever either to register Interests for resale under any Federal or state securities laws or to take any action which would make available to any Person any exemption from the registration requirements of such laws.

    9.8.    Hypothecation. Any hypothecation, mortgage, pledge or collateralization of an Interest is expressly prohibited, except (a) as contemplated by Section 8.6, (b) consented to by Members holding at least a majority of the Percentage Interests, or (c) as otherwise permitted under this Agreement. Any purported hypothecation, mortgage, pledge or collateralization in any manner by any Person in violation of this Section 9.8 shall be null and void and of no legal effect.

    9.9.    Distributions and Allocations with Respect to Transferred Interests. If any Interest is sold, assigned or transferred during any accounting period in compliance with the provisions of this Article 9, Profit, Loss and all other items of income, gain, loss and deduction attributable to the transferred Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Members in good faith. Solely for purposes of making such allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which it is given notice of such transfer and all distributions on or before such date shall be made to the transferor, and all distributions after such date shall be made to the transferee; provided, however, that if the Company does not receive a notice stating the date such Interest was transferred and such other information as the Company may reasonably require within 30 days after the end of the accounting period during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the accounting period during which the transfer occurs, was the owner of the Interest. Neither the Company nor the Members shall incur any liability for making allocations and distributions in

accordance with the provisions of this Section 9.9, whether or not the Members or the Company had knowledge of any Transfer of ownership of any Interest.

9.10.    <u>Voluntary Withdrawal</u>.  No Member shall have the right to Voluntarily Withdraw from the Company.

9.11.    <u>Involuntary Withdrawal</u>.  Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become a transferee of an Interest but shall not become a Member.  The successor transferee of an Interest shall have all the rights of a transferee of an Interest but shall not be entitled to receive the fair market value of the Interest as of the date of the Involuntary Withdrawal from the Company except as provided herein.  The successor of the withdrawn Member shall have the option to retain the Membership Interest in the Company.  Said option must be exercised by written notice delivered by the representative (as the case may be) to the Members of the Company and received within sixty (60) days of the Involuntary Withdrawal event.  In the event that the option is not exercised within sixty (60) days, the successor of the withdrawn shall be obligated to sell, and the remaining Members shall have the option to purchase, in the same priority as set forth in Section 9.2 above, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree.  The purchase price of a Membership Interest to be purchased in accordance with the provisions of this Section 9.11 shall be as follows:

(a)      The purchase price of the Membership Interest owned by the successor of the withdrawn Member shall be determined as of the last day of the month preceding the month during which the Involuntary Withdrawal occurs, and shall be the fair market value of the Membership Interest to be purchased hereunder.

(b)      The determination of the purchase price shall, unless agreed to between the successor of the withdrawn Member and the remaining Members, be made by an independent appraiser selected as follows:

(i)      Within thirty (30) days after demand by either the remaining Members or the successor of the withdrawn Member, both the remaining Members and the successor of the withdrawn Member shall each submit their estimation of the value of the Company in a sealed envelope to the accountants regularly employed by the Company.  The accountants regularly employed by the Company shall open the sealed envelopes and examine the estimated valuations submitted only after they have received both valuations.  If the highest estimated value submitted is equal to or less than one hundred ten percent (110%) of the lowest value submitted, the Fair Value shall be the average of the two estimated values.  If the highest estimated value submitted is greater than one hundred ten percent (110%) of the lowest value submitted, the Appraised Value shall be determined by the procedure set forth in Section 9.9(b)(ii).

(ii)      The remaining Members and the successor of the withdrawn Member shall jointly select a qualified appraiser or appraisers, and such jointly selected appraiser or appraisers shall value the Company.  If the parties cannot so agree on the selection of a qualified appraiser or appraisers, then, within thirty (30) days after demand by either of them, each party shall appoint a qualified appraiser.  If any party entitled to appoint an appraiser does not do so, then the appraiser appointed by the other party may act alone.  The two (2) appraisers so appointed shall, within thirty (30) days after the appointment of the second of them to be appointed, select a third appraiser.  The appraiser or appraisers shall estimate the value of the Company and submit their estimate or estimates to the accountants regularly employed by the Company.  The Appraised Value shall be the estimated value submitted by the Members to the accountants regularly employed by the Company which is closest to the estimate made by the appraiser or the appraisers or, if there are more than one estimate reached by the various appraisers, the average or all such estimates.  The cost of the appraisals shall be borne equally by the parties.

(c)      It is understood and agreed that the purchase price determined in accordance with this Section 9.11 is the full agreed value of such portion of the Membership Interest; that except as otherwise provided in this Operating Agreement such value shall in no manner be altered; and that all property, both tangible and intangible, if any, as well as liabilities, including mortgages, liens or other encumbrances of any kind whatsoever, if any, of or upon the property of the Company have been considered in determining such purchase price.

(d)      Unless otherwise agreed by all of the Members, the aggregate purchase price due to any successor of the withdrawn Member shall be paid in the following manner:

(i)      There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such successor of the withdrawn Member.  Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the successor of the withdrawn Member.

(ii)     There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Cessation. Such amount is to be determined by the Members of the Company.

(iii)     Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in ten (10) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining nine (9) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)     The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Transferring Member, bearing interest at the *Wall Street Journal* prime rate of then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Membership Interest.

(v)     The closing shall take place upon the date determined by the Remaining Members, but shall occur within six (6) months of the date of the Involuntary Withdrawal.

9.12.    **Buy-Sell.** Each Member or Members (collectively, the "Offeror") shall have the right at any time to serve upon any one or more of the other Members (collectively, the "Offeree") a notice in writing which shall contain an offer to sell the entire Interest in the Company of the Offeror or to purchase the entire Interest in the Company of the Offeree, as set forth below. Any Transfer of an Interest under this provision is not subject to any of the Transfer restrictions set forth in Article 9.

(a)     No offer shall be subject to the provisions of this Section 9.12 unless such offer is both an offer to sell the entire Interest of the Offeror and an offer to purchase the entire Interest of the Offeree, and such offer must specify the selling or purchase price and that the price of the Interest to be so transferred shall be paid in cash. The selling price and the purchase price specified in such offer must be computed on the basis of the same Interest value. Such offer shall be irrevocable for a period of sixty (60) days (the "Offer Period"), and the Offeree may, on or before the end of the Offer Period, accept either the offer to sell or the offer to purchase (but not both), and upon acceptance, the Offeror shall be required to sell or to purchase, as the case may be.

(b)     If the Offeree fails within said sixty (60) day period to accept either of said offers, then the offers shall automatically expire and be of no further force and effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of said sixty (60) day period, to purchase the Interest of the Offeree, at the applicable price as specified in Section 9.12(a), and if the Offeror exercises such right, the Offeree shall be required to sell. If the Offeror fails to exercise its right to purchase or sell within the time specified, either party may thereafter make a new offer pursuant to this Section 9.12.

(c)     The closing of such purchase and sale shall be held at the time and place and on the date specified by the Offeror by written notice to the Offeree, which date shall be on or before the one hundred twentieth (120th) day after the date of the offer to purchase or sell. Payment of the purchase price shall be made in cash or cashier's check. Each Member shall bear his or her own legal and other closing expenses. The selling Member(s) shall convey his/her/its Interest(s) in the Company and in the assets thereof by appropriate assignment and any other appropriate instrument, subject only to such title defects and encumbrances as existed on the date the offer hereunder was made. Each Member who is now or hereafter becomes a Member, by so becoming a Member, hereby covenants and agrees to execute any and all instruments and to cooperate in giving effect to the provisions of this Section 9.12.

## ARTICLE 10. DISSOLUTION AND WINDING UP

10.1.    **Dissolution.**

(a)     **Dissolution Events.** The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each, a "Dissolution Event"):

(i)     a unanimous determination by all of the Members to dissolve, wind up and liquidate the Company;

(ii)      the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act;

(iii)     the sale of all or substantially all of the assets of the Company; or

(iv)     there being no Members.

10.2.    <u>Continuation</u>. If the event specified in <u>Section 10.1(a)(iv)</u> occurs, the Company shall not dissolve and shall not be required to be wound up if, within 90 days of the date of the event that terminated the continued membership of the last remaining Member, the personal representative of the last remaining Member agrees in writing to continue the Company and to admit the personal representative of such Member or its nominees or designee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

10.3.    <u>Covenant</u>.  The Members hereby agree that the Company shall not dissolve prior to the occurrence of a Dissolution Event.

10.4.    <u>Winding Up</u>.

(a)      <u>Liquidation and Distribution</u>.  Except as otherwise provided in <u>Section 10.1</u>, upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members.  The Members and any officers and agents of the Company shall not take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and assets, and the assets (or the proceeds of any liquidation thereof) shall be applied and distributed in the following order:

(i)      <u>first</u>, to creditors, including any Member that is a creditor, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Members;

(ii)     <u>second</u>, to Members in satisfaction of liabilities of the Company for distributions; and

(iii)    <u>the balance</u>, if any, to the Members in proportion to their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.  If a Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

Notwithstanding the provisions of <u>Section 4.1</u> hereof, in the year of the sale or other disposition of the Company's property, and in the year of liquidation of the Company, items of gross income and deduction shall be allocated to the Members to the extent necessary to produce Capital Accounts for the Members such that the amounts distributed pursuant to <u>Section 10.2(a)(iii)</u> will be in the amounts, sequence and priority set forth in <u>Section 4.1</u>.  The Members shall not receive any additional compensation for any services performed pursuant to this <u>Article 10</u>.

(b)     <u>Reserves</u>.  In the discretion of the Members, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this <u>Article 10</u> may be:

(i)      distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company and paying any contingent or unforeseen liabilities or obligations of the Company.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Members, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

(ii)     withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, <u>provided</u> that any such withheld amounts, to the extent not used to pay such Company liabilities, shall be distributed to the Members as soon as practicable.

(c)     Certificate of Cancellation.  Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with this Article 10, the Members shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Members deem such filing necessary or advisable.

10.5.     Certain Terminations.  Notwithstanding any other provisions of this Article 10, in the event the Company is terminated within the meaning of Section 708(b)(1)(B) of the Code, but no Dissolution Event has occurred, the Company's property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.

10.6.     Liquidation of Member's Interest.  Except as otherwise specifically provided in this Agreement, any distribution made to a Member as a result of the liquidation of such Member's interest in the Company (within the meaning of Treasury Regulations Section 1.761-1(d)), which liquidation is not a result of dissolution of the Company, shall be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the fiscal year during which such liquidation occurs through the date of such liquidation (other than those adjustments due to distributions pursuant to this Section 10.4), by the end of such year (or, if later, within 90 days after the date of such liquidation).  All distributions upon liquidation of a Member's interest in the Company shall be made in accordance with the timing requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7.     Rights of Members.  Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of such Member's Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company.  No Member shall have priority over any other Member as to the return of its Capital Contributions, distributions or allocations.

10.8.     Records of Liquidation.  Each of the Members shall be furnished with a statement prepared by the Company's accountants which shall set forth the assets and liabilities of the Company as of the date of the occurrence of the Dissolution Event and the plans for compliance with Section 10.2.

10.9.     Form of Liquidating Distributions.  For purposes of making the distributions required by Section 10.2, the Members may determine whether to distribute all or a portion of the Company's assets in-kind or to sell all or any portion of the assets and distribute the proceeds therefrom; provided, however, that, in the absence of a determination by the Members with respect to the form of liquidating distributions, the Company's assets shall be sold and the proceeds thereof distributed to the Members; provided, further, however, that if any distributions are made in-kind, the Capital Account of each Member shall be adjusted immediately prior to such distribution for any variation between the adjusted basis of the distributed property for tax purposes and the current fair market value of such property, to the extent not already reflected in the Capital Accounts.

### ARTICLE 11.  MISCELLANEOUS

11.1.     Notices.  All notices or other communications permitted or required to be given under this Agreement shall be in writing, signed by the party giving such notice or other communication, and shall be delivered personally, telecopied, or sent by certified mail or overnight courier service, to the address of each Member as set forth on "Exhibit A" or as otherwise reflected on the books and records of the Company.  The date of personal delivery or telecopy or three business days after the date of mailing (or the next business day after delivery by overnight courier service), as the case may be, shall be the date of receipt of such notice or other communication.  Any Member may change its notice address by giving notice, in writing, stating its new address to the Company.

11.2.     Amendments.  A proposed amendment shall be adopted and be effective as an amendment hereto only by the consent of a majority in interest vote.

11.3.     Binding Effect.  Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns.

11.4.     Construction.  The terms and provisions of this Agreement shall be construed fairly in accordance with their plain meaning, regardless of which party hereto was responsible for the drafting of such terms and provisions.

11.5.     Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.6.    Severability.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section 11.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause a Member to lose the material benefit of such Member's economic bargain.

11.7.    Entire Agreement.  This Agreement constitutes the entire agreement, and supersedes all prior agreements or understandings, whether written or oral, between the parties hereto with respect to the subject matter hereof.

11.8.    Governing Law; Costs and Attorney Fees.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles.  To the extent that any party to this Agreement prevails against any other party hereto in connection with the prevailing party's enforcement of its rights under this Agreement, the prevailing party shall be entitled to its costs and expenses (including attorney fees) in connection with such dispute.

11.9.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

11.10.    Further Assurances.  The parties hereto shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purpose of this Agreement.

11.11.    No Third Party Beneficiaries.  This Agreement is made solely and specifically among and for the benefit of the Members and the Company, and no other Person will have any right, interest or claim hereunder or be entitled to any benefit under or on account of this Agreement as a third party beneficiary or otherwise.  In furtherance of and not in limitation of the foregoing, nothing contained in this Agreement is intended to be for the benefit of any creditor or other Person (other than the Members) to whom or which any debts, liabilities or obligations are owed by (or who or which otherwise has any claim against) the Company or any Member, and no such creditor or other Person shall obtain any right hereunder against the Company or any Member by reason of any debt liability or obligation (or otherwise).

**IN WITNESS WHEREOF,** the Parties have executed and entered into this Agreement as of the day first above written.

MEMBERS:

R&M Advisors, LLC
By:

Robert Lindeman, its authorized signatory

Blue Fire Capital, LLC
By:

Michael Sloane, its authorized signatory

25

"EXHIBIT A"

## MEMBERS' NAMES, ADDRESSES AND PERCENTAGE INTERESTS

| MEMBER NAME AND MAILING ADDRESS | | PERCENTAGE INTEREST |
|---|---|---|
| R&M Advisors, LLC 8462 Grennan Woods Drive Powell, Ohio 43065 | | 50% |
| Blue Fire Capital, LLC 811 Main Street Paris, Kentucky 40361 | | 50% |

**"EXHIBIT B"**

**CAPITAL CONTRIBUTIONS**

| MEMBER NAME | CONTRIBUTED CASH OR PROPERTY | VALUE OF CAPITAL CONTRIBUTION |
|---|---|---|
| R&M Advisors, LLC | | |
| Blue Fire Capital, LLC | | |

"EXHIBIT C"

CURRENT OFFICERS

| Name | Office |
|------|--------|
| Robert Lindeman | President |
| Michael Sloane | Vice-President and Secretary |

"EXHIBIT D"

CERTIFICATE OF FORMATION



PAGE 1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "PIES & PINTS DEVELOPMENT PARTNERS, LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF AUGUST, A.D. 2011, AT 11:45 O'CLOCK A.M.

5029865   8100

110953221

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8993036

DATE: 08-25-11

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:45 AM 08/25/2011
FILED 11:45 AM 08/25/2011
SRV 110953221 - 5029865 FILE

**STATE OF DELAWARE
LIMITED LIABILITY COMPANY
CERTIFICATE OF FORMATION**

FIRST: The name of the limited liability company is PIES & PINTS DEVELOPMENT PARTNERS, LLC.

SECOND: The name and address of its registered agent in the State of Delaware is:

Capitol Services, Inc.
1675 South State Street, Suite B
Dover, Delaware 19901

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Formation of PIES & PINTS DEVELOPMENT PARTNERS, LLC this 20th day of August, 2011.

J. W. CHENAULT SANDERS
Authorized Person

Case: 12-CV-002962-Clerk of Courts of the Common Pleas- 2020 May 11 6:57 PM-20CV003581

# EXHIBIT 2

## PIES & PINTS DEVELOPMENT PARTNERS, LLC
a Delaware limited liability company

September 1, 2011

### ACTION BY UNANIMOUS WRITTEN CONSENT OF THE MEMBERS

The undersigned, being all of the members (the "Members") of Pies & Pints Development Partners, LLC, a Delaware limited liability company (the "Company"), hereby authorize, approve, and adopt the following resolutions by unanimous written action:

Appointment of Manager

RESOLVED, that the members confirm that Robert A. Lindeman is, and has been since the effective date of the Company's limited liability company operating agreement (the "Operating Agreement"), appointed as the sole manager of the Company ("Manager"), to serve until his successor is duly appointed and qualified pursuant to the Operating Agreement of the Company;

FURTHER RESOLVED, that any actions heretofore taken by the foregoing Manager that are consistent with the foregoing resolutions are hereby ratified and approved.

IN WITNESS WHEREOF, the undersigned member has executed this written consent as of the day and year first above written, waiving all notice requirements, whether provided by statute or otherwise.

MEMBERS:

R&M Advisors, LLC

By: _____
Robert Lindeman, its authorized signatory

Blue Fire Capital, LLC

By: _____
Michael Sloane, its authorized signatory

Case: 21-3062-0962-Clerk of Courts of the Common Pleas- 2020 May 11 6:57 PM-20CV003153

# EXHIBIT 3

LIMITED LIABILITY COMPANY

OPERATING AGREEMENT

OF

PIES & PINTS MANAGEMENT COMPANY, LLC

LIMITED LIABILITY COMPANY
OPERATING AGREEMENT
OF
PIES & PINTS MANAGEMENT COMPANY, LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (hereinafter referred to as the "Agreement"), dated as of July 31_____, 2012 (hereinafter referred to as the "Effective Date"), is entered into by and between Pies & Pints Development Partners, LLC, a Delaware Limited Liability Company, (hereinafter referred to as "PPDP"), and KSDB, LLC, a West Virginia Limited Liability Corporation, (hereinafter referred to as "KSDB"), as the sole members (hereinafter referred to as the "Members").

R E C I T A L S :

WHEREAS, the Members have agreed to form PIES & PINTS MANAGEMENT COMPANY, LLC (hereinafter referred to as the "Company") in order to manage operations of a gourmet pizza and craft beer business and to be operated in accordance with the terms hereof, and subject to the conditions set forth in, this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

ARTICLE 1. DEFINED TERMS

Capitalized terms used in this Agreement shall, unless otherwise noted or unless the context otherwise requires, have the following meanings:

"Act" means the Delaware Revised Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended from time to time.

"Additional Members" has the meaning assigned to such term in Section 6.11.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account in any amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, with respect to a specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified. For purposes of this Agreement, the term "control" (including its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Agreement" means this Limited Liability Company Agreement of PIES & PINTS MANAGEMENT COMPANY, LLC as amended, supplemented, or otherwise modified from time to time.

"Asset Value" means, with respect to any asset of the Company, the adjusted basis of such asset for Federal income tax purposes, except that:

(a) the initial Asset Value of any asset contributed by a Member to the Company shall be the Gross Fair Market Value of such asset;

(b) upon the distribution in kind of any Company asset, the Asset Value of such asset shall be adjusted immediately prior to such distribution to equal its Gross Fair Market Value;

(c)     to the extent that Members holding at least a majority of the Percentage Interests agree, the Asset Values of all Company assets shall be adjusted to equal their respective Gross Fair Market Values as of the following times: (i) upon the acquisition of an interest in the Company by a new Member or an additional interest by an existing Member in exchange for more than a *de minimis* capital contribution; and (ii) upon the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company;

(d)     if the Asset Value of an asset has been determined or adjusted in accordance with clauses (a), (b) or (c) above, such Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profit and Loss; and

(e)     to the extent not otherwise provided in this Agreement, the Asset Value of any Company asset shall be adjusted so that the Capital Account of each Member is determined and maintained in accordance with the capital accounting rules in Treasury Regulations Section 1.704-1(b)(2)(iv).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the State of Delaware are authorized or required by law to close.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 3.6.

"Capital Contribution" means, with respect to any Member, the amount of money and the Gross Fair Market Value of any property (other than money) contributed to the Company by such Member, reduced by the amount of any liabilities of such Member assumed by the Company in connection with the contribution or secured by any contributed property.

"Certificate" has the meaning assigned to such term in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means PIES & PINTS MANAGEMENT COMPANY, LLC, the limited liability company formed under the Act and pursuant to this Agreement.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Gross Fair Market Value" means, with respect to any asset of the Company, the fair market value of such asset determined in the case of any asset contributed by a Member to the Company, by the contributing Member, unreduced by any liabilities.

"Indemnitee" means the officers of the Company, if any, and (b) any other Person (including Affiliates or the Company) as the Members may designate from time to time, in their sole and absolute discretion.

"Interest" means the ownership interest of a Member in the Company, consisting of such Member's (a) Percentage Interest, (b) share of the Profits and Losses and other items of income, gain, deduction and loss of the Company and the Member's right to receive distributions of the Company's assets, (c) right to vote and to grant or withhold consents with respect to Company matters as provided in this Agreement or in the Act, and (d) other rights and privileges as provided in this Agreement.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(a)     such Member makes an assignment for the benefit of creditors;

(b)     such Member files a voluntary petition of bankruptcy;

(c)     such Member is adjudged bankrupt or insolvent or has entered against such Member an order for relief in any bankruptcy or insolvency proceeding;

(d)     such Member files a petition or answer seeking for such Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

2

(e)        such Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding described in clauses (a) through (d) above;

(f)        such Member seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties; or

(g)        120 days after commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation if the proceeding has not been dismissed, or if within 90 days after the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties, the appointment is not vacated or stayed, or if within 90 days after the expiration of any such stay, the appointment is not vacated.

"Member" means any Person who (a) is or becomes a Member pursuant to the terms of this Agreement and (b) has not ceased to be a Member.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Net Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any mortgage or other financing or refinancing, or from any sale, exchange, condemnation or other disposition (other than in the ordinary course of business) of the Company's property or interest therein, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness associated therewith, all as determined by the Members.

"Net Cash Flow" means all cash received from Company operations, other than amounts received as Capital Contributions or Net Capital Proceeds, reduced by all cash paid, or amounts used to establish reasonable reserves, for all Company expenses, debt payments, capital improvements, replacements or other contingencies, all as determined by the Members.

"Percentage Interest" means, with respect to a Member, the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time in accordance with this Agreement.  A Percentage Interest may be evidenced by a certificate issued by the Company, and expressed on a certificate as "Units".

"Permitted Transfer" means a Transfer of an Interest in compliance with Section 9.1, 9.2 or 9.3.

"Person" means any individual, corporation, partnership, limited partnership, firm, joint venture, association, business entity, joint stock company, trust, estate, limited liability company, unincorporated association, government or regulatory body (or any agency or political subdivision thereof) or other entity.

"Profit" and "Loss" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)        any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such income or loss;

3

(b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from such taxable income or loss;

(c) in the event the Asset Value of any Company asset is adjusted in accordance with subsection (b) or (c) of the definition of Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss of the fiscal year in which such adjustment occurs;

(d) gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Asset Value;

(e) depreciation, amortization and other cost recovery deductions shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g); and

(f) any items which are specially allocated pursuant to the provisions of Section 4.2 shall not be taken into account in computing Profit or Loss. Nevertheless, such items shall be taken into account in adjusting Capital Accounts pursuant to Section 3.6.

"Transfer" means any actual or proposed disposition of all or a portion of an interest (legal or equitable) by any means, direct or indirect, absolute or conditional, voluntary or involuntary, including by sale, assignment, put, transfer, pledge, hypothecation, mortgage or other encumbrance, court order, operation of law, distribution, settlement, exchange, waiver, abandonment, gift, alienation, bequest or disposal.

"Treasury Regulations" means the income tax regulations, including any temporary regulations, promulgated under the Code from time to time.

"Unreturned Capital Contribution" means, with respect to any Interest, the total Capital Contributions made with respect to that Interest, less all amounts actually distributed with respect to that Interest pursuant to Sections 5.1(a) and 5.2(a) & (b) of this Agreement.

"Voluntarily Withdraw" or "Voluntary Withdrawal" means a Member's dissociation from the Company other than in connection with a Permitted Transfer or Involuntary Withdrawal.

Other Defined Terms; Interpretation. Capitalized terms used in this Agreement and not defined in Section 1.1 shall have the meanings assigned to them elsewhere in this Agreement. The definitions shall apply equally to both the singular and the plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE 2. ORGANIZATIONAL MATTERS

2.1. <u>Formation</u>. The Members have organized the Company as a limited liability company under the Act and hereby (a) confirm the Members' status as all of the existing members of the Company, and (b) execute and enter into this Agreement as the Limited Liability Company Agreement of the Company. The Members have caused a Certificate of Formation (the "Certificate") in the form of "Exhibit D" attached to be signed and filed with the Secretary of State of the State of Delaware in accordance with the provisions of the Act. The Company's existence began on the date on which the Certificate was filed with and accept by the State of Delaware and shall continue unless otherwise terminated in accordance with the provisions of this Agreement or the Act.

2.2. <u>Name</u>. The name of the Company is "PIES & PINTS MANAGEMENT COMPANY, LLC." The Company may do business under that name and any other name as determined by the Members, subject to any restrictions imposed by law. The Members may change the name of the Company at any time and from time to time and shall give prompt notice of any such change to each Officer, if any, and all Members, if not already notified.

2.3. <u>Principal Place of Business</u>. The principal place of business of the Company shall be 8462 Grennan Woods Drive, Powell, Ohio 43065, or such other place as the Members may from time to time designate.

4

2.4. <u>Registered Office; Registered Agent</u>. The registered agent of the Company is Capitol Services Inc. and the registered office of the Company within the State of Delaware is 1675 South State Street, Suite B, Dover, Delaware 19901. The Members may change the registered office and/or the registered agent of the Company in accordance with the Act and shall give prompt notice of any such change to to each Officer, if any, and all Members, if not already notified.

2.5. <u>Purposes</u>. The business and purpose of the Company is to manage the operations of a gourmet pizza and craft beer restaurant concept. The Company may engage in any and all activities necessary, incidental, related or desirable to the foregoing or as may be agreed to by the Members holding a majority of the Interests. The Company shall not engage in any other business or activity without the prior written consent of the Members holding a majority of the Interests.

2.6. <u>Powers</u>. Subject to all of the terms, covenants, conditions and limitations contained in this Agreement and any other agreement entered into by the Company, the Company shall have the power and authority to do any and all acts and things necessary, appropriate, proper, advisable, desirable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Company, including all power and authority, directly or through its ownership interest in other entities, to enter into and perform contracts of any kind, and borrow money and issue evidences of indebtedness, whether or not secured by a mortgage, deed of trust, pledge or other lien.

2.7. <u>Qualification in Other Jurisdictions</u>. The Members shall take any and all actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware. Before conducting business in any jurisdiction other than the State of Delaware, the Company shall file all forms and take all other actions required under applicable laws, including the tax laws, of that jurisdiction in order to conduct such business.

2.8. <u>Members</u>. The name, mailing address and Percentage Interest of each Member is set forth on "Exhibit A," attached hereto. The Members shall update "Exhibit A" from time to time as necessary to reflect changes to the information therein. An amendment or revision to "Exhibit A" made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to "Exhibit A" shall be deemed a reference to "Exhibit A" as it may be amended and in effect from time to time.

2.9. <u>Title to Property</u>. The Company shall at all times, hold title to all of its property in the name of the Company and not in the name of any Member, and no Member shall have any ownership interest in such property in such Member's individual name. Each Member's Interest shall be personal property for all purposes.

2.10. <u>Payments of Individual Obligations</u>. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for, or in payment of, any individual obligation of any Member.

ARTICLE 3. CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. <u>Initial Capital Contributions</u>. On or prior to the date hereof, each Member shall contribute to the capital of the Company the cash and/or property set forth opposite such Member's name on "Exhibit B" hereto, the terms of which exhibit are incorporated herein by reference. The Capital Contributions (if any) required to be made by Additional Members shall be determined pursuant to Section 6.11.

3.2. <u>Additional Contributions</u>. Except as otherwise provided herein and by applicable law, the Members shall be liable only to make their Capital Contributions pursuant to Section 3.1, and no Member shall be required to lend any funds to the Company or, after a Member's Capital Contribution has been fully paid pursuant to Section 3.1, to make any additional capital contributions to the Company.

3.3. <u>Return of Capital Contributions</u>. No Member shall have the right to receive the return of any Capital Contribution except as otherwise provided in this Agreement or the Act.

3.4. <u>No Interest on Capital Contributions</u>. Except as otherwise provided in this Agreement, the Members shall not be paid interest on their Capital Contributions.

3.5. <u>Limitation of Liability</u>. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no

Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

3.6.   Capital Accounts.

(a)   Establishment and Maintenance of Capital Accounts.   A separate Capital Account shall be established and maintained for each Member in accordance with applicable Treasury Regulations as promulgated and in effect on the effective date of this Agreement as well as in accordance with all subsequent amendments to such Treasury Regulations which by their terms are binding on the Company, and to the extent the Company is permitted to elect the manner in which any item affects the Capital Accounts as they are specified in this Section 3.6(a), such election shall, except as otherwise provided in this Agreement, be made by the Members.

(b)   No Restoration.   No Member shall have any obligation at any time to restore a deficit balance in such Member's Capital Account.

3.7.   Loans.   A Member may, at any time, make a loan or cause a loan to be made to the Company in such amount and on such terms as the Members may agree. No such loan shall increase a Member's Capital Account or Percentage Interest. Any such loan shall be payable and collectable only out of Company assets, and no other Member shall be personally obligated to repay any part thereof. No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor. Notwithstanding anything herein to the contrary, profit allocations and other distributions to Members shall be subordinate to the repayment of Member loans to the Company.

## ARTICLE 4. ALLOCATIONS

4.1.   Allocations of Profit and Loss.

(a)   Profit.   Profit of the Company for each taxable year shall be allocated:

(i)   first, in the same proportions as the aggregate Loss (if any) for all previous years was allocated among the Members pursuant to Section 4.1(b)(ii), until the aggregate Profit allocated to each Member pursuant to this Section 4.1(a)(i) for such year and all previous years is equal to the aggregate Loss allocated to such Member pursuant to Section 4.1(b)(ii) for all previous years; and

(ii)   thereafter, the balance, if any, to the Members in proportion to their Percentage Interests.

(b)   Loss.   Loss of the Company for each taxable year shall be allocated:

(i)   first, in the same proportions as the aggregate Profit (if any) for all previous years was allocated among the Members pursuant to Section 4.1(a)(ii), until the aggregate Loss allocated to each Member pursuant to this Section 4.1(b)(i) for such year and all previous years is equal to the aggregate Profit allocated to such Member pursuant to Section 4.1(a)(ii) for all previous years; and

(ii)   thereafter, the balance, if any, to the Members in proportion to their Percentage Interests.

4.2.   Special Allocation Rules.   Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

(a)   Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article 4, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

6

(b)     Member Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 4, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 4.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset.  If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain) shall be allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 4.2(c) were not in the Agreement.  This Section 4.2(c) is intended to comply with the qualified income offset requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied consistently therewith.

(d)     Nonrecourse Deductions.  Nonrecourse deductions (as defined in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

(e)     Member Nonrecourse Deductions.  Member Nonrecourse Deductions for each taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(f)     Curative Allocations.

(i)     General Curative Allocations.  The allocations set forth in Sections 4.2(a), (b), (c), (d) and (e) and Section 4.3 (the "Regulatory Allocations") are intended to comply with Treasury Regulations Section 1.704-1(b).  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.2(f)(i).  Therefore, the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Members determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.1.

(ii)     Audit Adjustment Curative Allocations.  In the event there is a final administrative or judicial determination for Federal income tax purposes for any taxable year that changes the Capital Account balances of the Members from the Capital Account balances for such taxable year as previously computed by the Company (an "Adjustment"), then, notwithstanding anything contained in Section 4.1, Profit, Loss, and other items of income, gain, loss, and deduction for that taxable year and, if necessary, subsequent taxable years, shall be allocated among the Members so that, to the extent possible, the Capital Account balances of the Members (taking into account such Adjustment) for that taxable year, and all subsequent taxable years, are the same as they would have been had such Adjustment not occurred.  The reallocation described in the preceding sentence shall not be made to the extent that the Adjustment constitutes the correction of an arithmetic or computational error.

4.3.     Loss Limitation.  Losses allocated pursuant to Section 4.1 shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year (or any other period).  In the event some but not all Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1, the limitation set forth in this Section 4.3 shall be applied on a Member by Member basis and Losses not allocable to a particular Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

4.4.  <u>Allocations with Respect to Contributed Property; Asset Value Adjustments.</u>

    (a)  <u>Contributed Property.</u>  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction (and any item thereof) with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation at the time of contribution between the adjusted basis of such property to the Company for Federal income tax purposes and the Asset Value of the contributed property ("Section 704(c) Allocations"). The method under which Section 704(c) Allocations will be made for each item of contributed property shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Members.

    (b)  <u>Asset Value Adjustments.</u>  In the event the Asset Value of any Company property is adjusted pursuant to subparagraph (c) of the definition of Asset Value so as to differ from its adjusted basis for Federal income tax purposes, subsequent allocations of income, gain, loss, and deduction (and any item thereof) with respect to such property shall, in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4), take account of any variation between the adjusted basis of such asset for Federal income tax purposes and the Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder ("Reverse Section 704(c) Allocations"). The method under which Reverse Section 704(c) Allocations will be made for each item of property whose Asset Value is adjusted shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Members.

    (c)  <u>Tax Allocations Only.</u>  Allocations pursuant to this Section 4.4 are solely for tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, share of Profit, Loss, or other items, or distributions pursuant to any provision of this Agreement.

4.5.  <u>Depreciation Recapture.</u>  Pursuant to Treasury Regulations Sections 1.1245-1(e) and 1.1250-1(f), to the extent the Company recognizes gain as a result of a sale, exchange, or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members. In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement. Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange, or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

4.6.  <u>Other Allocation Rules.</u>

    (a)  <u>Binding Agreement.</u>  The Members are aware of the Federal income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their shares of Company income, gain, loss, deduction and credits for Federal income tax purposes.

    (b)  <u>Excess Nonrecourse Liabilities.</u>  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Percentage Interests.

4.7.  <u>Tax Savings Clause.</u>  The allocations of Company income, gain, loss, deduction, and credits for Federal income tax purposes described in this Agreement are intended to be recognized under Code Section 704(b) or Code Section 704(c). To the extent that any of such allocations are not recognized under Code Section 704(b) or Code Section 704(c), the Company shall make appropriate adjustments to such allocations (and, if necessary, adjustments to any Member's Capital Account) so as to cause all of such allocations to be recognized under Code Section 704(b) or Code Section 704(c), to the extent possible.

## ARTICLE 5. DISTRIBUTIONS

5.1.  <u>Net Cash Flow Distributions.</u>  Except as otherwise provided in Section 10.2, Net Cash Flow, if any, shall be distributed to the Members at such times as the Members shall determine in proportion to their percentage interests.

5.2.  <u>Net Capital Proceeds.</u>  Except as provided in Section 10.2 hereof or as otherwise determined by the Members, Net Capital Proceeds shall be distributed not more than 90 days following the receipt of such proceeds by the Company to the Members in the following order and priority in proportion to their Percentage Interests.

5.3.  Tax Distributions.  Except as prohibited by applicable law, the Members may, in their sole discretion, cause the Company to distribute to each Member, with respect to any fiscal year of the Company, either during such fiscal year or within 90 days thereafter, in cash an amount equal to (a) 40% multiplied by (b) the lesser of (i) the taxable income of the Company for such fiscal year allocated to such Member or (ii) the cumulative taxable income of the Company for such fiscal year and all preceding fiscal years of the Company allocated to such Member.

5.4.  Restrictions on Making Distributions.  No distribution shall be made by the Company if, after giving effect to the distribution, the Company would be unable to pay its debts as they become due in the usual course of business.

## ARTICLE 6. MANAGEMENT

6.1.  Manager-Managed.  The business and affairs of the Company shall be managed under the direction and control of the Managers.  If no other standard is provided, any Company action requiring a vote of the Managers shall be possible only with the consent of the majority in interest.

6.2.  Authority to Bind the Company.  Except as provided in this Agreement, the Certificate or the Act, only the Manager, any officers designated by the Manager in accordance with Section 6.9, and any other agents of the Company authorized by the Manager shall have the authority to bind the Company.  Each Manager shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action of such Manager.

6.3.  Powers of the Managers.  Subject to all of the terms, covenants, conditions and limitations contained in this Agreement and any other agreement entered into by the Company and subject to the limitations imposed by law, including the Act, the Managers shall have the power, on behalf of the Company, to do or to direct to be done all things necessary or convenient to carry out the business and affairs of the Company, including:

(a)  the institution, prosecution and defense of any proceeding in the Company's name;

(b)  the purchase, receipt, lease or other acquisition, ownership, holding, improvement or use of, and other dealing with, any property of the Company, wherever located;

(c)  the sale, conveyance, mortgage, pledge, lease, exchange and other disposition of any property of the Company;

(d)  the execution of contracts and guaranties, incurrence of liabilities, borrowing money (including refinancing, recasting, extending, compromising or otherwise dealing with any such loan), issuance of notes, bonds and other obligations, and the securing of any of the Company's obligations by mortgage or pledge of any of the Company's property or income;

(e)  the lending of money, investment and reinvestment of the Company's funds, and receipt and holding of property as security for repayment, including the loaning of money to Members, officers, employees, and agents;

(f)  the purchase of assets or securities of another Person;

(g)  the making of any capital investment or other capital expenditure or commitment;

(h)  the conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company within or without the State of Delaware;

(i)  the appointment of officers, employees and agents of the Company, the defining of their duties, and the establishment of their compensation;

(j)  the opening and maintaining of bank accounts for the Company's funds;

(k)  the payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, officers, employees and agents of the Company;

(l)      the making of donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

(m)      the payment of compensation to any or all Members, officers and employees on account of services previously rendered to the Company, whether or not an agreement to pay such compensation was made before such services were rendered;

(n)      the purchase of insurance on the life any of the Company's Members, officers or employees for the benefit of the Company;

(o)      the participation in partnership agreements, joint ventures or other associations of any kind with any other Person; and

(p)      any other act that furthers the business and affairs of the Company.

6.4.    <u>Compensation; Reimbursement</u>. The Company may pay reasonable compensation to the Managers for services rendered to the Company in amounts determined from time to time by the affirmative vote of Members holding at least a majority of the Percentage Interests. Each Manager shall also be reimbursed for such Manager's reasonable out-of-pocket expenses incurred in connection with the management of the Company.

6.5.    <u>Designation of Officers</u>. The officers of the Company, if any, shall be responsible for the day-to-day business affairs of the Company, subject to the overall direction and control of the Managers. The officers shall include a President, a Secretary, and such other officers as the Managers may from time to time determine. Any two or more offices may be held by the same individual.

6.6.    <u>Initial Officers; Election and Removal of Officers</u>. The current officers of the Company are the individuals set forth on "Exhibit C" hereto. Each such person shall be deemed duly elected to the office or offices set forth opposite his or her name as of the date of this Agreement. Subject to the rights, if any, of an officer under a contract of employment, officers may be removed, replacements elected and officer vacancies filled by the Managers. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect on the date of receipt of that notice by the Managers or at any later time specified in that notice and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

6.7.    <u>Duties of Officers</u>.

(a)    <u>President</u>. The President shall be responsible for the day-to-day operations of the Company, and shall report directly to the Managers. Without limiting the generality of the foregoing, the President shall be authorized to execute on behalf of the Company any and all contracts, subcontracts, purchase orders, leases, bonds, insurance policies, bills of sale and other instruments or other documents pertaining to the Company, subject to Section 6.11(e) and except as such authorization may be modified or restricted by the Managers or this Agreement.

(b)    <u>Treasurer</u>. The Treasurer shall act under the direction of the President. Subject to the direction of the President, he or she shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers or by the proper officers of the Company. The Treasurer shall disburse the funds of the Company as may be ordered by the proper officers of the Company or the Managers, taking proper vouchers for such disbursements, and shall render to the President, and the Managers when they so require, an account of all his or her transactions as Treasurer and of the financial condition of the Company.

(c)    <u>Secretary</u>. The Secretary shall be responsible for recording the minutes of meetings of the Members or Managers, maintaining the official records of the Company, and performing other duties as generally pertain to the office of Secretary.

(d)    <u>Other Officers</u>. The other officers of the Company shall have such powers and duties in the management of the Company as may be prescribed by the Managers and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Managers and the President.

(e)    <u>Specific Authority</u>.  The President and the Treasurer shall each have authority to execute on behalf of the Company any and all contracts, subcontracts, purchase orders, leases, bonds, insurance policies, bills of sale and other instruments or other documents pertaining to the Company, and to sign checks, drafts and other orders affecting the Company, in an amount or obligating the Company up to $500.00 in each instance, without obtaining the consent of the Managers.

6.8.    <u>Liability of the Managers</u>.

(a)    <u>Good Faith Acts or Omissions</u>.  Notwithstanding anything to the contrary set forth in this Agreement, no Manager shall be liable for monetary damages to the Company or to any other Manager for losses sustained or liabilities incurred as a result of errors in judgment or of any act or omission if the Manager acted in good faith.

(b)    <u>Agents</u>.  Subject to their obligations and duties as Managers set forth in this Article 6, the Managers may exercise any of the powers granted to them by this Agreement and perform any of the duties imposed upon them hereunder either directly or by or through their agents.  The Managers shall not be responsible for any misconduct or negligence on the part of any such agent appointed by them in good faith.

(c)    <u>Amendments</u>.  Any amendment, modification or repeal of this Section 6.7 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the Managers' liability to the Company and the Managers under this Section 6.7 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

6.9.    <u>Other Matters Concerning the Managers</u>.

(a)    <u>Reliance</u>.  The Managers may rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(b)    <u>Advisers</u>.  The Managers  may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion of such Persons as to matters which such a Manager reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith.

6.10.    <u>Indemnification</u>.

(a)    <u>Indemnification Rights</u>.  The Company shall indemnify each Indemnitee from and against any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and other legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, that relate to the operations of the Company as set forth in this Agreement in which such Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, unless it is established that (i) the act or omission of the Indemnitee was material to the matter giving rise to the proceedings and constituted gross negligence, was committed in bad faith or was the result of active and deliberate misconduct or dishonesty; (ii) the Indemnitee actually received an improper personal benefit in money, property or services; or (iii) in the case of any criminal proceeding, the Indemnitee had reasonable cause to believe that the act or omission was unlawful.  The termination of any proceeding by civil judgment, order or settlement does not create a presumption that the Indemnitee did not meet the requisite standard of conduct for indemnification set forth in this Section 6.10(a).  The termination of any proceeding by conviction or upon a plea of *nolo contendere* or its equivalent by an Indemnitee, or an entry of an order of probation against an Indemnitee prior to judgment, creates a rebuttable presumption that such Indemnitee acted in a manner contrary to that specified in this Section 6.10(a) with respect to the subject matter of such proceeding.

(b)    <u>Advancement of Expenses</u>.  The right to indemnification conferred in this Section 6.10 shall be a contract right and shall include the right of each Indemnitee to be paid by the Company the expenses incurred in defending any such proceeding in advance of its final disposition; provided, however, that the payment of such expenses in advance of the final disposition of a proceeding shall be made only upon delivery to the Company of (i) a written affirmation of the Indemnitee of his or her good faith belief that the standard of conduct necessary for indemnification by the Company pursuant to this Section 6.9 has been met, and (ii) a written undertaking by or on behalf of the Indemnitee to repay all amounts so advanced if it shall ultimately be determined that the standard of conduct has not been met.

     (c)    Survival. The indemnification provided pursuant to this Section 6.9 shall continue as to a Person who has ceased to have the status of an Indemnitee pursuant to clause (a) of the definition of "Indemnitee" herein and shall inure to the benefit of the heirs, successors, assigns, executors and administrators of any such Person, or to a Person whose status as an Indemnitee was originally established pursuant to clause (b) of such definition and was later terminated for any reason other than the affirmative decision of the Managers to terminate such status; provided, however, that, except as provided in Section 6.10(d) with respect to proceedings seeking to enforce rights to indemnification, the Company shall indemnify any such Person seeking indemnification in connection with a proceeding (or part thereof) initiated by such Person only if such proceeding (or part thereof) was authorized by the Managers.

     (d)    Enforcement. If a claim under Section 6.9(a) is not paid in full by the Company within 30 calendar days after a written claim has been received by the Company, the Indemnitee making such claim may at any time thereafter (but prior to the payment of the claim) bring suit against the Company to recover the unpaid amount of the claim and, if successful, in whole or in part, such Indemnitee shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Company) that the Indemnitee has not met the standard of conduct set forth above that makes it permissible for the Company to indemnify the Indemnitee for the amount claimed, but the burden of proving such defense shall be on the Company. Neither the failure of the Company to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth herein, nor an actual determination by the Company that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct.

     (e)    Not Exclusive. The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section 6.10 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute or agreement, or pursuant to any vote of the Managers, or otherwise.

     (f)    Insurance; Other Agreements. The Company may purchase and maintain insurance, at its expense, on its own behalf and on behalf of any Indemnitee and of such other Persons as the Managers shall determine, against any liability (including expenses) that may be asserted against and incurred by such Person in connection with the Company's activities pursuant to this Agreement, whether or not the Company would have the power to indemnify such Person against such liability under the terms of this Agreement. In addition, the Company may enter into indemnification agreements with one or more of the Indemnitees pursuant to which the Company shall agree to indemnify such Indemnitee(s) to the fullest extent permitted by law, and advance to such Indemnitee(s) all related expenses, subject to reimbursement if it is subsequently determined that indemnification is not permitted.

     (g)    Interested Transactions. An Indemnitee shall not be denied indemnification in whole or in part pursuant to this Section 6.10 because such Indemnitee has an interest in the transaction to which the indemnification relates if the transaction otherwise was permitted by the terms of this Agreement.

     (h)    No Third Party Beneficiaries; Amendment. The provisions of this Section 6.10 are for the benefit of the Indemnitees, their heirs, successors, assigns, executors and administrators, and shall not be deemed to create any rights for the benefit of any other Person. Any amendment or repeal of this Section 6.10 or any provision hereof shall be prospective only and shall not in any way affect the Company's obligation to indemnify any Indemnitee under this Section 6.10 as in effect immediately prior to such amendment or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment or repeal, regardless of when such claims may arise or be asserted.

## ARTICLE 7. MEMBERS

7.1.    Meetings of and Voting by Members.

     (a)    Procedure. A meeting of the Members may be called at any time by one or more Members holding at least 20% of the Percentage Interests entitled to vote at such meeting. Meetings of the Members shall be held at the Company's principal place of business or at any other place within or without the State of Delaware designated by the Member(s) calling such meeting. The Member(s) calling the meeting, as applicable, shall give at least one Business Days' prior written notice of the meeting to the other Members, stating the time and place of the meeting. A Member may waive notice of a meeting by delivering a written waiver to the other Members. A Member's attendance at or participation in a meeting waives any required notice of such meeting,

unless at the beginning of such meeting or promptly upon such Member's arrival, such Member objects to holding the meeting or transacting business at the meeting, and does not thereafter vote for or assent to action taken at the meeting. Unless otherwise required by law or by this Agreement, a notice need not specify the business to be transacted at, or the purpose of, any meeting of the Members; provided, however, if such notice does specify the business to be transacted at, or the purpose of, a meeting of the Members, such notice shall not limit the actions the Members may take at such meeting.

(b)     Exercise of Voting Rights.  A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

(c)     Quorum.  At any meeting of the Members, Members holding a majority of the Percentage Interests, present in person or represented by proxy, shall constitute a quorum for the transaction of business, except as otherwise provided by law, the Certificate or this Agreement.

(d)     Action by Members.  Except as otherwise provided in this Agreement or the Act, the affirmative vote of Members holding a majority of the Percentage Interests present in person or represented by proxy at a meeting of the Members at which a quorum is present shall be required to approve any matter coming before the Members.

(e)     Action by Written Consent.  In lieu of holding a meeting, the Members may vote or otherwise take action by a written consent executed by Members holding the minimum Percentage Interests required to approve the matters being voted or acted upon by the Members.  Any action taken by the written consent of the Members shall have the same force and effect as if taken by the Members at a meeting.

(f)     Telephonic Meetings.  Members may participate in any meeting of the Members by means of a conference telephone or similar communication equipment by which all Members participating in the meeting can hear each other at the same time.  Such participation shall constitute presence in person at the meeting.

7.2.     Personal Services.  No Member shall be required to perform services for the Company solely by virtue of being a Member.  The Company may purchase or provide goods or services from or to a Member; provided that, unless otherwise agreed by the Members, the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises that are not Members.  The foregoing authorization shall also apply to a sale or disposition of substantially all of the Company's assets to a Member prior to or following dissolution or upon the winding up or liquidation of the Company.  Amounts paid to a Member for goods or services in transactions authorized pursuant to this Section 7.2 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by a Member from any such transaction shall belong to such Member and not to the Company.  Unless approved by the Members, no Member shall otherwise receive any compensation for services rendered to the Company except for such fees, commissions and other compensation expressly provided for in this Agreement.  However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

7.3.     Additional Members.

(a)     Admission.  With the consent of Members holding a majority of the Percentage Interests, the Company may at any time admit additional Members ("Additional Members").

(b)     Time of Admission.  An Additional Member shall be deemed admitted as a Member at the time such Person has executed and delivered to the Company a counterpart to this Agreement.

(c)     Required Contribution.  The Members shall determine what, if any, Capital Contribution each Additional Member need make and the Percentage Interest to be issued to such Member.  Any admission of an Additional Member shall dilute, pro rata, the Percentage Interests allocated to Members.  The Members may provide that the required contribution may be paid prior to, at the time of, or subsequent to, the issuance of an Interest to such Member and that any subsequent contribution may be made from distributions paid or payable in respect of such Interest.  If any portion of a required contribution is payable after the issuance of the Interest to such Member, the Company may determine that any rights otherwise incident to such Interest (including voting, distribution, inspection and transfer rights) will not come into effect until such required contribution has been made.

13

# ARTICLE 8. ACCOUNTING, BOOKS AND RECORDS

8.1.    Accounting, Books and Records.

(a)    Maintenance.  The Company shall keep separate books of account, which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with this Agreement.  The books of account and other Company records shall be available for inspection and copying by any Member (or such Member's agent).

(b)    Methodology; Examination.  The Members shall select a method of accounting for preparation of the Company's financial reports and for tax purposes and shall keep the Company's books and records accordingly.  The books and records of the Company shall be available at the Company's principal office for examination by a Member or the Member's duly authorized representative at reasonable times during normal business hours.  The rights granted to a Member pursuant to this Section 8.1(b) are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established or amended from time to time.

8.2.    Reports; Other Tax Information.

(a)    Financial Statements.  The Company shall cause to be delivered to each Member the financial statements listed in clauses (i) and (ii) below, prepared, in each case (other than with respect to Members' Capital Accounts, which shall be prepared in accordance with this Agreement), in accordance with GAAP consistently applied (subject to normal year-end audit adjustments).

(i)    As soon as practicable following the end of each fiscal year of the Company (and in any event not later than 90 days after the end of such fiscal year):

(A)    a balance sheet of the Company as of the end of such fiscal year and the related statements of operations, Members' Capital Accounts and changes therein, and cash flows for such fiscal year, together with appropriate notes to such financial statements and supporting schedules, all of which shall be audited and certified by the Company's accountants; and

(B)    necessary tax information for such fiscal year.

(ii)    As soon as practicable following the end of each fiscal quarter of the Company (and in any event not later than 60 days after the end of each such fiscal quarter), an unaudited balance sheet of the Company as of the end of such fiscal quarter and the related statements of operations and cash flows for such fiscal quarter.

(b)    Other Reports.  The Company shall cause to be delivered to a Member such other reports as such Member may reasonably request from time to time.

8.3.    Taxation as a Partnership.  The Members intend that, pursuant to the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code, the Company shall be treated as a partnership for Federal income tax purposes.  None of the Company or the Members shall take any action that would cause the Company to be excluded from the application of any provision of Subchapter K, Chapter 1 of Subtitle A of the Code or any similar provision of any state tax laws.  The Company and the Members shall not elect classification of the Members for Federal tax purposes as other than a partnership under Treasury Regulations Section 301.7701-3.  The Members may determine whether to make or fail to make any corresponding election for state or local tax purposes.

8.4.    Tax Elections.  The Members shall, in their sole and absolute discretion, (a) determine whether to make any available election (including the election under Section 754 of the Code) or choose any available reporting method pursuant to the Code or state or local tax law, and (b) have the right to seek to revoke any such election (including the election under Section 754 of the Code) or change any reporting method upon the Members' determination, in their sole and absolute discretion, that such revocation is in the best interests of all of the Members.

8.5.    Tax Matters Partner.

    (a)    <u>Designation</u>. Pies & Pints Development Partners, LLC (R&M Advisors, LLC [Rob Lindeman]) shall be the "tax matters partner" of the Company for federal income tax purposes. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service ("<u>IRS</u>") of the beginning of an administrative proceeding with respect to the Company, the tax matters partner shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

    (b)    <u>Authority</u>. The tax matters partner is authorized, but not required:

    (i)    to enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the tax matters partner may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (A) that (within the time prescribed pursuant to the Code and Regulations) files a statement with the IRS providing that the tax matters partner shall not have the authority to enter into a settlement agreement on behalf of such Member or (B) that is a "notice partner" (as defined in Section 6231 of the Code) or a Member of a "notice group" (as defined in Section 6223(b)(2) of the Code);

    (ii)    in the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the tax matters partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located;

    (iii)    to intervene in any action brought by any other Member for judicial review of a final adjustment;

    (iv)    to file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request;

    (v)    to enter into an agreement with the IRS to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item; and

    (vi)    to take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

    The taking of any action and the incurring of any expense by the tax matters partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the tax matters partner and the provisions relating to indemnification set forth in Section 6.10 of this Agreement shall be fully applicable to the tax matters partner in its capacity as such.

    (c)    <u>Compensation; Reimbursement</u>. The tax matters partner shall receive no compensation for its services. The Company shall bear all third party costs and expenses incurred by the tax matters partner in performing its duties as such (including legal and accounting fees). Nothing herein shall be construed to restrict the Company from engaging an accounting firm to assist the tax matters partner in discharging his duties hereunder.

    8.6.    <u>Withholding</u>. Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of Federal, state, local, or foreign taxes that the Members determine that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including any taxes required to be withheld or paid by the Company pursuant to Sections 1441, 1442, 1445 or 1446 of the Code. Any amount paid on behalf of or with respect to a Member shall constitute a loan by the Company to such Member, which loan shall be repaid by such Member within 15 days after notice from the Members that such payment must be made unless (a) the Company withholds such payment from a distribution that would otherwise be made to the Member, or (b) the Members determine, in their sole and absolute discretion, that such payment may be satisfied out of the available funds of the Company that would, but for such payment, be distributed to the Member. Any amounts withheld pursuant to the foregoing clauses (a) or (b) shall be treated as having been

distributed to such Member, and each Member hereby grants to the Company a security interest in the Interest held by such Member to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 8.6. If a Member fails to pay any amounts owed to the Company pursuant to this Section 8.6 when due, the Members may, in their sole and absolute discretion, elect to make the payment to the Company on behalf of such defaulting Member, and in such event shall be deemed to have loaned such amount to such defaulting Member and, until repayment of such loan, shall succeed to all rights and remedies of the Company as against such defaulting Member (including the right to receive distributions). Any amounts payable by a Member hereunder shall bear interest at the base rate on corporate loans at large United States money center commercial banks, as published from time to time in the Wall Street Journal, plus four percentage points (but not higher than the maximum lawful rate) from the date such amount is due (i.e., 15 days after demand) until such amount is paid in full. Each Member shall take such actions as the Company or the Members shall request in order to perfect or enforce the security interest created hereunder.

## ARTICLE 9. TRANSFERS

9.1.    <u>Restrictions on Transfer</u>.

(a)    <u>General Restriction</u>.   No Member may Transfer, directly or indirectly, or by operation of law or otherwise, any Interest, except as hereinafter set forth in this Article 9 or upon the prior written consent of each Member and the Company, which consent may be granted or withheld in the sole and absolute discretion of each Member or the Company.

(b)    <u>Transfers to Affiliates</u>.   Notwithstanding Section 9.1(a), and notwithstanding anything to the contrary contained in Section 9.2, each Member may, during such Member's lifetime or upon the Member's death or dissolution, Transfer all or any part of the Interest held by such Member to any of the following:

(i)    a spouse, parent, descendant, brother or sister of such Member (or, if such Member is a trust, any of the aforementioned family members as the beneficiaries of such trust);

(ii)    a trust for the benefit of such Member or any of the permitted persons named in subsection (i) above;

(iii)    any other Member; or

(iv)    any Affiliate of a Member,

<u>provided</u>, <u>however</u>, that no Member may Transfer any Interest to any Person that competes, directly or indirectly, with the business of the Company;- <u>further provided</u> that, notwithstanding anything to the contrary contained in this Agreement, no Member may Transfer any Interest to any Person without the prior consent of the other Members if such Transfer, when considered alone or with other Transfers, would terminate the Company within the meaning of Code Section 708(b)(1)(B).

(c)    <u>Transferees</u>.   Any transferee of an Interest pursuant to Section 9.1(b) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest and shall be considered an Assignee under Section 9.6 unless all of the conditions set forth in Section 9.5 with respect to such transferee have been satisfied.

9.2.    <u>Right of First Refusal</u>.

(a)    <u>Voluntary Transfers of Interests</u>.   Except as herein provided, no Member (a "Selling Member") may voluntarily Transfer all or any portion of such Member's Interest except (x) with the prior written consent of each other Member and the Company, which consent may be granted or withheld in the sole and absolute discretion of each such other Member or the Company, or (y) in compliance with the following provisions:

(i)    <u>Notice</u>.   The Selling Member shall first deliver a written notice (a "<u>Voluntary Transfer Notice</u>") to the Company and the other Members stating (A) that the Selling Member desires to Transfer all or a specified portion of the Selling Member's Interest and (B) the price and other material terms of the proposed Transfer. The Voluntary Transfer Notice shall be accompanied by a certificate of the Selling Member certifying that it has received from a third party a <u>bona fide</u> offer to acquire such Interest at such price and on such terms as are set forth in the Voluntary Transfer Notice and shall identify such third party.

(ii)     **Member Right**.  Within 15 days after receipt of a Voluntary Transfer Notice (the "Member Period"), each Member may elect, by delivering to the Selling Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest specified in the Voluntary Transfer Notice, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company).  If a Member does not respond to the Voluntary Transfer Notice within the Member Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

(iii)     **Company Right**.  If one or more Members do not exercise their respective right to purchase their pro rata portion of the Interest specified in the Voluntary Transfer Notice within the Member Period, then, within five business days after the expiration of the Member Period (the "Company Period"), the Company may elect, by delivering to the Selling Member written notice of the Company's election, to purchase all of the Interest specified in the Voluntary Transfer Notice that the Members have not elected to purchase, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company).  If the Company does not respond to the Voluntary Transfer Notice within the Company Period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

(iv)     **Consummation**.  If the Members and/or the Company elect to acquire all of the Interest specified in the Voluntary Transfer Notice pursuant to this Section 9.2(a), the applicable Members and/or the Company and the Selling Member shall consummate the sale and purchase of such Interest within 30 days after expiration of the Member Period, on the same terms and conditions specified in the Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company).

(v)     **Selling Member Right**.  If the Members and the Company do not exercise their respective rights under this Section 9.2(a) to purchase all of the Interest specified in the Voluntary Transfer Notice within the specified time periods, then, within five days after the expiration of the Company Period, the Selling Member shall deliver to the other Members a copy of the Voluntary Transfer Notice, and such other Members shall be entitled to participate in such Transfer of Interests as provided in Section 9.3.  The Selling Member and the Tag-Along Members (as defined below) shall be permitted to sell their Interests to the offeror specified in the Voluntary Transfer Notice within the time and on the terms provided in Section 9.3.

(b)     **Involuntary Transfer of Interests**.

(i)     **Notice**.  Within 15 days of any involuntary Transfer of an Interest or the appointment of a personal representative for a Member who has died, the Member or the Member's personal representative (the "Transferring Member") shall send written notice to the Company and the other Members of such involuntary Transfer (including the nature and details thereof) or the Member's death, as applicable (an "Involuntary Transfer Notice").

(ii)     **Member Right**.  Within 30 days after receipt of an Involuntary Transfer Notice (the "Member Involuntary Transfer Period"), each Member may elect, by delivering to the Transferring Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest to which the Involuntary Transfer Notice refers.  If a Member does not respond to the Involuntary Transfer Notice within the Member Involuntary Transfer Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

(iii)     **Company Right**.  If one or more Members do not exercise their respective rights to purchase their pro rata portion of the Interest to which the Involuntary Transfer Notice refers within the Member Involuntary Transfer Period, then, within 30 days after the expiration of the Member Involuntary Transfer Period, the Company may elect, by delivering to the Transferring Member written notice of the Company's election, to purchase all of the Interest to which the Involuntary Transfer Notice refers that the Members have not elected to purchase.  If the Company does not respond to the Involuntary Transfer Notice within such 30-day period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

(v)     **Consummation**.  If the Members and/or the Company elect to acquire all of the Interest to which the Involuntary Transfer Notice refers pursuant to this Section 9.2(b), the applicable Members and/or Company and the Transferring Member shall consummate the sale and purchase of such Interest within 60 days after expiration of the Member Involuntary Transfer Period, at a price equal to (A) the Percentage Interest represented by the Interest specified in the Involuntary

Transfer Notice, multiplied by (B) the difference between (x) the aggregate Asset Value of all assets of the Company and (y) the outstanding liabilities of the Company, payable in cash or on such other terms as the applicable Members and/or the Company (as the case may be) and the Transferring Member agree.

(v) <u>Transferring Member Right</u>. If the Members and the Company do not exercise their respective rights under this Section 9.2(b) to purchase all of the Interest specified in the Involuntary Transfer Notice within the specified time periods, then such Interest may be held by the transferee of such disposed interest (or in case of a trustee in bankruptcy or a deceased Member's personal representative, such Interest may be further disposed of by such trustee or personal representative), provided that (x) no transferee of such Interest shall become a substituted Member without first satisfying the conditions set forth in Section 9.5 and (y) such transferee shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.3. <u>Tag-Along Rights</u>.

(a) <u>Exercise of Tag-Along Rights</u>. If the Members and/or the Company do not purchase all the Interest subject to a third party offer pursuant to Section 9.2(a), then the other Members shall be entitled to participate in any Transfer of the Interest by the Selling Member pursuant to such third party offer (a "<u>Tag-Along Right</u>"). Each Member may elect to exercise its Tag-Along Right by delivering written notice to the Selling Member (a "<u>Tag-Along Notice</u>"), within 10 days following receipt of the notice described in Section 9.2(a)(v), that such Member desires to participate in the proposed Transfer upon the price, terms and conditions set forth in the Voluntary Transfer Notice and specifying the Interest such Member desires to include in such Transfer. If any Members elect to exercise Tag-Along Rights (each, a "<u>Tag-Along Member</u>"), each Tag-Along Member shall be entitled to sell an Interest equal to the lesser of (i) the amount specified by such Tag-Along Member in its Tag-Along Notice or (ii) such Tag-Along Member's pro rata portion of the Interests being Transferred based on the ratio which the Percentage Interest held by such Tag-Along Member bears to the aggregate Percentage Interests held by all Tag-Along Members and the Selling Member.

(b) <u>No Tag-Along Members</u>. If none of the Members gives a timely Tag-Along Notice with respect to the Transfer proposed in the Voluntary Transfer Notice, then the Selling Member shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may have been given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; provided, however, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The purchaser of any Interest so sold (i) must satisfy the conditions set forth in Section 9.5 to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

(c) <u>Tag-Along Members</u>. If one or more Members gives a timely Tag-Along Notice, then the Selling Member shall use all reasonable efforts to obtain the agreement of the offeror to the participation of the Tag-Along Members in the sale on the terms set forth in the Voluntary Transfer Notice. The Selling Member shall not Transfer any Interest to the offeror if such offeror declines to allow the participation of the Tag-Along Members on such basis. The Selling Member and the Tag-Along Members shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may be given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; provided, however, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The Interest to be sold by each Tag-Along Member shall be as determined pursuant to Section 9.3(a), and the Selling Member shall provide the remaining Interest to be sold. The purchaser of any Interest so sold (i) must comply with the provisions of Section 9.5 in order to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.4. <u>Prohibited Transfers</u>.

(a) <u>Non-Compliant Transfer</u>. Any purported Transfer of an Interest that is not in compliance with this Article 9 shall be null and void and of no force or effect; provided that if the Company is required to recognize any such Transfer, the Interest Transferred shall be strictly limited to the transferor's right to allocations and distributions as provided by this Agreement with respect to the Transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts or liabilities for damages that the transferor or transferee may have to the Company, and shall not include the right to any information or accounting of the affairs of the Company, the right to inspect the books or records of the Company, and/or any of the other rights of a Member under the Act or this Agreement.

(b) <u>Indemnity</u>. In the case of a Transfer or attempted Transfer of an Interest that is not in compliance with this Article 9, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the

Company and the other Members from all cost, liability and damage that the Company and any such indemnified Members may incur (including incremental tax liabilities, attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.5.    Admission of Substituted Members.  Transferees of Interests pursuant to this Article 9 who are already Members shall be automatically admitted as substituted Members with respect to such acquired Interests.  Subject to the other provisions of this Article 9, a transferee of an Interest, other than a transferee who is already a Member, may be admitted to the Company as a substituted Member only upon satisfaction of the following conditions:

(a)    the Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

(b)    the transferee of the Interest shall, by written instrument in form and substance reasonably satisfactory to the Members, (i) accept and adopt the terms and provisions of this Agreement, including this Article 9, and (ii) assume the obligations of the transferor Member under this Agreement with respect to the Transferred Interest.  The transferor Member shall be released from all such assumed obligations, except those obligations or liabilities of the transferor Member arising out of a breach of this Agreement or based on events occurring, arising or maturing prior to the Transfer; and

(c)    the transferee of the Interest pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Interest.

9.6.    Rights of Unadmitted Assignees.  A Person who acquires an Interest but who is not admitted as a substituted Member pursuant to Section 9.5 (an "Assignee") shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to become (or exercise any right of) a Member.  The Interest of an Assignee shall be deemed to be voted on all matters in the same proportion as the remaining Interest was voted.  An Assignee is entitled, to the extent of the Percentage Interest assigned, only to allocations of Profit, Loss and other tax items of the Company and to distributions from the Company.

9.7.    Compliance with Securities Laws.  If any Interest is to be transferred, either (a) such Interest shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) at the request of the Members, the transferor shall provide an opinion of counsel, satisfactory to the Members, that the proposed Transfer is exempt from such registration requirements.  The Company and the Members have no obligation or intention whatsoever either to register Interests for resale under any Federal or state securities laws or to take any action which would make available to any Person any exemption from the registration requirements of such laws.

9.8.    Hypothecation.  Any hypothecation, mortgage, pledge or collateralization of an Interest is expressly prohibited, except (a) as contemplated by Section 8.6, (b) consented to by Members holding at least a majority of the Percentage Interests, or (c) as otherwise permitted under this Agreement.  Any purported hypothecation, mortgage, pledge or collateralization in any manner by any Person in violation of this Section 9.8 shall be null and void and of no legal effect.

9.9.    Distributions and Allocations with Respect to Transferred Interests.  If any Interest is sold, assigned or transferred during any accounting period in compliance with the provisions of this Article 9, Profit, Loss and all other items of income, gain, loss and deduction attributable to the transferred Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Members in good faith.  Solely for purposes of making such allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which it is given notice of such transfer and all distributions on or before such date shall be made to the transferor, and all distributions after such date shall be made to the transferee; provided, however, that if the Company does not receive a notice stating the date such Interest was transferred and such other information as the Company may reasonably require within 30 days after the end of the accounting period during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the accounting period during which the transfer occurs, was the owner of the Interest.  Neither the Company nor the Members shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.9, whether or not the Members or the Company had knowledge of any Transfer of ownership of any Interest.

9.10.   Voluntary Withdrawal.  No Member shall have the right to Voluntarily Withdraw from the Company.

9.11.   Involuntary Withdrawal.  Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become a transferee of an Interest but shall not become a Member.  The successor transferee of an Interest shall have all the rights of a transferee of an Interest but shall not be entitled to receive the fair market value of the Interest as of the date of the Involuntary Withdrawal from the Company except as provided herein.  The successor of the withdrawn Member shall have the option to retain the Membership Interest in the Company.  Said option must be exercised by written notice delivered by the representative (as the case may be) to the Members of the Company and received within sixty (60) days of the Involuntary Withdrawal event.  In the event that the option is not exercised within sixty (60) days, the successor of the withdrawn shall be obligated to sell, and the remaining Members shall have the option to purchase, in the same priority as set forth in Section 9.2 above, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree.  The purchase price of a Membership Interest to be purchased in accordance with the provisions of this Section 9.11 shall be as follows:

(a)   The purchase price of the Membership Interest owned by the successor of the withdrawn Member shall be determined as of the last day of the month preceding the month during which the Involuntary Withdrawal occurs, and shall be the fair market value of the Membership Interest to be purchased hereunder.

(b)   The determination of the purchase price shall, unless agreed to between the successor of the withdrawn Member and the remaining Members, be made by an independent appraiser selected as follows:

(i)   Within thirty (30) days after demand by either the remaining Members or the successor of the withdrawn Member, both the remaining Members and the successor of the withdrawn Member shall each submit their estimation of the value of the Company in a sealed envelope to the accountants regularly employed by the Company.  The accountants regularly employed by the Company shall open the sealed envelopes and examine the estimated valuations submitted only after they have received both valuations.  If the highest estimated value submitted is equal to or less than one hundred ten percent (110%) of the lowest value submitted, the Fair Value shall be the average of the two estimated values.  If the highest estimated value submitted is greater than one hundred ten percent (110%) of the lowest value submitted, the Appraised Value shall be determined by the procedure set forth in Section 9.9(b)(ii).

(ii)   The remaining Members and the successor of the withdrawn Member shall jointly select a qualified appraiser or appraisers, and such jointly selected appraiser or appraisers shall value the Company.  If the parties cannot so agree on the selection of a qualified appraiser or appraisers, then, within thirty (30) days after demand by either of them, each party shall appoint a qualified appraiser.  If any party entitled to appoint an appraiser does not do so, then the appraiser appointed by the other party may act alone.  The two (2) appraisers so appointed shall, within thirty (30) days after the appointment of the second of them to be appointed, select a third appraiser.  The appraiser or appraisers shall estimate the value of the Company and submit their estimate or estimates to the accountants regularly employed by the Company.  The Appraised Value shall be the estimated value submitted by the Members to the accountants regularly employed by the Company which is closest to the estimate made by the appraiser or the appraisers or, if there are more than one estimate reached by the various appraisers, the average or all such estimates.  The cost of the appraisals shall be borne equally by the parties.

(c)   It is understood and agreed that the purchase price determined in accordance with this Section 9.11 is the full agreed value of such portion of the Membership Interest; that except as otherwise provided in this Operating Agreement such value shall in no manner be altered; and that all property, both tangible and intangible, if any, as well as liabilities, including mortgages, liens or other encumbrances of any kind whatsoever, if any, of or upon the property of the Company have been considered in determining such purchase price.

(d)   Unless otherwise agreed by all of the Members, the aggregate purchase price due to any successor of the withdrawn Member shall be paid in the following manner:

(i)   There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such successor of the withdrawn Member.  Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the successor of the withdrawn Member.

(ii)   There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Cessation.  Such amount is to be determined by the Members of the Company.

20

(iii)     Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in ten (10) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining nine (9) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)     The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Transferring Member, bearing interest at the *Wall Street Journal* prime rate of then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Membership Interest.

(v)     The closing shall take place upon the date determined by the Remaining Members, but shall occur within six (6) months of the date of the Involuntary Withdrawal.

9.12.    <u>Buy-Sell</u>. Each Member or Members (collectively, the "Offeror") shall have the right at any time to serve upon any one or more of the other Members (collectively, the "Offeree") a notice in writing which shall contain an offer to sell the entire Interest in the Company of the Offeror or to purchase the entire Interest in the Company of the Offeree, as set forth below. Any Transfer of an Interest under this provision is not subject to any of the Transfer restrictions set forth in Article 9.

(a)     No offer shall be subject to the provisions of this Section 9.12 unless such offer is both an offer to sell the entire Interest of the Offeror and an offer to purchase the entire Interest of the Offeree, and such offer must specify the selling or purchase price and that the price of the Interest to be so transferred shall be paid in cash. The selling price and the purchase price specified in such offer must be computed on the basis of the same Interest value. Such offer shall be irrevocable for a period of sixty (60) days (the "Offer Period"), and the Offeree may, on or before the end of the Offer Period, accept either the offer to sell or the offer to purchase (but not both), and upon acceptance, the Offeror shall be required to sell or to purchase, as the case may be.

(b)     If the Offeree fails within said sixty (60) day period to accept either of said offers, then the offers shall automatically expire and be of no further force and effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of said sixty (60) day period, to purchase the Interest of the Offeree, at the applicable price as specified in Section 9.12(a), and if the Offeror exercises such right, the Offeree shall be required to sell. If the Offeror fails to exercise its right to purchase or sell within the time specified, either party may thereafter make a new offer pursuant to this Section 9.12.

(c)     The closing of such purchase and sale shall be held at the time and place and on the date specified by the Offeror by written notice to the Offeree, which date shall be on or before the one hundred twentieth (120th) day after the date of the offer to purchase or sell. Payment of the purchase price shall be made in cash or cashier's check. Each Member shall bear his or her own legal and other closing expenses. The selling Member(s) shall convey his/her/its Interest(s) in the Company and in the assets thereof by appropriate assignment and any other appropriate instrument, subject only to such title defects and encumbrances as existed on the date the offer hereunder was made. Each Member who is now or hereafter becomes a Member, by so becoming a Member, hereby covenants and agrees to execute any and all instruments and to cooperate in giving effect to the provisions of this Section 9.12.

## ARTICLE 10. DISSOLUTION AND WINDING UP

10.1.    <u>Dissolution</u>.

(a)    <u>Dissolution Events</u>. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each, a "<u>Dissolution Event</u>"):

(i)     a unanimous determination by all of the Members to dissolve, wind up and liquidate the Company;

(ii)     the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act;

(iii)    the sale of all or substantially all of the assets of the Company; or

(iv)    there being no Members.

10.2.    <u>Continuation</u>. If the event specified in <u>Section 10.1(a)(iv)</u> occurs, the Company shall not dissolve and shall not be required to be wound up if, within 90 days of the date of the event that terminated the continued membership of the last remaining Member, the personal representative of the last remaining Member agrees in writing to continue the Company and to admit the personal representative of such Member or its nominees or designee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

10.3.    <u>Covenant</u>. The Members hereby agree that the Company shall not dissolve prior to the occurrence of a Dissolution Event.

10.4.    <u>Winding Up</u>.

(a)    <u>Liquidation and Distribution</u>. Except as otherwise provided in <u>Section 10.1</u>, upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. The Members and any officers and agents of the Company shall not take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and assets, and the assets (or the proceeds of any liquidation thereof) shall be applied and distributed in the following order:

(i)    <u>first</u>, to creditors, including any Member that is a creditor, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Members;

(ii)    <u>second</u>, to Members in satisfaction of liabilities of the Company for distributions; and

(iii)    <u>the balance</u>, if any, to the Members in proportion to their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods. If a Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

Notwithstanding the provisions of <u>Section 4.1</u> hereof, in the year of the sale or other disposition of the Company's property, and in the year of liquidation of the Company, items of gross income and deduction shall be allocated to the Members to the extent necessary to produce Capital Accounts for the Members such that the amounts distributed pursuant to <u>Section 10.2(a)(iii)</u> will be in the amounts, sequence and priority set forth in <u>Section 4.1</u>. The Members shall not receive any additional compensation for any services performed pursuant to this <u>Article 10</u>.

(b)    <u>Reserves</u>. In the discretion of the Members, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this <u>Article 10</u> may be:

(i)    distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Members, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

(ii)    withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, <u>provided</u> that any such withheld amounts, to the extent not used to pay such Company liabilities, shall be distributed to the Members as soon as practicable.

(c)     Certificate of Cancellation.  Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with this Article 10, the Members shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Members deem such filing necessary or advisable.

10.5.    Certain Terminations.  Notwithstanding any other provisions of this Article 10, in the event the Company is terminated within the meaning of Section 708(b)(1)(B) of the Code, but no Dissolution Event has occurred, the Company's property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.

10.6.    Liquidation of Member's Interest.  Except as otherwise specifically provided in this Agreement, any distribution made to a Member as a result of the liquidation of such Member's interest in the Company (within the meaning of Treasury Regulations Section 1.761-1(d)), which liquidation is not a result of dissolution of the Company, shall be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the fiscal year during which such liquidation occurs through the date of such liquidation (other than those adjustments due to distributions pursuant to this Section 10.4), by the end of such year (or, if later, within 90 days after the date of such liquidation).  All distributions upon liquidation of a Member's interest in the Company shall be made in accordance with the timing requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7.    Rights of Members.  Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of such Member's Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company.  No Member shall have priority over any other Member as to the return of its Capital Contributions, distributions or allocations.

10.8.    Records of Liquidation.  Each of the Members shall be furnished with a statement prepared by the Company's accountants which shall set forth the assets and liabilities of the Company as of the date of the occurrence of the Dissolution Event and the plans for compliance with Section 10.2.

10.9.    Form of Liquidating Distributions.  For purposes of making the distributions required by Section 10.2, the Members may determine whether to distribute all or a portion of the Company's assets in-kind or to sell all or any portion of the assets and distribute the proceeds therefrom; provided, however, that, in the absence of a determination by the Members with respect to the form of liquidating distributions, the Company's assets shall be sold and the proceeds thereof distributed to the Members; provided, further, however, that if any distributions are made in-kind, the Capital Account of each Member shall be adjusted immediately prior to such distribution for any variation between the adjusted basis of the distributed property for tax purposes and the current fair market value of such property, to the extent not already reflected in the Capital Accounts.

## ARTICLE 11. MISCELLANEOUS

11.1.    Notices.  All notices or other communications permitted or required to be given under this Agreement shall be in writing, signed by the party giving such notice or other communication, and shall be delivered personally, telecopied, or sent by certified mail or overnight courier service, to the address of each Member as set forth on "Exhibit A" or as otherwise reflected on the books and records of the Company.  The date of personal delivery or telecopy or three business days after the date of mailing (or the next business day after delivery by overnight courier service), as the case may be, shall be the date of receipt of such notice or other communication.  Any Member may change its notice address by giving notice, in writing, stating its new address to the Company.

11.2.    Amendments.  A proposed amendment shall be adopted and be effective as an amendment hereto only by the consent of a majority in interest vote.

11.3.    Binding Effect.  Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns.

11.4.    Construction.  The terms and provisions of this Agreement shall be construed fairly in accordance with their plain meaning, regardless of which party hereto was responsible for the drafting of such terms and provisions.

11.5.    Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.6.    Severability.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section 11.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause a Member to lose the material benefit of such Member's economic bargain.

11.7.    Entire Agreement.  This Agreement constitutes the entire agreement, and supersedes all prior agreements or understandings, whether written or oral, between the parties hereto with respect to the subject matter hereof.

11.8.    Governing Law; Costs and Attorney Fees.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles.  To the extent that any party to this Agreement prevails against any other party hereto in connection with the prevailing party's enforcement of its rights under this Agreement, the prevailing party shall be entitled to its costs and expenses (including attorney fees) in connection with such dispute.

11.9.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

11.10.    Further Assurances.  The parties hereto shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purpose of this Agreement.

11.11.    No Third Party Beneficiaries.  This Agreement is made solely and specifically among and for the benefit of the Members and the Company, and no other Person will have any right, interest or claim hereunder or be entitled to any benefit under or on account of this Agreement as a third party beneficiary or otherwise.  In furtherance of and not in limitation of the foregoing, nothing contained in this Agreement is intended to be for the benefit of any creditor or other Person (other than the Members) to whom or which any debts, liabilities or obligations are owed by (or who or which otherwise has any claim against) the Company or any Member, and no such creditor or other Person shall obtain any right hereunder against the Company or any Member by reason of any debt liability or obligation (or otherwise).

IN WITNESS WHEREOF, the Parties have executed and entered into this Agreement as of the day first above written

MEMBERS:

PIES & PINTS DEVELOPMENT PARTNERS, LLC

RAM Advisors, LLC
By:

Robert Lindeman, its authorized signatory

Blue Fire Capital, LLC
By:

Michael Sloane, its authorized signatory

KSOB, LLC

Kimberly Shingledecker

David Bailey

25

"EXHIBIT A"

MEMBERS' NAMES, ADDRESSES AND PERCENTAGE INTERESTS

| MEMBER NAME AND MAILING ADDRESS | | PERCENTAGE INTEREST |
|---|---|---|
| Pies & Pints Development Partners, LLC 8462 Grennan Woods Drive, Powell, Ohio 43065 | | 60% |
| KSDB, LLC 222 Capital Street, Suite 100 Charleston, West Virginia 25301 | | 40% |

"EXHIBIT B"

CAPITAL CONTRIBUTIONS

| MEMBER NAME | CONTRIBUTED CASH OR PROPERTY | VALUE OF CAPITAL CONTRIBUTION |
|---|---|---|
| Pies & Pints Development Partners, LLC<br>8462 Grennan Woods Drive, Powell, Ohio 43065 | | |
| KSDB, LLC | | |

"EXHIBIT C"

<u>CURRENT OFFICERS</u>

| <u>Name</u> | <u>Office</u> |
|---|---|
| Rob Lindeman | President |
| Kimberly Shingledecker | Secretary |

**"EXHIBIT D"**

<u>CERTIFICATE OF FORMATION</u>

J.W. CHENAULT SANDERS, J.D., LL.M.
———— ATTORNEY AT LAW ————

OFFICE: 615.810.9249    108 HARDING PLACE, SUITE 203    www.chenaultsanders.com
FAX: 615.810.9293    NASHVILLE, TENNESSEE 37205    chenault@chenaultsanders.com

August 16, 2012

*VIA E-MAIL* regagent@capitolservices.com

Capitol Corporate Services, Inc.
P.O. Box 1831
Austin, TX 78767

Dear Sir or Madam:

Please find enclosed the Registered Agent Client Contact Information form for Pies & Pints Management Company, LLC along with a file-stamped copy of the Certificate of Formation filed with the Delaware Secretary of State's Office for the company. You will see that the company name was changed from Pies & Pints Management, LLC to Pies & Pints Management <u>Company</u>, LLC, subsequent to the initial filing of the Certificate of Formation. I have also enclosed the Certificate of Amendment reflecting the name change for your records.

Please note that as my law firm is establishing the company, the fee is $120.00. Please don't hesitate to contact me should you have any company questions.

Sincerely,

J. W. Chenault Sanders

Enclosures

# REGISTERED AGENT
# CLIENT CONTACT INFORMATION

 **CAPITOL** SERVICES

To better serve you Capitol Corporate Services, Inc. (Capitol Services) maintains three types of contact information for each entity represented. Should you have any questions while completing this form please call the Registered Agent Department 1-800-345-4647.

*Capitol Services offers online access to clients for better management of their entities. Our online services allow registered users to view their service of process history, access all correspondence received and forwarded, and pay invoices online. Check "Yes, provide this contact with online access to the account" and a secure user name and password will be emailed upon receiving your information.

**1. Entity Name** Pies & Pints Management Company, LLC

**State(s)** Delaware

## 2. Primary Service of Process ("SOP") Contact

SOP documents (such as lawsuits and other legal correspondence) will be forwarded to the "primary contact" via Federal Express. To receive an email notification of SOP, please provide an email address (or multiple email addresses) in the spaces provided.

| | |
|---|---|
| Rob Lindeman | 614-668-7249 |
| **Name** | **Telephone Number** |
| Rand M Advisors, LLC | rob@randmadvisors.com |
| **Company / Firm** | **Email Address** |
| 8462 Grennan Woods Dr. | |
| **Street Address (No PO Boxes)** | **Additional Email Address(es)** *(optional)* |
| Powell    OH    43065 | ✓ *Yes, provide this contact with online access to the account. |
| **City**    **State**    **Zip Code** | |

## 3. Tax Notices & Official State Correspondence Contact

✓ *Check if all information is the same as #2 Primary SOP Contact.*

Official notices from the state (such as annual reports and tax notices) will be forwarded to the "tax contact" via regular mail.

| | |
|---|---|
| **Name** | **Telephone Number** |
| **Company / Firm** | **Email Address** |
| **Street Address** | **Additional Email Address(es)** *(optional)* |
| **City**    **State**    **Zip Code** | __ *Yes, provide this contact with online access to the account. |

☐ **Check to have notices sent by email in addition to USPS mail.** *(Must provide email address above)*

## 4. Billing & Renewal Notices Contact

✓ *Check if all information is the same as #2 Primary SOP Contact.*

The annual renewal invoice for registered agent services will be directed to the "billing contact." Please indicate if you would like to take advantage of our paperless invoicing and provide an email address (or multiple email addresses) in the spaces provided.

| | |
|---|---|
| **Name** | **Telephone Number** |
| **Company / Firm** | **Email Address** |
| **Street Address** | **Additional Email Address(es)** *(optional)* |
| **City**    **State**    **Zip Code** | *Yes, provide this contact with online access to the account. |

**Invoices sent by USPS Mail unless other delivery method(s) selected:** *(Must provide email address above)*  ☐ **Email ONLY.**  ☑ **BOTH Email and USPS Mail.**

| 5. Person Completing this Form | J.W. Chenault Sanders | 615-810-9253 | chenault@chenaultsanders.com |
|---|---|---|---|
| | **Name** | **Telephone Number** | **Email Address** |

**Send completed client information form via Mail, Fax or E-mail to: Capitol Services - Registered Agent Department**
**Mail:** P.O. Box 1831, Austin, TX 78767    **Fax:** 800-432-3622    **Email:** regagent@capitolservices.com

Revision Date: January 10, 2012    **ATTENTION: Mary Ann Quick, RA Dept.**    Capitol Corporate Services, Inc. / Capitol Services, Inc.

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:13 PM 08/02/2012
FILED 03:13 PM 08/02/2012
SRV 120900178 - 5193497 FILE

### STATE OF DELAWARE
### LIMITED LIABILITY COMPANY
### CERTIFICATE OF FORMATION

**FIRST**: The name of the limited liability company is PIES & PINTS MANAGEMENT, LLC

**SECOND**: The name and address of the limited liability company in the State of Delaware is:

Capitol Services Inc.
1675 South State Street, Suite B
Dover, Delaware 19901

The name and address of the registered agent of the limited liability company is:

Capitol Services Inc.
1675 South State Street, Suite B
Dover, Delaware 19901

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of PIES & PINTS MANAGEMENT, LLC this 31st day of July, 2012.

J.W. Chenault Sanders
Authorized Person

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:46 AM 08/09/2012*
*FILED 11:46 AM 08/09/2012*
*SRV 120920439 - 5193497 FILE*

# STATE OF DELAWARE
## CERTIFICATE OF AMENDMENT

1.  Name of Limited Liability Company: _____

    Pies & Pints Management, LLC

2.  The Certificate of Formation of the limited liability company is hereby amended as follows:

    > The name of the Limited Liability Company is Pies &
    > Pints Management Company, LLC.

    IN WITNESS WHEREOF, the undersigned have executed this Certificate on the 9th _____ day of August _____, A.D. 2012 .

    By: _____

    Authorized Person(s)

    Name: J. W. Chenault Sanders

    Print or Type

**EXHIBIT 4**

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY

OPERATING AGREEMENT

OF

PIES & PINTS MANAGEMENT COMPANY, LLC


December 31, 2019

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

# PIES & PINTS MANAGEMENT COMPANY, LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (hereinafter referred to as the "Agreement"), dated as of December 31, 2019 (hereinafter referred to as the "Effective Date"), is entered into by and between Pies & Pints Development Partners, LLC, a Delaware limited liability company, (hereinafter referred to as "PPDP"), and KSDB, LLC, a West Virginia limited liability company, (hereinafter referred to as "KSDB"), as the sole members (hereinafter referred to as the "Members"), and amends and restates in its entirety that certain Limited Liability Company Operating Agreement of Pies & Pints Management Company, LLC dated as of June 31, 2012.

## RECITALS:

WHEREAS, the Members formed PIES & PINTS MANAGEMENT COMPANY, LLC (hereinafter referred to as the "Company") in order to manage operations of a gourmet pizza and craft beer business and to own certain intellectual and other property related thereto in accordance with the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE 1. DEFINED TERMS

1.1.    Defined Terms. Capitalized terms used in this Agreement shall, unless otherwise noted or unless the context otherwise requires, have the following meanings:

"Act" means the Delaware Revised Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended from time to time.

"Additional Members" has the meaning assigned to such term in Section 7.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account in any amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1

"Affiliate" means, with respect to a specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified. For purposes of this Agreement, the term "control" (including its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Agreement" means this Amended and Restated Limited Liability Company Operating Agreement of PIES & PINTS MANAGEMENT COMPANY, LLC as amended, supplemented, or otherwise modified from time to time.

"Asset Value" means, with respect to any asset of the Company, the adjusted basis of such asset for Federal income tax purposes, except that:

(a)     the initial Asset Value of any asset contributed by a Member to the Company shall be the Gross Fair Market Value of such asset;

(b)     upon the distribution in kind of any Company asset, the Asset Value of such asset shall be adjusted immediately prior to such distribution to equal its Gross Fair Market Value;

(c)     to the extent that Members holding at least a majority of the Percentage Interests agree, the Asset Values of all Company assets shall be adjusted to equal their respective Gross Fair Market Values as of the following times: (i) upon the acquisition of an interest in the Company by a new Member or an additional interest by an existing Member in exchange for more than a de minimis capital contribution; and (ii) upon the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company;

(d)     if the Asset Value of an asset has been determined or adjusted in accordance with clauses (a), (b) or (c) above, such Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profit and Loss; and

(e)     to the extent not otherwise provided in this Agreement, the Asset Value of any Company asset shall be adjusted so that the Capital Account of each Member is determined and maintained in accordance with the capital accounting rules in Treasury Regulations Section 1.704-1 (b)(2)(iv).

"Board" means the Company's Board of Managers.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the State of Delaware are authorized or required by law to close.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 3.6.

"Capital Contribution" means, with respect to any Member, the amount of money and the Gross Fair Market Value of any property (other than money) contributed to the Company by such

2

Member, reduced by the amount of any liabilities of such Member assumed by the Company in connection with the contribution or secured by any contributed property.

"Certificate" has the meaning assigned to such term in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means PIES & PINTS MANAGEMENT COMPANY, LLC, the limited liability company formed under the Act and pursuant to this Agreement.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Gross Fair Market Value" means, with respect to any asset of the Company, the fair market value of such asset determined in the case of any asset contributed by a Member to the Company, by the contributing Member, unreduced by any liabilities.

"Indemnitee" means the officers of the Company, if any, and (b) any other Person (including Affiliates or the Company) as the Board may designate from time to time, in its sole and absolute discretion.

"Interest" means the ownership interest of a Member in the Company, consisting of such Member's (a) Percentage Interest, (b) share of the Profits and Losses and other items of income, gain, deduction and loss of the Company and the Member's right to receive distributions of the Company's assets, (c) right to vote and to grant or withhold consents with respect to Company matters as provided in this Agreement or in the Act, and (d) other rights and privileges as provided in this Agreement.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

       (a)     such Member makes an assignment for the benefit of creditors;

       (b)     such Member files a voluntary petition of bankruptcy;

       (c)     such Member is adjudged bankrupt or insolvent or has entered against such Member an order for relief in any bankruptcy or insolvency proceeding;

       (d)     such Member files a petition or answer seeking for such Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

       (e)     such Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding described in clauses (a) through (d) above;

3

(f)　　such Member seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties; or

(g)　　120 days after commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation if the proceeding has not been dismissed, or if within 90 days after the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties, the appointment is not vacated or stayed, or if within 90 days after the expiration of any such stay, the appointment is not vacated.

"Manager" or "Managers" means the individual(s) named as Managers of the Company as set forth in Article 6 hereof.

"Majority Vote of the Board" means the affirmative vote, approval or consent, as the case may be, of more than fifty percent (50%) of the total voting power of all Managers as set forth in Section 6.1(c).

"Majority Vote of the Members" means the affirmative vote, approval or consent, as the case may be, of the holders of more than fifty percent (50%) of the Units of the Company.

"Member" means any Person who (a) is or becomes a Member pursuant to the terms of this Agreement and (b) has not ceased to be a Member.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Net Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any mortgage or other financing or refinancing, or from any sale, exchange, condemnation or other disposition (other than in the ordinary course of business) of the Company's property or interest therein, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness associated therewith, all as determined by the Board.

"Net Cash Flow" means all cash received from Company operations, other than amounts received as Capital Contributions or Net Capital Proceeds, reduced by all cash paid, or amounts used to establish reasonable reserves, for all Company expenses, debt payments, capital improvements, replacements or other contingencies, all as determined by the Board.

4

"Percentage Interest" means, with respect to a Member, the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Percentage Interest" in "Exhibit A", as such percentage may be adjusted from time to time in accordance with this Agreement. A Percentage Interest may be evidenced by a certificate issued by the Company, and expressed on a certificate as "Units".

"Permitted Transfer" means a Transfer of an Interest in compliance with Section 9.1, 9.2 or 9.3.

"Person" means any individual, corporation, partnership, limited partnership, firm, joint venture, association, business entity, joint stock company, trust, estate, limited liability company, unincorporated association, government or regulatory body (or any agency or political subdivision hereof) or other entity.

"Profit" and "Loss" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(h)     any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such income or loss;

(i)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from such taxable income or loss;

(j)     in the event the Asset Value of any Company asset is adjusted in accordance with subsection (b) or (c) of the definition of Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss of the fiscal year in which such adjustment occurs;

(k)     gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Asset Value;

(l)     depreciation, amortization and other cost recovery deductions shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g); and

(m)     any items which are specially allocated pursuant to the provisions of Section 4.2 shall not be taken into account in computing Profit or Loss. Nevertheless, such items shall be taken into account in adjusting Capital Accounts pursuant to Section 3.6.

"Transfer" means any actual or proposed disposition of all or a portion of an interest (legal or equitable) by any means, direct or indirect, absolute or conditional, voluntary or involuntary, including by sale, assignment, put, transfer, pledge, hypothecation, mortgage or other

encumbrance, court order, operation of law, distribution, settlement, exchange, waiver, abandonment, gift, alienation, bequest or disposal.

"Treasury Regulations" means the income tax regulations, including any temporary regulations, promulgated under the Code from time to time.

"Unanimous Vote of the Managers" means the affirmative vote, approval or consent, as the case may be, of one hundred percent (100%) of the total voting power of all Managers as set forth in Section 6.1(c).

"Unanimous Vote of the Members" means the affirmative vote, approval or consent, as the case may be, of one hundred percent (100%) of the Units of the Company.

"Unit" means a measure of ownership interest in the Company. Each Member's Interest may be designated and referred to herein as being a number of Units, and all Units owned by a Member shall constitute such Member's Percentage Interest.

"Voluntarily Withdraw" or "Voluntary Withdrawal" means a Member's dissociation from the Company other than in connection with a Permitted Transfer or Involuntary Withdrawal.

1.2.    Other Defined Terms; Interpretation.  Capitalized terms used in this Agreement and not defined in Section 1.1 shall have the meanings assigned to them elsewhere in this Agreement. The definitions shall apply equally to both the singular and the plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE 2. ORGANIZATIONAL MATTERS

2.1.    Formation.  The Members have organized the Company as a limited liability company under the Act by the filing of a Certificate of Formation (the "Certificate") with the Secretary of State of Delaware in accordance with the provisions of the Act and hereby (a) confirm the Members' status as all of the existing members of the Company, and (b) execute and enter into this Agreement as the Limited Liability Company Agreement of the Company. The Company's existence began on the date on which the Certificate was filed with and accepted by the State of Delaware and shall continue unless otherwise terminated in accordance with the provisions of this Agreement or the Act.

2.2.    Name.  The name of the Company is "PIES & PINTS MANAGEMENT COMPANY, LLC." The Company may do business under that name and any other name as determined by the Board, subject to any restrictions imposed by law. The Board may change the name of the Company at any time and from time to time and shall give prompt notice of any such change to each officer of the Company and all Members, if not already notified.

2.3.    Principal Place of Business.  The principal place of business of the Company shall be 8462 Grennan Woods Drive, Powell, Ohio 43065, or such other place as the Members may from time to time designate.

6

2.4.     Registered Office; Registered Agent.  The registered agent of the Company is Capitol Services Inc. and the registered office of the Company within the State of Delaware is 1675 South State Street, Suite B, Dover, Delaware 19901. The Board may change the registered office and/or the registered agent of the Company in accordance with the Act and shall give prompt notice of any such change to each officer of the Company and all Members, if not already notified.

2.5.     Purposes.  The business and purpose of the Company is to manage the operations of a gourmet pizza and craft beer restaurant concept and to own certain intellectual and other property related thereto. The Company may engage in any and all activities necessary, incidental, related or desirable to the foregoing or as may be approved by the Board. The Company shall not engage in any other business or activity inconsistent with this Section 2.5 without first obtaining the approval of the Board.

2.6.     Powers.  Subject to all of the terms, covenants, conditions and limitations contained in this Agreement and any other agreement entered into by the Company, the Company shall have the power and authority to do any and all acts and things necessary, appropriate, proper, advisable, desirable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Company, including all power and authority, directly or through its ownership interest in other entities, to enter into and perform contracts of any kind, and borrow money and issue evidences of indebtedness, whether or not secured by a mortgage, deed of trust, pledge or other lien.

2.7.     Qualification in Other Jurisdictions.  The  Board shall take any and all actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware. Before conducting business in any jurisdiction other than the State of Delaware, the Company shall file all forms and take all other actions required under applicable laws, including the tax laws, of that jurisdiction in order to conduct such business.

2.8.     Members.  The name, mailing address and Percentage Interest of each Member is set forth on "Exhibit A," attached hereto.  The Members shall update "Exhibit A" from time to time as necessary to reflect changes to the information therein.  An amendment or revision to "Exhibit A" made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to "Exhibit A" shall be deemed a reference to "Exhibit A" as it may be amended and in effect from time to time.

2.9.     Title to Property.  The Company shall at all times, hold title to all of its property in the name of the Company and not in the name of any or Member or Manager, and no Member or Manager shall have any ownership interest in such property in such Member's or Manager's individual name.  Each Member's Interest shall be personal property for all purposes.

2.10.    Payments of Individual Obligations.  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for, or in payment of, any individual obligation of any Member or Manager.

## ARTICLE 3. CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. Capital Contributions. The initial Capital Contributions of cash and/or property to the Company by each Member are set forth opposite such Member's name on "Exhibit B" hereto, which were made in exchange for the Percentage Interests of such Member set forth on "Exhibit A" hereto. The Capital Contributions (if any) required to be made by Additional Members shall be determined pursuant to Section 7.1.

3.2. Additional Contributions. Except as otherwise provided herein or by applicable law, no Member shall be required to lend any funds to the Company or make any additional capital contributions to the Company.

3.3. Return of Capital Contributions. No Member shall have the right to receive the return of any Capital Contribution except as otherwise provided in this Agreement or the Act.

3.4. No Interest on Capital Contributions. Except as otherwise provided in this Agreement, the Members shall not be paid interest on their Capital Contributions.

3.5. Limitation of Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

3.6. Capital Accounts.

(a) Establishment and Maintenance of Capital Accounts. A separate Capital Account shall be established and maintained for each Member in accordance with applicable Treasury Regulations as promulgated and in effect on the effective date of this Agreement as well as in accordance with all subsequent amendments to such Treasury Regulations which by their terms are binding on the Company, and to the extent the Company is permitted to elect the manner in which any item affects the Capital Accounts as they are specified in this Section 3.6(a), such election shall, except as otherwise provided in this Agreement, be made by the Members.

(b) No Restoration. No Member shall have any obligation at any time to restore a deficit balance in such Member's Capital Account.

3.7. Loans. A Member may, at any time, make a loan or cause a loan to be made to the Company in such amount and on such terms as such Member and the Board may agree. No such loan shall increase a Member's Capital Account or Percentage Interest. Any such loan shall be payable and collectable only out of Company assets, and no other Member shall be personally obligated to repay any part thereof. No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor. Notwithstanding anything herein to the contrary, profit allocations and other distributions to Members shall be subordinate to the repayment of Member loans to the Company.

## ARTICLE 4. ALLOCATIONS

8

4.1.    Allocations of Profit and Loss.

(a)    Profit. Profit of the Company for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

(b)    Loss. Loss of the Company for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

4.2.    Special Allocation Rules. Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article 4, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(7). This Section 4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 4, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain) shall be allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 4.2(c) were not in the Agreement. This Section 4.2(c) is intended to comply with the qualified income

offset requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied consistently therewith.

(d) <u>Nonrecourse Deductions</u>. Nonrecourse deductions (as defined in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

(e) <u>Member Nonrecourse Deductions</u>. Member Nonrecourse Deductions for each taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(f) <u>Curative Allocations.</u>

(i) <u>General Curative Allocations</u>. The allocations set forth in Sections 4.2(a), (b), (c), (d) and (e) and Section 4.3 (the "Regulatory Allocations") are intended to comply with Treasury Regulations Section 1.704-1(b). It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.2(f)(i). Therefore, the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Members determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.1.

(ii) <u>Audit Adjustment Curative Allocations</u>. In the event there is a final administrative or judicial determination for Federal income tax purposes for any taxable year that changes the Capital Account balances of the Members from the Capital Account balances for such taxable year as previously computed by the Company (an "Adjustment"), then, notwithstanding anything contained in Section 4.1, Profit, Loss, and other items of income, gain, loss, and deduction for that taxable year and, if necessary, subsequent taxable years, shall be allocated among the Members so that, to the extent possible, the Capital Account balances of the Members (taking into account such Adjustment) for that taxable year, and all subsequent taxable years, are the same as they would have been had such Adjustment not occurred. The reallocation described in the preceding sentence shall not be made to the extent that the Adjustment constitutes the correction of an arithmetic or computational error.

4.3. <u>Loss Limitation</u>. Losses allocated pursuant to Section 4.1 shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year (or any other period). In the event some but not all Members would have had Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1, the limitation set forth in this Section 4.3 shall be applied on a Member by Member basis and Losses not allocable to a particular Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

4.4.    Allocations with Respect to Contributed Property; Asset Value Adjustments.

(a)    Contributed Property.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction (and any item thereof) with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation at the time of contribution between the adjusted basis of such property to the Company for Federal income tax purposes and the Asset Value of the contributed property ("Section 704(c) Allocations").  The method under which Section 704(c) Allocations will be made for each item of contributed property shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Members.

(b)    Asset Value Adjustments.  In the event the Asset Value of any Company property is adjusted pursuant to subparagraph (c) of the definition of Asset Value so as to differ from its adjusted basis for Federal income tax purposes, subsequent allocations of income, gain, loss, and deduction (and any item thereof) with respect to such property shall, in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4), take account of any variation between the adjusted basis of such asset for Federal income tax purposes and the Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder ("Reverse Section 704(c) Allocations").  The method under which Reverse Section 704(c) Allocations will be made for each item of property whose Asset Value is adjusted shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Board.

(c)    Tax Allocations Only.  Allocations pursuant to this Section 4.4 are solely for tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, share of Profit, Loss, or other items, or distributions pursuant to any provision of this Agreement.

4.5.    Depreciation Recapture.  Pursuant to Treasury Regulations Sections 1.1245-1(e) and 1.1250-1(f), to the extent the Company recognizes gain as a result of a sale, exchange, or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members.  In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement.  Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange, or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

4.6.    Other Allocation Rules.

(a)    Binding Agreement.  The Members are aware of the Federal income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their shares of Company income, gain, loss, deduction and credits for Federal income tax purposes.

11

      (b)     Excess Nonrecourse Liabilities. Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Percentage Interests.

      4.7.    Tax Savings Clause. The allocations of Company income, gain, loss, deduction, and credits for Federal income tax purposes described in this Agreement are intended to be recognized under Code Section 704(b) or Code Section 704(c). To the extent that any of such allocations are not recognized under Code Section 704(b) or Code Section 704(c), the Company shall make appropriate adjustments to such allocations (and, if necessary, adjustments to any Member's Capital Account) so as to cause all of such allocations to be recognized under Code Section 704(b) or Code Section 704(c), to the extent possible.

## ARTICLE 5. DISTRIBUTIONS

      5.1.    Net Cash Flow Distributions. Except as otherwise provided in Section 10.4, Net Cash Flow, if any, shall be distributed to the Members at such times as the Board shall determine in proportion to the Members' Percentage Interests.

      5.2.    Net Capital Proceeds. Except as provided in Section 10.4 hereof or as otherwise determined by the Board, Net Capital Proceeds shall be distributed not more than 90 days following the receipt of such proceeds by the Company to the Members in proportion to their Percentage Interests.

      5.3.    Tax Distributions. Except as prohibited by applicable law, the Board may, in its sole discretion, cause the Company to distribute to each Member, with respect to any fiscal year of the Company, either during such fiscal year or within 90 days thereafter, in cash an amount equal to (a) forty percent (40.0%) multiplied by (b) the lesser of (i) the taxable income of the Company for such fiscal year allocated to such Member or (ii) the cumulative taxable income of the Company for such fiscal year and all preceding fiscal years of the Company allocated to such Member.

      5.4.    Restrictions on Making Distributions. No distribution shall be made by the Company if, after giving effect to the distribution, the Company would be unable to pay its debts as they become due in the usual course of business.

## ARTICLE 6. MANAGEMENT AND OPERATIONS

      6.1.    Management. The business and affairs of the Company shall be managed by its "managers" (as defined in Section 18-101 of the Act) in accordance with the provisions of this Agreement and the Act. Such managers are collectively referred to herein as the "Board of Managers" or the "Board" and each is individually referred to herein as a "Manager."

      (a)     Board. Except as otherwise specifically provided in this Agreement or by applicable law, the Board will have full, complete and exclusive authority to manage, direct and control the business, affairs and properties of the Company, and to perform any and all other acts or activities customary or incident to the management of the Company's activities; provided, however, the officers of the Company shall be responsible for the day-to-day operation of the

12

Company, except for actions requiring a Majority Vote of the Board as set forth in Section 6.1(m) or a Majority Vote of the Members as set forth in Section 6.3(b), and except as decided by the Unanimous Vote of the Managers or Unanimous Vote of the Members.

       (b)    Number of Managers. The number of Managers which will constitute the entire Board will be four (4). Managers need not be Members of the Company.

       (c)    Election and Removal of Managers.

          (i)    R&M Advisors, LLC ("R&M") will be entitled to designate and elect one (1) manager to the Board (the "R&M Manager"). The R&M Manager will serve until such time that his or her successor is elected and qualified. The R&M Manager may only be removed, with or without cause, by the affirmative vote of the Members holding a majority of the total Membership Interests of R&M. The R&M Manager shall initially be Robert Lindeman. The R&M Manager shall have 1.5 votes on all matters for which Managers shall be entitled to vote.

          (ii)    Blue Fire Capital, LLC ("Blue Fire") will be entitled to designate and elect one (1) manager to the Board (the "Blue Fire Manager"). The Blue Fire Manager will serve until such time that his or her successor is elected and qualified. The Blue Fire Manager may only be removed, with or without cause, by the affirmative vote of the Members holding a majority of the total Membership Interests of Blue Fire. The Blue Fire Manager shall initially be Michael Sloane. The Blue Fire Manager shall have 1.5 votes on all matters for which Managers shall be entitled to vote.

          (iii)    KSDB, LLC will be entitled to designate and elect two (2) Managers to the Board (each, a "KSDB Manager"). Each KSDB Manager will serve until such time that his or her successor is elected and qualified. A KSDB Manager may only be removed, with or without cause, by the affirmative vote of Members holding a majority of the total membership interests of KSDB, LLC. The KSDB Managers shall initially be Kimberly Shingledecker and David Bailey. Each KSDB Manager shall have one (1) vote for all matters upon which Managers shall be entitled to vote.

          (iv)    Each of R&M's and Blue Fire's right to appoint a Manager as set forth in this Section 6.1(c) shall transfer as follows: (i) if all of R&M's beneficial ownership in PPDP's Percentage Interests is acquired by Blue Fire (i.e., Blue Fire becomes the sole equity owner of PPDP), Blue Fire shall succeed to R&M's rights in this Section 6.1(c); and (ii) if all of Blue Fire's beneficial ownership in PPDP's Percentage Interests is acquired by R&M (i.e., R&M becomes the sole equity owner of PPDP), R&M shall succeed to Blue Fire's rights in this Section 6.1(c).

       (d)    Vacancies. A Manager vacancy on the Board by reason of death, resignation, retirement, disqualification, removal from office, or otherwise will be filled by the Member or other Person entitled to elect such Manager pursuant to Section 6.1(c). The Managers so chosen will hold office until their successors are duly elected and qualified, unless sooner replaced in accordance with Section 6.1(c).

    (e)    Regular Meetings. Regular meetings of the Board shall be held not less frequently than quarterly at such time and place as from time to time may be determined by the Board.

    (f)    Special Meetings. Special meetings of the Board may be called by any two (2) Managers or the President on at least ten (10) Business Days prior notice to each Manager, either personally, by facsimile, or by e-mail transmission.

    (g)    Committees. From time to time, the Board may appoint a committee or committees for any purpose or purposes to the extent permitted by law, which committee or committees will have such powers as specified in the resolution of appointment.

    (h)    Quorum; Voting. At all meetings of the Board a majority of the total number of Managers will be necessary and sufficient to constitute a quorum for the transaction of business, and the act of the Managers holding a majority of the total number of votes present at any meeting at which there is a quorum will be the act of the Board, except as otherwise required by applicable law or provided by this Agreement. If a quorum is not present at any meeting of the Board, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. Each Manager shall be entitled to the number of votes specified in Section 6.1(c)(i), (ii) and (iii), respectively, above on all matters voted on by the Board. Unless otherwise required by the express terms of this Agreement or applicable law, actions of the Board shall require a Majority Vote of the Board.

    (i)    Action Without Meeting. Any action which may be taken at any meeting of the Board, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken is signed by the number of members of the Board that would be necessary (in accordance with Section 6.1(h) above) to authorize or take such action at a meeting at which all Managers entitled to vote thereon were present and voted. Prompt notice of the taking of Board action without a meeting by less than unanimous written consent will be given to those members of the Board who have not consented in writing.

    (j)    Meetings by Telephonic or Other Communications Equipment. Managers may conduct and participate in any meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and such participation in a meeting will constitute presence in person at such meeting.

    (k)    Manager Compensation. Managers shall not be entitled to compensation in their capacity as managers; provided, however, that the managers shall be entitled to reimbursement of travel expenses reasonably incurred in attending any meeting of the Board.

    (l)    Reserved.

    (m)    Actions Requiring Approval of Managers. The Company will not, without a Majority Vote of the Board:

        (i)    make any investment in any joint venture or invest or purchase equity in any similar arrangement with a third party;

14

(ii)    make any loans or advances to any Person, including any employee, officer, or Manager, except (A) advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board and (B) loans to subsidiaries of the Company in the ordinary course of business;

(iii)    guarantee any indebtedness, except for trade accounts of the Company or any subsidiary of the Company arising in the ordinary course of business;

(iv)    make any investment inconsistent with any investment policy approved by the Board;

(v)    incur any aggregate indebtedness in excess of $25,000 that is not already included in a Board-approved budget, other than (A) trade credit incurred in the ordinary course of business, or (B) previously Board approved bank lines of credit;

(vi)    enter into or be a party to any transaction with any Manager, Member, or officer of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Securities and Exchange Act) of any such person;

(vii)    hire, fire or change in any material respect the compensation of the officers, including approving any grants of equity interests;

(viii)    change the principal business of the Company, enter new lines of business, or exit the current line of business;

(ix)    sell, assign, license, pledge or encumber any assets of the Company, including without limitation, any material technology or intellectual property, other than the sale or assignment of assets in a transaction or series of related transactions for an amount not to exceed $25,000;

(x)    enter into any corporate strategic relationship involving the payment, contribution or assignment by the Company or to the Company of assets greater than $25,000;

(xi)    settle any material proceeding in the Company's name, in excess of $50,000;

(xii)    make any donations to the public welfare or for religious, charitable, scientific, literary or educational purposes in excess of $500 per instance or $5,000 per calendar year;

(xiii)    enter into, or cause any subsidiary or Affiliate to enter into, any lease for real property;

(xiv)    purchase insurance on the life any of the Company's Members, officers or employees for the benefit of the Company;

15

(xv)     purchase or redeem any Units other than (i) purchases or redemptions of Units as expressly authorized herein, or (ii) repurchases of Units from former employees, officers, managers, consultants or other persons who performed services for the Company in connection with the cessation of such employment or service at the lower of fair market value or cost;

(xvi)     create or authorize the creation of any debt security; or

(xvii)     adopt any transaction or agreement between the Company and any Member or any Affiliate or family member of such Member except for transactions contemplated by this Agreement.

6.2.     Individual Member Authority. The President, acting individually, and any other officer of the Company hereafter appointed by the Board, each has and will have the authority to bind the Company as an agent in the ordinary course of business, subject to the limitations set forth in this Agreement. No Member acting solely in such Member's capacity as Member has the authority to bind the Company, unless such action is expressly authorized by this Agreement or by the Board. Any Member of the Company acting in such Member's capacity as a Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any action by such Member of the Company purporting to act for or to undertake any obligation, debt, duty or responsibility on behalf of any other Member or the Company, to the extent such action or undertaking is not in accordance with the express authority of this Agreement or express authority granted by the Board or the Members in accordance with this Agreement.

6.3.     Members.

(a)     Voting. Except as otherwise provided in this Agreement or required by applicable law, the Members will vote together as a single class on all matters submitted to a vote of the Members of the Company, with each such Member entitled to that number of votes equal to the number of Units held by such Members (with fractional Units, if any, rounded up or down to the nearest whole number).

(b)     Events Requiring Member Approval. The Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law, the Articles or this Agreement) a Majority Vote of the Members:

(i)     liquidate, dissolve or wind-up the business and affairs of the Company, or effect any merger or consolidation of the Company or any other liquidating transaction;

(ii)     amend, alter or repeal any provision of this Agreement or the Certificate of Formation;

(iii)     create or authorize the creation of, or issue any additional class or series of Units or other equity security of the Company or any instrument or security that is convertible into or exchangeable for equity securities of the Company, or grant any right for the purchase of any Units;

16

(iv)     cause or permit any subsidiary of the Company to issue any class or series of equity securities or any other instrument or security directly or indirectly convertible into or exchangeable for equity securities of the Company, or sell, transfer or otherwise dispose of any equity interest of any direct or indirect subsidiary of the Company, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary; or

(v)     increase or decrease the size of the Board.

(c)     Meetings of Members. Meetings of the Members, for any purpose, or purposes, may be called by the President, and will be called by the President upon the request of Members holding greater than ten percent (10%) of the total outstanding Units. Such request will state the purpose or purposes of the proposed meeting. Business transacted at any meeting of the Members will be limited to the purposes stated in the notice. Meetings of Members may be held at any place as set forth in the notice of meeting.

(d)     Notice of Meeting. Whenever Members are required or permitted to take any action at a meeting, a written notice of the meeting will be given by the Company to the Members, which notice must state the place, if any, date and hour of the meeting, the means of remote communication by which Members and proxy holders may be deemed to be present in person and vote at such meeting, and the purpose or purposes for which the meeting is called. The written notice of any meeting must be given to each Member entitled to vote at such meeting not less than ten (10) days before the date of the meeting.

(e)     Quorum. A majority of the total outstanding Units of the Company, the holders of which are present in person or represented by proxy, will constitute a quorum for the transaction of business except as may otherwise be provided by law or by this Agreement.

(f)     Fixing Record Date. In order that the Company may determine the Members entitled to notice of or to vote at any meeting of the Members, or any adjournment thereof, or to express consent to Company action in writing without a meeting, or entitled to receive payment of any distribution or allotment of any rights, or for the purpose of any other lawful action, the President shall fix a record date which will not be less than ten (10) days before the date of such meeting.

(g)     Members Action by Written Consent Without a Meeting. Any action which may be taken at any meeting of the Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by Members holding not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the taking of Member action without a meeting by less than unanimous written consent will be given to those Members who have not consented in writing.

(h)     Proxies. At each meeting of the Members, each Member having the right to vote may vote in person or may authorize another Person or Persons to act for such Member by proxy appointed by an instrument in writing subscribed by such Member and bearing a date not more than eleven (11) months prior to said meeting, unless such instrument provides for a longer

17

period. All proxies must be filed with the Secretary of the Company at the beginning of each meeting in order to be counted in any vote at the meeting.

(i)  Meetings by Telephonic or Other Communications Equipment. Members may conduct and participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and such participation in a meeting will constitute presence in person at such meeting.

6.4.  Officers.

(a)  Generally. Subject to the requirements of Section 6.1(m), Section 6.1(n), and Section 6.3(b), the officers shall be responsible for the day-to-day operations of the Company.

(b)  Designation of Officers. The Board may, from time to time, (i) designate one or more individuals to be officers of the Company, with such titles as the Board may assign to such individuals; (ii) subject to any agreement between the Company and any such officer, remove any such officer, with or without cause; and (iii) fill any vacancy of such offices. As of the Effective Date, the officers are a President (who is Robert Lindeman), and a Secretary (who is Kimberly Shingledecker). The Company may also have, at the discretion of the Board, such other officers as may be appointed by the Board (including, without limitation, the officers set forth in this Section 6.4). Officers so designated will have such authority and perform such duties as this Agreement provides or as the Board may from time to time delegate to them, subject to express limitations in this Agreement. Any number of offices may be held by the same Person. Any officer may resign as such at any time (except as otherwise provided in any agreement between the Company and such officer).

(c)  President. The President will, subject to the powers and directives of the Board and the provisions set forth in this Agreement, be in general and active charge of the business and affairs of the Company, will be the Company's chief policy-making officer, will have control over the Company's officers, agents and employees, will see that all orders and resolutions of the Board are carried into effect, and will have such other powers and duties customarily exercised by the president of business corporations. Absent a Chairman of the Board, the President will preside at all meetings of the Board and Members. Subject to the authority of the Board, the President shall have authority to make contracts on behalf of the Company in the ordinary course of the Company's business, shall be responsible to effect all orders and resolutions of the Board and the Members, shall sign and deliver in the name of the Company any agreements, documents, certificates, deeds, mortgages, bonds, contracts, or other instruments pertaining to the business of the Company except as otherwise delegated or provided by law.  The President will have such other powers and duties as may be prescribed by the Board or as may be provided in this Agreement.

(d)  Vice Presidents. The Vice Presidents, if any such officers are appointed, will have such other powers and duties as may be prescribed by the President or the Board, or as may be provided in this Agreement. In the absence or disability of the President, the Vice Presidents, in order of their rank as fixed by the Board, shall perform all the duties of the President and when so acting shall have all powers of and be subject to all the restrictions upon the President.

18

(e)    Secretary. The Secretary will keep the minutes of all meetings of the Board and Members in appropriate books and will attend to the giving of all notices for the Company. The Secretary will have charge of such books and papers as the Board may direct, will exercise all powers and duties customarily exercised by the secretary of business organizations, and will have such other powers and duties as may be prescribed by the Board or the President, or as may be provided in this Agreement.

(f)    Other Officers and Agents. The Board may from time to time appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.

(g)    Officer Compensation. The salaries and other compensation of the officers of the Company shall be as determined by the Board of Managers.

6.5.    Indemnification; Limitation of Liability.

(a)    Indemnification. The Company shall indemnify every Person (the "Indemnitee") who is or was a party or is or was threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such Person is or was a Manager or officer of the Company, or, while a Manager or officer of the Company, is or was serving at the request of the Company as a manager, officer, employee, agent or trustee of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against any losses, damages or expenses actually and reasonably incurred by the Indemnitee in connection with such action, suit or proceeding, except for liability (i) for any breach of the Indemnitee's duty of loyalty to the Company or its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the Indemnitee derived an improper personal benefit. The right to indemnification conferred in this Section 6.5(a) includes the right of the Indemnitee to be paid by the Company the expenses incurred in defending any such action in advance of its final disposition to the fullest extent permitted by the Act (an "Advancement of Expenses"); provided, however, that the Company will only make an Advancement of Expenses upon delivery to the Company of an undertaking, by or on behalf of such Indemnitee, to repay all amounts so advanced if it is ultimately determined that such Indemnitee is not entitled to be indemnified under this Section 6.5(a) or otherwise.

(b)    Limitation of Liability. A Manager of the Company will not be personally liable to the Company or its Members for monetary damages for breach of fiduciary duties as a Manager, provided that the liability of a Manager (i) for any breach of the Manager's loyalty to the Company or its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the manager derived an improper personal benefit will not be eliminated or limited hereby.

(c)    Repeal or Modification. Any repeal or modification of this Section 6.5 will not adversely affect any right or protection of any individual existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

19

## ARTICLE 7. MEMBERS

7.1.    Additional Members.

(a)    Admission. With a Majority Vote of the Members, the Company may at any time admit additional Members ("Additional Members").

(b)    Time of Admission. An Additional Member shall be deemed admitted as a Member at the time such Person has executed and delivered to the Company a counterpart to this Agreement.

(c)    Required Contribution. The Managers shall determine what, if any, Capital Contribution each Additional Member need make and the Percentage Interest and Units to be issued to such Member. Any admission of an Additional Member shall dilute, pro rata, the Percentage Interests allocated to Members. The Members may provide that the required contribution may be paid prior to, at the time of, or subsequent to, the issuance of an Interest to such Member and that any subsequent contribution may be made from distributions paid or payable in respect of such Interest. If any portion of a required contribution is payable after the issuance of the Interest to such Member, the Company may determine that any rights otherwise incident to such Interest (including voting, distribution, inspection and transfer rights) will not come into effect until such required contribution has been made.

## ARTICLE 8. ACCOUNTING, BOOKS AND RECORDS

8.1.    Accounting, Books and Records.

(a)    Maintenance. The Company shall keep separate books of account, which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with this Agreement. The books of account and other Company records shall be available for inspection and copying by any Member (or such Member's agent).

(b)    Methodology; Examination. The Members shall select a method of accounting for preparation of the Company's financial reports and for tax purposes and shall keep the Company's books and records accordingly. The books and records of the Company shall be available at the Company's principal office for examination by a Member or the Member's duly authorized representative at reasonable times during normal business hours. The rights granted to a Member pursuant to this Section 8.1(b) are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established or amended from time to time.

8.2.    Reports; Other Tax Information.

(a)    Financial Statements. The Company shall cause to be delivered to each Member the financial statements listed in clauses (i) and (ii) below, prepared, in each case (other than with respect to Members' Capital Accounts, which shall be prepared in accordance with this

Agreement). in accordance with GAAP consistently applied (subject to normal year-end audit adjustments).

           (i)      As soon as practicable following the end of each fiscal year of the Company (and in any event not later than 90 days after the end of such fiscal year):

                    (A)      a balance sheet of the Company as of the end of such fiscal year and the related statements of operations. Members' Capital Accounts and changes therein, and cash flows for such fiscal year, together with appropriate notes to such financial statements and supporting schedules, all of which shall be audited and certified by the Company's accountants; and

                    (B)      necessary tax information for such fiscal year.

           (ii)      As soon as practicable following the end of each fiscal quarter of the Company (and in any event not later than 60 days after the end of each such fiscal quarter), an unaudited balance sheet of the Company as of the end of such fiscal quarter and the related statements of operations and cash flows for such fiscal quarter.

           (b)      Other Reports. The Company shall cause to be delivered to a Member such other reports as such Member may reasonably request from time to time.

        8.3.      Taxation as a Partnership. The Members intend that, pursuant to the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code, the Company shall be treated as a partnership for Federal income tax purposes. None of the Company or the Members shall take any action that would cause the Company to be excluded from the application of any provision of Subchapter K, Chapter 1 of Subtitle A of the Code or any similar provision of any state tax laws. The Company and the Members shall not elect classification of the Members for Federal tax purposes as other than a partnership under Treasury Regulations Section 301.7701-3. The Members may determine whether to make or fail to make any corresponding election for state or local tax purposes.

        8.4.      Tax Elections. The Members shall, in their sole and absolute discretion, (a) determine whether to make any available election (including the election under Section 754 of the Code) or choose any available reporting method pursuant to the Code or state or local tax law, and (b) have the right to seek to revoke any such election (including the election under Section 754 of the Code) or change any reporting method upon the Members' determination. in their sole and absolute discretion. that such revocation is in the best interests of all of the Members.

        8.5.      Tax Matters Partner.

           (a)      Designation. Pies & Pints Development Partners, LLC (R&M Advisors, LLC (Rob Lindeman)) shall be the "tax matters partner" of the Company for federal income tax purposes for all taxable years of the Company commencing prior to January 1, 2018. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service ("IRS") of the beginning of an administrative proceeding with respect to the Company, the tax matters

partner shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

(b)    Authority. The tax matters partner is authorized, but not required:

(i)    to enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the tax matters partner may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (A) that (within the time prescribed pursuant to the Code and Regulations) files a statement with the IRS providing that the tax matters partner shall not have the authority to enter into a settlement agreement on behalf of such Member or (8) that is a "notice partner" (as defined in Section 6231 of the Code) or a Member of a "notice group" (as defined in Section 6223(b)(2) of the Code);

(ii)    in the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the tax matters partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located;

(iii)    to intervene in any action brought by any other Member for judicial review of a final adjustment;

(iv)    to file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request;

(v)    to enter into an agreement with the IRS to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

The taking of any action and the incurring of any expense by the tax matters partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the tax matters partner and the provisions relating to indemnification set forth in Section 6.10 of this Agreement shall be fully applicable to the tax matters partner in its capacity as such.

8.6.    Partnership Representative.

(a)    Designation. The "partnership representative" for purposes of Subchapter C of Chapter 63 of Subtitle F of the Code after amendment by the Bipartisan Budget Act of 2015,

P.L. 114-74 (the "Revised Audit Procedures") for taxable years of the Company commencing on or after January 1, 2018, shall be selected by a Majority Vote of the Members. Until removed and replaced by a Majority Vote of the Members, the partnership representative shall be Pies & Pints Development Partners, LLC (R&M Advisors, LLC (Rob Lindeman)). The partnership representative, upon the approval of the Board, shall if possible opt out of the Revised Audit Procedures for tax years of the Company.

      (b)    Authority and Duties.

      (i)    The partnership representative shall have the power and authority granted to the partnership representative under the Code. If any "partnership adjustment" is determined with respect to the Company under the Revised Audit Procedures, the partnership representative shall promptly notify the Members and shall take such actions as he, she or it may deem appropriate including whether to dispute the adjustment prior to payment, cause the Company to pay the amount of any such adjustment or, if available, make the election to push the adjustment to the Members for the reviewed year as set forth in the Revised Audit Procedures. If the Company is assessed an "imputed underpayment" under the Revised Audit Procedures, the partnership representative shall apportion the imputed underpayment, together with any penalties and interest thereon, among the Members and former Members who were Members during the reviewed year in the manner that would, as nearly as possible, result in an apportionment of liability that is the same as the liability such Member or former Member would have had under the Code prior to the adoption of the Revised Audit Procedures. In making such apportionment, the partnership representative shall take into account any amended tax returns for the reviewed year or tax attributes of a Member or former Member that result in a reduction in the imputed underpayment by crediting such Member or former Member with such reduction. The Members shall cooperate with the partnership representative in providing information, including, without limitation, information regarding the direct and indirect owners of a Member, reasonably necessary for the Company to minimize any imputed underpayment or other liabilities of the Members under the Revised Audit Procedures. Each Member and former Member shall indemnify or reimburse the Company for his, her or its allocable share of any imputed underpayment plus any penalties and interest thereon. The Company may offset distributions, withdrawals and other amounts which any Member is otherwise entitled to receive under this Agreement against a Member's indemnification obligations under this Section 8.6(b)(i). A Member's obligations under this Section 8.6(b)(i) shall survive the Member withdrawing or otherwise disposing of his, her or its interest in the Company and the termination, dissolution, liquidation or winding up of the Company.

      (ii)    The partnership representative shall have the authority to extend the statute of limitations for assessment of tax deficiencies with respect to adjustments to the Company's federal, state, local or foreign tax returns, and to represent the Company before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Company with respect to such tax matters or otherwise affect the rights of the Company and the Members; provided that, to the extent any such extension, agreement, election or document might have a material effect on any Member, the partnership representative must reasonably consult with such Member in any discussions or negotiations associated with such agreement or document. Each Member agrees to cooperate with

the partnership representative and to do or refrain from doing any or all things reasonably required by the partnership representative to conduct such proceedings.

(iii)    The partnership representative shall keep each Member informed of all administrative and judicial proceedings pursuant to Section 6231 or Section 6234 of the Code and shall furnish each Member in writing a copy of each notice or other communication received by the partnership representative. If any Member intends to file a notice of inconsistent treatment under Section 6222(c) of the Code, such Member shall, prior to the filing of such notice, provide notice to the partnership representative of such intent and the manner in which the Member's intended treatment of the Company item is (or may be) inconsistent with the treatment of that item by the Company.

(iv)    The partnership representative shall not file pursuant to Section 6227 of the Code a request for an administrative adjustment of items of the Company without first notifying all Members. If a Majority agree with the requested adjustment, the partnership representative shall file the request on behalf of the Company.

(v)    The partnership representative intending to file a petition under Sections 6234 of the Code with respect to any item of the Company, or other tax matters involving the Company, shall notify the Members prior to such filing of the nature of the contemplated proceeding within a reasonable time to allow the Members to participate in the choice of the forum for such petition, and the Majority shall agree on an appropriate forum. If the partnership representative intends to seek review of any court decision rendered as a result of such proceeding, the partnership representative shall notify the Members and obtain the approval of a Majority prior to seeking such review.

(vi)    If the Company is terminated for U.S. federal income tax purposes, the provisions of this Section 8.6 shall survive such termination and shall remain binding on the Members for a period of time necessary to resolve with the IRS any and all matters regarding the U.S. federal income taxation of the Company's tax returns.

8.7.    Compensation; Reimbursement.    The tax matters partner and partnership representative shall receive no compensation for its services. The Company shall bear all third party costs and expenses incurred by the tax matters partner or partnership representative in performing its duties as such (including legal and accounting fees). Nothing herein shall be construed to restrict the Company from engaging an accounting firm to assist the tax matters partner in discharging his duties hereunder.

8.8.    Withholding. Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of Federal, state, local, or foreign taxes that the Members determine that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including any taxes required to be withheld or paid by the Company pursuant to Sections 1441, 1442, 1445 or 1446 of the Code. Any amount paid on behalf of or with respect to a Member shall constitute a loan by the Company to such Member, which loan shall be repaid by such Member within 15 days after notice from the Members that such payment must be made unless (a) the Company withholds such payment from a distribution that would otherwise be made to the Member, or (b) the Members

24

determine, in their sole and absolute discretion, that such payment may be satisfied out of the available funds of the Company that would, but for such payment, be distributed to the Member. Any amounts withheld pursuant to the foregoing clauses (a) or (b) shall be treated as having been distributed to such Member, and each Member hereby grants to the Company a security interest in the Interest held by such Member to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 8.8. If a Member fails to pay any amounts owed to the Company pursuant to this Section 8.8 when due, the Members may, in their sole and absolute discretion, elect to make the payment to the Company on behalf of such defaulting Member, and in such event shall be deemed to have loaned such amount to such defaulting Member and, until repayment of such loan, shall succeed to all rights and remedies of the Company as against such defaulting Member (including the right to receive distributions). Any amounts payable by a Member hereunder shall bear interest at the base rate on corporate loans at large United States money center commercial banks, as published from time to time in the Wall Street Journal, plus four percentage points (but not higher than the maximum lawful rate) from the date such amount is due (i.e., 15 days after demand) until such amount is paid in full. Each Member shall take such actions as the Company or the Members shall request in order to perfect or enforce the security interest created hereunder.

## ARTICLE 9. TRANSFERS

9.1.    Restrictions on Transfer.

(a)     General Restriction. No Member may Transfer, directly or indirectly, or by operation of law or otherwise, any Interest, except as hereinafter set forth in this Article 9 or upon the prior written consent of each Member and the Company, which consent may be granted or withheld in the sole and absolute discretion of each Member or the Company.

(b)     Transfers to Affiliates. Notwithstanding Section 9.1(a), and notwithstanding anything to the contrary contained in Section 9.2, each Member may, during such Member's lifetime or upon the Member's death or dissolution, Transfer all or any part of the Interest held by such Member to any of the following:

(i)     a spouse, parent, descendant, brother or sister of such Member (or, if such Member is a trust, any of the aforementioned family members as the beneficiaries of such trust);

(ii)     a trust for the benefit of such Member or any of the permitted persons named in subsection above;

(iii)     any other Member; or

(iv)     any Affiliate of a Member,

provided, however, that no Member may Transfer any Interest to any Person that competes, directly or indirectly, with the business of the Company.

(c)     Transferees. Any transferee of an Interest pursuant to Section 9.1(b) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest and

shall be considered an Assignee under Section 9.6 unless all of the conditions set forth in Section 9.5 with respect to such transferee have been satisfied.

9.2.    Right of First Refusal.

(a)    Voluntary Transfers of Interests. Except as herein provided, no Member (a "Selling Member") may voluntarily Transfer all or any portion of such Member's Interest except (x) with the prior written consent of each other Member and the Board, which consent may be granted or withheld in the sole and absolute discretion of each such other Member or the Board, or (y) in compliance with the following provisions:

(i)    Notice. The Selling Member shall first deliver a written notice (a "Voluntary Transfer Notice") to the Company and the other Members stating (A) that the Selling Member desires to Transfer all or a specified portion of the Selling Member's Interest and (B) the price and other material terms of the proposed Transfer. The Voluntary Transfer Notice shall be accompanied by a certificate of the Selling Member certifying that it has received from a third party a bona fide offer to acquire such Interest at such price and on such terms as are set forth in the Voluntary Transfer Notice and shall identify such third party.

(ii)    Member Right. Within 15 days after receipt of a Voluntary Transfer Notice (the "Member Period"), each Member may elect, by delivering to the Selling Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest specified in the Voluntary Transfer Notice, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Board). If a Member does not respond to the Voluntary Transfer Notice within the Member Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

(iii)    Company Right. If one or more Members do not exercise their respective right to purchase their pro rata portion of the Interest specified in the Voluntary Transfer Notice within the Member Period, then, within five business days after the expiration of the Member Period (the "Company Period"), the Company, as determined by a Majority Vote of the Board, may elect, by delivering to the Selling Member written notice of the Company's election, to purchase all of the Interest specified in the Voluntary Transfer Notice that the Members have not elected to purchase, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company). If the Company does not respond to the Voluntary Transfer Notice within the Company Period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

(iv)    Consummation. If the Members and/or the Company elect to acquire all of the Interest specified in the Voluntary Transfer Notice pursuant to this Section 9.2(a), the applicable Members and/or the Company and the Selling Member shall consummate the sale and purchase of such Interest within 30 days after expiration of the Member Period, on the same terms and conditions specified in the Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company).

(v)     <u>Selling Member Right</u>. If the Members and the Company do not exercise their respective rights under this Section 9.2(a) to purchase all of the Interest specified in the Voluntary Transfer Notice within the specified time periods, then, within five days after the expiration of the Company Period, the Selling Member shall deliver to the other Members a copy of the Voluntary Transfer Notice, and such other Members shall be entitled to participate in such Transfer of Interests as provided in Section 9.3. The Selling Member and the Tag-Along Members (as defined below) shall be permitted to sell their Interests to the offeror specified in the Voluntary Transfer Notice within the time and on the terms provided in Section 9.3.

    (b)     <u>Involuntary Transfer of Interests.</u>

    (i)     <u>Notice</u>. Within 15 days of any involuntary Transfer of an Interest or the appointment of a personal representative for a Member who has died, the Member or the Member's personal representative (the "Transferring Member") shall send written notice to the Company and the other Members of such involuntary Transfer (including the nature and details thereon or the Member's death, as applicable (an "Involuntary Transfer Notice").

    (ii)     <u>Member Right</u>. Within 30 days after receipt of an Involuntary Transfer Notice (the "Member Involuntary Transfer Period"), each Member may elect, by delivering to the Transferring Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest to which the Involuntary Transfer Notice refers. If a Member does not respond to the Involuntary Transfer Notice within the Member Involuntary Transfer Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

    (iii)     <u>Company Right</u>. If one or more Members do not exercise their respective rights to purchase their pro rata portion of the Interest to which the Involuntary Transfer Notice refers within the Member Involuntary Transfer Period, then, within 30 days after the expiration of the Member Involuntary Transfer Period, the Company, as determined by a Majority Vote of the Managers, may elect, by delivering to the Transferring Member written notice of the Company's election, to purchase all of the Interest to which the Involuntary Transfer Notice refers that the Members have not elected to purchase. If the Company does not respond to the Involuntary Transfer Notice within such 30-day period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

    (iv)     <u>Consummation</u>. If the Members and/or the Company elect to acquire all of the Interest to which the Involuntary Transfer Notice refers pursuant to this Section 9.2(b), the applicable Members and/or Company and the Transferring Member shall consummate the sale and purchase of such Interest within 60 days after expiration of the Member Involuntary Transfer Period, at a price equal to (A) the Percentage Interest represented by the Interest specified in the Involuntary Transfer Notice, multiplied by (8) the difference between (x) the aggregate Asset Value of all assets of the Company and (y) the outstanding liabilities of the Company, payable in cash or on such other terms as the applicable Members and/or the Company (as the case may be) and the Transferring Member agree.

(v)     Transferring Member Right. If the Members and the Company do not exercise their respective rights under this Section 9.2(b) to purchase all of the Interest specified in the Involuntary Transfer Notice within the specified time periods, then such Interest may be held by the transferee of such disposed interest (or in case of a trustee in bankruptcy or a deceased Member's personal representative, such Interest may be further disposed of by such trustee or personal representative), provided that (x) no transferee of such Interest shall become a substituted Member without first satisfying the conditions set forth in Section 9.5 and (y) such transferee shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.3.     Tag-Along Rights.

(a)     Exercise of Tag-Along Rights. If the Members and/or the Company do not purchase all the Interest subject to a third party offer pursuant to Section 9.2(a), then the other Members shall be entitled to participate in any Transfer of the Interest by the Selling Member pursuant to such third party offer (a "Tag-Along Right"). Each Member may elect to exercise its Tag• Along Right by delivering written notice to the Selling Member (a "Tag-Along Notice"), within 10 days following receipt of the notice described in Section 9.2(a)(v), that such Member desires to participate in the proposed Transfer upon the price, terms and conditions set forth in the Voluntary Transfer Notice and specifying the Interest such Member desires to include in such Transfer. If any Members elect to exercise Tag-Along Rights (each, a "Tag-Along Member"), each Tag-Along Member shall be entitled to sell an Interest equal to the lesser of (i) the amount specified by such Tag-Along Member in its Tag-Along Notice or (ii) such Tag-Along Member's pro rata portion of the Interests being Transferred based on the ratio which the Percentage Interest held by such Tag-Along Member bears to the aggregate Percentage Interests held by all Tag-Along Members and the Selling Member.

(b)     No Tag-Along Members. If none of the Members gives a timely Tag-Along Notice with respect to the Transfer proposed in the Voluntary Transfer Notice, then the Selling Member shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may have been given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; provided, however, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The purchaser of any Interest so sold (i) must satisfy the conditions set forth in Section 9.5 to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

(c)     Tag-Along Members. If one or more Members gives a timely Tag-Along Notice, then the Selling Member shall use all reasonable efforts to obtain the agreement of the offeror to the participation of the Tag-Along Members in the sale on the terms set forth in the Voluntary Transfer Notice. The Selling Member shall not Transfer any Interest to the offeror if such offeror declines to allow the participation of the Tag-Along Members on such basis. The Selling Member and the Tag-Along Members shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may be given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; provided, however, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The Interest to be sold by each Tag-Along Member shall be as determined pursuant to Section 9.3(a), and the Selling Member shall provide the remaining Interest to be sold.

The purchaser of any Interest so sold (i) must comply with the provisions of Section 9.5 in order to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.4.     Prohibited Transfers.

(a)     Non-Compliant Transfer.  Any purported Transfer of an Interest that is not in compliance with this Article 9 shall be null and void and of no force or effect; provided that if the Company is required to recognize any such Transfer, the Interest Transferred shall be strictly limited to the transferor's right to allocations and distributions as provided by this Agreement with respect to the Transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts or liabilities for damages that the transferor or transferee may have to the Company, and shall not include the right to any information or accounting of the affairs of the Company, the right to inspect the books or records of the Company, and/or any of the other rights of a Member under the Act or this Agreement.

(b)     Indemnity.  In the case of a Transfer or attempted Transfer of an Interest that is not in compliance with this Article 9, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability and damage that the Company and any such indemnified Members may incur (including incremental tax liabilities, attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.5.     Admission of Substituted Members.  Transferees of Interests pursuant to this Article 9 who are already Members shall be automatically admitted as substituted Members with respect to such acquired Interests.  Subject to the other provisions of this Article 9, a transferee of an Interest, other than a transferee who is already a Member, may be admitted to the Company as a substituted Member only upon satisfaction of the following conditions:

(a)     the Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

(b)     the transferee of the Interest shall, by written instrument in form and substance reasonably satisfactory to the Members, (i) accept and adopt the terms and provisions of this Agreement, including this Article 9, and (ii) assume the obligations of the transferor Member under this Agreement with respect to the Transferred Interest.  The transferor Member shall be released from all such assumed obligations, except those obligations or liabilities of the transferor Member arising out of a breach of this Agreement or based on events occurring, arising or maturing prior to the Transfer; and

(c)     the transferee of the Interest pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Interest.

9.6.     Rights of Unadmitted Assignees.  A Person who acquires an Interest but who is not admitted as a substituted Member pursuant to Section 9.5 (an "Assignee") shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to

become (or exercise any right of) a Member. The Interest of an Assignee shall be deemed to be voted on all matters in the same proportion as the remaining Interest was voted. An Assignee is entitled, to the extent of the Percentage Interest assigned, only to allocations of Profit, Loss and other tax items of the Company and to distributions from the Company.

9.7.    Compliance with Securities Laws. If any Interest is to be transferred, either (a) such Interest shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) at the request of the Members, the transferor shall provide an opinion of counsel, satisfactory to the Members, that the proposed Transfer is exempt from such registration requirements. The Company and the Members have no obligation or intention whatsoever either to register Interests for resale under any Federal or state securities laws or to take any action which would make available to any Person any exemption from the registration requirements of such laws.

9.8.    Hypothecation. Any hypothecation, mortgage, pledge or collateralization of an Interest is expressly prohibited, except (a) as contemplated by Section 8.6, (b) by a Majority Vote of the Members, or (c) as otherwise permitted under this Agreement. Any purported hypothecation, mortgage, pledge or collateralization in any manner by any Person in violation of this Section 9.8 shall be null and void and of no legal effect.

9.9.    Distributions and Allocations with Respect to Transferred Interests. If any Interest is sold, assigned or transferred during any accounting period in compliance with the provisions of this Article 9, Profit, Loss and all other items of income, gain, loss and deduction attributable to the transferred Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Members in good faith. Solely for purposes of making such allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which it is given notice of such transfer and all distributions on or before such date shall be made to the transferor, and all distributions after such date shall be made to the transferee; provided, however, that if the Company does not receive a notice stating the date such Interest was transferred and such other information as the Company may reasonably require within 30 days after the end of the accounting period during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the accounting period during which the transfer occurs, was the owner of the Interest. Neither the Company nor the Members shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.9, whether or not the Members or the Company had knowledge of any Transfer of ownership of any Interest.

9.10.    Voluntary Withdrawal. No Member shall have the right to Voluntarily Withdraw from the Company.

9.11.    Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become a transferee of an Interest but shall not become a Member. The successor transferee of an Interest shall have all the rights of a transferee of an Interest but shall not be entitled to receive the fair market value of the Interest as of the date of the Involuntary Withdrawal from the Company except as provided herein.

The successor of the withdrawn Member shall have the option to retain the Membership Interest in the Company. Said option must be exercised by written notice delivered by the representative (as the case may be) to the Members of the Company and received within sixty (60) days of the Involuntary Withdrawal event. In the event that the option is not exercised within sixty (60) days, the successor of the withdrawn shall be obligated to sell, and the remaining Members shall have the option to purchase, in the same priority as set forth in Section 9.2 above, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree. The purchase price of a Membership Interest to be purchased in accordance with the provisions of this Section 9.11 shall be as follows:

(a) The purchase price of the Membership Interest owned by the successor of the withdrawn Member shall be determined as of the last day of the month preceding the month during which the Involuntary Withdrawal occurs, and shall be the fair market value of the Membership Interest to be purchased hereunder.

(b) The determination of the purchase price shall, unless agreed to between the successor of the withdrawn Member and the remaining Members, be made by an independent appraiser selected as follows:

(i) Within thirty (30) days after demand by either the remaining Members or the successor of the withdrawn Member, both the remaining Members and the successor of the withdrawn Member shall each submit their estimation of the value of the Company in a sealed envelope to the accountants regularly employed by the Company. The accountants regularly employed by the Company shall open the sealed envelopes and examine the estimated valuations submitted only after they have received both valuations. If the highest estimated value submitted is equal to or less than one hundred ten percent (110%) of the lowest value submitted, the Fair Value shall be the average of the two estimated values. If the highest estimated value submitted is greater than one hundred ten percent (110%) of the lowest value submitted, the Appraised Value shall be determined by the procedure set forth in Section 9.9(b)(ii).

(ii) The remaining Members and the successor of the withdrawn Member shall jointly select a qualified appraiser or appraisers, and such jointly selected appraiser or appraisers shall value the Company. If the parties cannot so agree on the selection of a qualified appraiser or appraisers, then, within thirty (30) days after demand by either of them, each party shall appoint a qualified appraiser. If any party entitled to appoint an appraiser does not so do, then the appraiser appointed by the other party may act alone. The two (2) appraisers so appointed shall, within thirty (30) days after the appointment of the second of them to be appointed, select a third appraiser. The appraiser or appraisers shall estimate the value of the Company and submit their estimate or estimates to the accountants regularly employed by the Company. The Appraised Value shall be the estimated value submitted by the Members to the accountants regularly employed by the Company which is closest to the estimate made by the appraiser or the appraisers or, if there are more than one estimate reached by the various appraisers, the average or all such estimates. The cost of the appraisals shall be borne equally by the parties.

(c) It is understood and agreed that the purchase price determined in accordance with this Section 9.11 is the full agreed value of such portion of the Membership Interest; that except as otherwise provided in this Operating Agreement such value shall in no manner be altered;

31

and that all property, both tangible and intangible, if any, as well as liabilities, including mortgages, liens or other encumbrances of any kind whatsoever, if any, of or upon the property of the Company have been considered in determining such purchase price.

(d)     Unless otherwise agreed by all of the Members, the aggregate purchase price due to any successor of the withdrawn Member shall be paid in the following manner:

(i)     There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such successor of the withdrawn Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the successor of the withdrawn Member.

(ii)     There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Cessation. Such amount is to be determined by the Board.

(iii)     Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in ten (10) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining nine (9) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)     The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Transferring Member, bearing interest at the Wall Street Journal prime rate of then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Membership Interest.

(v)     The closing shall take place upon the date determined by the Remaining Members, but shall occur within six (6) months of the date of the Involuntary Withdrawal.

9.12.   Buy-Sell. Each Member or Members (collectively, the "Offeror") shall have the right at any lime to serve upon any one or more of the other Members (collectively, the "Offeree") a notice in writing which shall contain an offer to sell the entire Interest in the Company of the Offeror or to purchase the entire Interest in the Company of the Offeree, as set forth below. Any Transfer of an Interest under this provision is not subject to any of the Transfer restrictions set forth in Article 9.

(a)     No offer shall be subject to the provisions of this Section 9.12 unless such offer is both an offer to sell the entire Interest of the Offeror and an offer to purchase the entire Interest of the Offeree, and such offer must specify the selling or purchase price and that the price of the Interest to be so transferred shall be paid in cash. The selling price and the purchase price

32

specified in such offer must be computed on the basis of the same Interest value. Such offer shall be irrevocable for a period of sixty (60) days (the "Offer Period"), and the Offeree may, on or before the end of the Offer Period, accept either the offer to sell or the offer to purchase (but not both), and upon acceptance, the Offeror shall be required to sell or to purchase, as the case may be.

(b)     If the Offeree fails within said sixty (60) day period to accept either of said offers, then the offers shall automatically expire and be of no further force and effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of said sixty (60) day period, to purchase the Interest of the Offeree, at the applicable price as specified in Section 9.12(a), and if the Offeror exercises such right, the Offeree shall be required to sell. If the Offeror fails to exercise its right to purchase or sell within the lime specified, either party may thereafter make a new offer pursuant to this Section 9.12.

(c)     The closing of such purchase and sale shall be held at the time and place and on the date specified by the Offeror by written notice to the Offeree, which date shall be on or before the one hundred twentieth (120th) day after the date of the offer to purchase or sell. Payment of the purchase price shall be made in cash or cashier's check. Each Member shall bear his or her own legal and other closing expenses. The selling Member(s) shall convey his/her/its Interest(s) in the Company and in the assets thereof by appropriate assignment and any other appropriate instrument, subject only to such title defects and encumbrances as existed on the date the offer hereunder was made. Each Member who is now or hereafter becomes a Member, by so becoming a Member, hereby covenants and agrees to execute any and all instruments and to cooperate in giving effect to the provisions of this Section 9.12.

## ARTICLE 10. DISSOLUTION AND WINDING UP

10.1.   Dissolution.

(a)     Dissolution Events.   The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each, a "Dissolution Event"):

(i)     a unanimous determination by all of the Members to dissolve, wind up and liquidate the Company;

(ii)    the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act;

(iii)   the sale of all or substantially all of the assets of the Company; or

(iv)    there being no Members.

10.2.   Continuation.   If the event specified in Section 10.1(a)(iv) occurs, the Company shall not dissolve and shall not be required to be wound up if, within 90 days of the date of the event that terminated the continued membership of the last remaining Member, the personal representative of the last remaining Member agrees in writing to continue the Company and to admit the personal representative of such Member or its nominees or designee to the Company as

33

a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

10.3.    Covenant.  The Members hereby agree that the Company shall not dissolve prior to the occurrence of a Dissolution Event.

10.4.    Winding Up.

(a)    Liquidation and Distribution.  Except as otherwise provided in Section 10.1, upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members.  The Members and any officers and agents of the Company shall not take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and assets, and the assets (or the proceeds of any liquidation hereof) shall be applied and distributed in the following order:

(i)    first, to creditors, including any Member that is a creditor, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Members;

(ii)    second, to establish such reserves for unknown or contingent liabilities of the Company as the Board may determine in accordance with Section 10.4(b); and

(iii)    the balance, if any, to the Members in proportion to their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.  If a Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

Notwithstanding the provisions of Section 5.1 hereof, in the year of the sale or other disposition of the Company's property, and in the year of liquidation of the Company, items of gross income and deduction shall be allocated to the Members to the extent necessary to produce Capital Accounts for the Members such that the amounts distributed pursuant to Section 10.2(a)(iii) will be in the amounts; sequence and priority set forth in Section 5.1.  The Members shall not receive any additional compensation for any services performed pursuant to this Article 10.

(b)    Reserves.  In the discretion of the Board, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Article 10 may be:

(i)    distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company and paying any contingent or unforeseen liabilities or obligations of the Company.  The assets of any such

trust shall be distributed to the Members from time to time, in the reasonable discretion of the Members, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

(ii)     withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that any such withheld amounts, to the extent not used to pay such Company liabilities, shall be distributed to the Members as soon as practicable.

(c)     Certificate of Cancellation.  Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with this Article 10, the Members shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Members deem such filing necessary or advisable.

10.5.   Certain Terminations.  Notwithstanding any other provisions of this Article 10, in the event the Company is terminated within the meaning of Section 708(b)(1)(B) of the Code, but no Dissolution Event has occurred, the Company's property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.

10.6.   Liquidation of Member's Interest.  Except as otherwise specifically provided in this Agreement, any distribution made to a Member as a result of the liquidation of such Member's interest in the Company (within the meaning of Treasury Regulations Section 1.761-1(d)), which liquidation is not a result of dissolution of the Company, shall be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the fiscal year during which such liquidation occurs through the date of such liquidation (other than those adjustments due to distributions pursuant to this Section 10.4), by the end of such year (or, if later, within 90 days after the date of such liquidation).  All distributions upon liquidation of a Member's interest in the Company shall be made in accordance with the timing requirements of Treasury Regulations Section 1.704-1 (b)(2)(ii)(b)(2).

10.7.   Rights of Members.  Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of such Member's Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. No Member shall have priority over any other Member as to the return of its Capital Contributions, distributions or allocations.

10.8.   Records of Liquidation.  Each of the Members shall be furnished with a statement prepared by the Company's accountants which shall set forth the assets and liabilities of the Company as of the date of the occurrence of the Dissolution Event and the plans for compliance with Section 10.2.

10.9.   Form of Liquidating Distributions.  For purposes of making the distributions required by Section 10.2, the Members may determine whether to distribute all or a portion of the Company's assets in-kind or to sell all or any portion of the assets and distribute the proceeds therefrom; provided, however, that, in the absence of a determination by the Members with respect to the form of liquidating distributions, the Company's assets shall be sold and the proceeds thereof distributed to the Members; provided, further, however, that if any distributions are made in-kind,

35

the Capital Account of each Member shall be adjusted immediately prior to such distribution for any variation between the adjusted basis of the distributed property for tax purposes and the current fair market value of such property, to the extent not already reflected in the Capital Accounts.

## ARTICLE 11. MISCELLANEOUS

11.1. Notices. All notices or other communications permitted or required to be given under this Agreement shall be in writing, signed by the party giving such notice or other communication, and shall be delivered personally, telecopied, or sent by certified mail or overnight courier service, to the address of each Member as set forth on "Exhibit A" or as otherwise reflected on the books and records of the Company. The date of personal delivery or telecopy or three business days after the date of mailing (or the next business day after delivery by overnight courier service), as the case may be, shall be the date of receipt of such notice or other communication. Any Member may change its notice address by giving notice, in writing, stating its new address to the Company.

11.2. Amendments.

(a) Subject to Section 6.3(b) and Sections 11.2(b) and (c), this Agreement and the Certificate may be amended, waived or modified from time to time only upon a Majority Vote of the Members.

(b) Notwithstanding anything contained in Section 11.2 or any other provision of this Agreement to the contrary, (1) no Member approval is required for any amendment made by the President, or such other officer designated by the President, to "Exhibit A" in accordance with Section 2.8, and (2) the Board may, without any Member action, approve any amendment to the Certificate or this Agreement:

(i) to reflect any change in the registered office or registered agent of the Company;

(ii) that is of an inconsequential nature and does not adversely affect the Members;

(iii) that is required by this Agreement; and

(iv) that clarifies any ambiguity or corrects any provision herein that may be inconsistent with the manifest intent of this Agreement.

(c) Notwithstanding anything contained in Section 11.2 or any other provision of this Agreement to the contrary, and except in the case of a Unanimous Vote of the Members, Section 6.1(c)(i) shall not be amended without the consent of R&M Advisors, LLC; Section 6.1(c)(ii) shall not be amended without the consent of Blue Fire Capital, LLC; and Section 6.1(c)(iii) shall not be amended without the consent of KSDB, LLC.

11.3. Binding Effect. Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns.

36

11.4.  Construction.  The terms and provisions of this Agreement shall be construed fairly in accordance with their plain meaning, regardless of which party hereto was responsible for the drafting of such terms and provisions.

11.5.  Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.6.  Severability.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section 11.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause a Member to lose the material benefit of such Member's economic bargain.

11.7.  Entire Agreement.  This Agreement constitutes the entire agreement, and supersedes all prior agreements or understandings, whether written or oral, between the parties hereto with respect to the subject matter hereof.

11.8.  Governing Law; Costs and Attorney Fees.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles.  To the extent that any party to this Agreement prevails against any other party hereto in connection with the prevailing party's enforcement of its rights under this Agreement, the prevailing party shall be entitled to its costs and expenses (including attorney fees) in connection with such dispute.

11.9.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

11.10.  Further Assurances.  The parties hereto shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purpose of this Agreement.

11.11.  No Third Party Beneficiaries.

(a)  Except as set forth in subsection (b) below, this Agreement is made solely and specifically among and for the benefit of the Members and the Company, and no other Person will have any right, interest or claim hereunder or be entitled to any benefit under or on account of this Agreement as a third party beneficiary or otherwise.  In furtherance of and not in limitation of the foregoing, nothing contained in this Agreement is intended to be for the benefit of any creditor or other Person (other than the Members) to whom or which any debts, liabilities or obligations are owed by (or who or which otherwise has any claim against) the Company or any Member, and no such creditor or other Person shall obtain any right hereunder against the Company or any Member by reason of any debt liability or obligation (or otherwise).

(b)     R&M Advisors, LLC and Blue Fire Capital, LLC are third party beneficiaries under Sections 6.1(c) and 11.2 of this Agreement and each have the specific right to enforce the Company's obligations under such section of this Agreement.

11.12.  Confidentiality.

(a)     Each Member will hold in confidence, and not use to the detriment of the Company (or for any other purpose except on behalf of the Company), and will cause its representatives and Affiliates to hold in confidence, and not use to the detriment of the Company (or for any other purpose except on behalf of the Company), any confidential or proprietary information it receives regarding the Company (whether relating to the Company or provided to the Company by or relating to a third party subject to the terms of a confidentiality, non-disclosure or similar agreement or with the reasonable expectation that such information would be treated as confidential or proprietary information). Failure to mark information as confidential or proprietary will not adversely affect its status as confidential or proprietary information. The obligations of the Members hereunder will not apply to the extent that they can demonstrate (i) any such information was already known to any such Member on a non-confidential basis or such information becomes publicly available through no fault of such Member, or (ii) the disclosure of such information is required by applicable law; provided, however, that prior to disclosing such confidential information, a Member must notify the Company reasonably in advance, which notice will include the basis upon which such Member believes the information is required to be disclosed.

(b)     Each Member acknowledges and agrees that a breach by such Member of Section 11.12(a) cannot be reasonably or adequately compensated in damages in an action at law, and that the Company will be entitled to, among other remedies, and without posting any bond or other undertaking, injunctive relief, which may include, but will not be limited to, the following: (i) restraining such Member from engaging in any action that would constitute or cause a breach or violation of this Agreement, (ii) obtaining specific performance to compel such Member to perform such Member's obligations and covenants hereunder, and (iii) obtaining damages available either at law or in equity.

(c)     In the event of the withdrawal of any Member, for any reason whatsoever, the confidentiality obligations and other restrictions on such Member's use of all such information herein described will continue in effect, and such party will immediately return to the Company all documents, records, financial data, and the like, and all copies thereof, which he might have obtained from the Company to the extent permitted by law.

*Signature Page Follows*

**IN WITNESS WHEREOF,** the Parties have executed and entered into this Agreement as of the day first above written.

**MEMBERS:**

**PIES & PINTS DEVELOPMENT PARTNERS, LLC**

R&M Advisors, LLC

By: _____
Robert Lindeman, its authorized signatory

Blue Fire Capital, LLC

By:_____
Michael Sloane, its authorized signatory

**KSDB, LLC**

_____
Kimberly Shingledecker

_____
David Bailey

*Signature Page to Amended and Restated Limited Liability Company Operating Agreement*

## "EXHIBIT A"

### MEMBERS' NAMES, ADDRESSES AND PERCENTAGE INTERESTS

| MEMBER NAME AND MAILING ADDRESS | PERCENTAGE INTEREST | UNITS |
|---|---|---|
| Pies & Pints Development Partners, LLC<br>8462 Grennan Woods Drive<br>Powell, Ohio 43065 | 60% | 60 |
| KSDB, LLC<br>222 Capital Street, Suite 100<br>Charleston, West Virginia 25301 | 40% | 40 |

"EXHIBIT B"

## CAPITAL CONTRIBUTIONS

| MEMBER NAME | CONTRIBUTED CASH OR PROPERTY | VALUE OF CAPITAL CONTRIBUTION |
|---|---|---|
| Pies & Pints Development Partners, LLC<br>8462 Grennan Woods Drive<br>Powell, Ohio 43065 | $679,859 | $679,859 |
| KSDB, LLC<br>PO BOX 956<br>Fayetteville, West Virginia 25840 | $453,239 | $453,239 |

12674750v5

# EXHIBIT 5

## PIES & PINTS MANAGEMENT COMPANY, LLC
## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into at Columbus, Ohio as of January 1, 2020 ("Effective Date") by and between Pies & Pints Management Company, LLC, a Delaware limited liability company, hereinafter referred to as the "Company" and Robert Lindeman, hereinafter referred to as the "Employee," collectively the "Parties." The obligations hereunder inure to the benefit of the Company's heirs, successors in interest and assigns.

in consideration of the foregoing and the mutual covenants contained herein, the Parties agree as follows:

**SECTION 1    Appointment and Term.** The Company hereby employs the Employee, and the Employee agrees to serve the Company as its President.

**SECTION 2    Duties.** So long as this Agreement shall continue in effect, the Employee shall:

2.1    Devote substantially all Employee's business time, energies, diligence, efforts and attention to the business and the affairs of the Company as its President, the most senior position in the Company, subject to the terms expressed in the Amended and Restated Limited Liability Company Operating Agreement; provided however, (i) Employee shall be permitted to serve as a director or non-employee manager of other businesses and (ii) Employee shall be entitled to take reasonable vacations and periods of leave and to devote reasonable time to trade, charitable and civic organizations.

2.2    Perform in a professional and diligent manner the responsibilities and duties of the position, which shall include such other responsibilities and duties as may be reasonably assigned by the Company's Board of Directors from time-to-time outside the duties and responsibilities of a President to further the Company's business and interests.

**SECTION 3    Compensation and Benefits.**

3.1    Base Salary.    As his compensation for Employee's services to be rendered hereunder and for his covenants herein contained, the Company shall pay to Employee an annual gross salary at the rate of Two Hundred Sixty-Five Thousand Dollars ($265,000.00) or such greater amount as may be determined by the Board of Directors from time to time (the "Base Salary"), payable in biweekly installments, less the customary employee tax withholding required to be made by the Company.

3.2    Additional Compensation. This Agreement does not interfere or alter in any way with the Amended and Restated Limited Liability Company Operating Agreement that establishes Employee's ownership and compensation therefrom.

3.3    Bonus. In addition to Employee's Base Salary, based upon his performance and other metrics as solely determined by the Board of Directors, the Company may

1

pay a bonus to Employee. The Board of Directors agrees to review Employees' performance annually for determination of a bonus and compensate in accordance with a bonus plan.

3.4 Benefits. The Company will continue to provide health, dental, vision, disability and life insurance for Employee on the same basis as is generally made available to all other management employees in similar positions and/or other managers. Employee will continue to participate in the Company sponsored 401k retirement plan.

**SECTION 4   Expenses.** The Company shall pay or reimburse the Employee for all reasonable travel, meetings and seminars, and other expenses incurred or paid by the Employee in connection with the performance of services under this Agreement, upon presentation of expense statements or vouchers bearing documentation as required under the Internal Revenue Code of 1986, as amended, for business expense deduction, and such other supporting information as the Board of Directors may from time to time request.

**SECTION 5   Termination.**

5.1 For Cause. "Cause" means, with respect to Employee:

(a) Employee's willful misconduct in the performance of his duties;

(b) Employee's willful engagement in dishonesty or illegal misconduct, which is, in each case, materially injurious to the Company;

(c) Employee's embezzlement, misappropriation, or fraud against the Company;

(d) Employee's conviction or a plea of guilty or nolo contendere to a crime that constitutes a felony or a crime that constitute a misdemeanor involving moral turpitude or causes material harm to the Company;

(e) Employee's material breach of this Agreement or the Amended and Restated Limited Liability Company Operating Agreement, which breach remains uncured after ten (10) days' written notice thereof from the Board of Directors; or

(f) Employee's willful failure to carry out any valid and legal directive of or resolution duly adopted by the Board.

For purposes of this provision, no act or failure to act on the part of Employee shall be considered "willful" unless it is done, or omitted to be done, by Employee in bad faith or without reasonable belief that Employee's action or omission was in the best interests of the Company. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board of Directors or upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by Employee in good faith and in the best interests of the Company. Upon termination of Employee's employment for Cause, Employee shall be entitled to receive his Base Salary through the date of termination, and any unpaid expenses or benefits vested as of the date of termination.

2

5.2    Without Cause/Employment At-Will.  Employee's employment with the Company is at-will and either party may terminate the employment relationship at any time, with or without cause.  Upon termination of this Agreement by the Company without cause, Employee shall be entitled to receive his Base Salary through the date of termination, nine (9) months of Employee's Base Salary from the date of termination, payable in accordance with normal payroll practices, and any unpaid expenses or benefits vested as of the date of termination.

5.3.    Termination Has No Effect on Rights as a Member or Manager.  The termination of Employee's employment with the Company for any reason shall not affect any rights that Employee has a direct or indirect member of the Company or manager of the Company.

**SECTION 6    Confidential Information.**  Employee acknowledges, understands and agrees that during the course of the Employee's employment with the Company, the Employee will receive specialized training in the Company's methods, processes and strategies and will have access to and will obtain confidential and/or trade secret information or documents relating to the Company.  Employee hereby agrees that he will not during his employment and/or thereafter, directly or indirectly, disclose or use for his own or another's purposes:

6.1    the Company's financial and business information, financial reports, pricing policies, information, including fee schedules set forth in third-party payer contracts, financial management systems, and billing systems relating to the Company, its affiliates, officers and employees;

6.2    the Company's methods of conducting business, recruiting new business opportunities or advertising or promoting the Company's services, or any plans relating thereto;

6.3    any other proprietary or confidential information of the Company; and/or

6.4    any other trade secrets of the Company as set forth in Ohio Revised Code Section 1333.61 et seq.

**SECTION 7    Business Opportunities.**  Except as set forth in Section 2.1, (a) Employee is not required to, and will not, devote his entire time and attention to the business of the Company; (b) Employee is permitted to have, and may presently or in the future have, investments or other business relationships, ventures, agreements or arrangements with entities engaged in business activities similar or dissimilar to the business of the Company, as long as such entity's sales from pizza do not exceed twenty-five percent (25%) of gross sales (an "Other Business"); (c) Employee will not be prohibited from pursuing and engaging in any such activities with an Other Business; and (d) Employee will not be obligated to make available or offer to the Company or any Member the right to participate in any such opportunity, relationship or investment with an Other Business (an "Other Opportunity") and the Company hereby renounces any interest in an Other Opportunity and any expectancy that an Other Opportunity will be offered to it. Subject to Employee's obligations under Section 2.1, Employee is authorized to engage in any Other Business; provided, that any transactions between the Company and an Other Business will be on terms no less favorable to the Company than would be obtainable in a comparable arm's-length transaction. Employee shall provide notice to the Board of Directors of his relationship with any person or entity that transacts any business with the Company (regardless of the nature of such other business or Employee's ownership interest

3

in or other relationship with such person or entity). The parties hereto expressly waive, to the fullest extent permitted by applicable law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed the Company by Employee or to assert that such involvement constitutes a conflict of interest by such persons with respect to the Company and Employee; provided, however, that such waiver shall apply only to claims that are made or could be made under this Section 7.

For the purposes of Section 7(b), (c) and (d), Employee's participation in an Other Business through a company than is owned by or affiliated with Employee or the spouse of Employee, shall be subject the same restrictions as Employee's direct participation in an Other Business.

**SECTION 8** **Non-Competition and Non-Solicitation.** Employee acknowledges, understands, and agrees that:

8.1 During the term of Employee's employment by the Company, except as disclosed to the Company and necessary to perform Employee's duties and obligations to the Company, and for a period of one (1) year after leaving employment at the Company, regardless of the reason for the termination of Employee's employment:

(a) Employee will not, directly or indirectly, render services to, engage in, work for or on behalf of, own or have an interest in, solicit, contact, assist in any manner or consult with any company, business, entity or person operating within a three-mile radius from any Company Location which is a Competitor of the Company (provided that Employee cannot be put in breach hereunder by the action of Company and/or its Affiliates opening a new Company Location);

(b) Employee will not, directly or indirectly solicit, contact, assist in any manner or consult with any company, business, entity or person which is/was a Customer or Prospective Customer of the Company or its Affiliates; and

(c) Employee will not directly or indirectly: (1) induce or attempt to induce any employee of the Company or its Affiliates to leave the employ of the Company or in any way interfere with the relationship between the Company or its Affiliates and any employee of the Company or its Affiliates; or (2) induce or attempt to induce any supplier, lessee, lessor or other business relation of the Company to cease doing business with the Company or its Affiliates, or in any way interfere with the relationship between the Company or its Affiliates and any such supplier, lessee, lessor or other business relation.

8.2 Definitions: As used in this Agreement:

(a) "Competitor" means any company, business, entity or person who sells the same or similar product and services as the Company and its Affiliates, and whose sales from pizza exceed twenty-five percent (25%) of gross sales;

4

(b) During employment "Customer" means any company, business, entity, or person for which the Company ever performed any work or services and "Prospective Customer" means any company, business, entity, or person which contacts the Company or is or has been contacted or solicited by the Company regarding the performance of any work or services or providing a proposal or bid on any work or services; and

(c) After termination of the Employee's employment "Customer" means any company, business, entity, or person for which the Company performed any work or services within the 12 months immediately preceding Employee's termination from employment at the Company and "Prospective Customer" means any company, business, entity, or person which contacted the Company or was contacted or solicited by the Company regarding the performance of any work or services or providing a proposal or bid on any work or services within the 12 months immediately preceding Employee's termination from employment at the Company.

(d) "Affiliate" means any direct or indirect subsidiary of the Company in which the Company holds fifty (50%) percent or great equity ownership interest.

(e) "Company Location" means any Pies & Pints restaurant.

8.3    Employee agrees that the nature and extent of the restrictions imposed on Employee by this Agreement are reasonable in time and scope and will not stifle the inherent skill and expertise of Employee or bar Employee's sole means of support.

8.4    Remedies for breach. Employee acknowledges, understands, and agrees that:

(a) If Employee breaches or threatens to breach this Agreement, the Company shall be entitled to an injunction which prevents further breaches or threatened breaches of Employee's promises set forth in this Agreement, in addition to any other legal or equitable remedy to which the Company is entitled; and

(b) If Employee breaches Sections 6 or 8 of this Agreement, such breach will cause irreparable harm to the Company.

**SECTION 9    Notices**. Any notices required or desired to be given to the Parties shall be deemed given when deposited in the United States mail, first class and postage prepaid, at the addresses listed below:

Employee:          Rob Lindeman
                   8462 Grennan Woods
                   Powell, OH 43065

With a copy to:    Janica Pierce Tucker, Esq.
                   Taft Stettinius & Hollister LLP
                   65 East State Street, Suite 1000
                   Columbus, OH 43215

5

| Company: | Pies & Pints Management Company, LLC |
| --- | --- |
| | 8462 Grennan Woods |
| | Powell, OH 43065 |
| With a copy to: | Jeremy D. Siegfried |
| | Porter, Wright, Morris & Arthur LLP |
| | 41 S. High Street, Suite 2800 |
| | Columbus, OH 43215 |

Any party may change such party's mailing address by serving written notice of such change of such new address upon the other party.

**SECTION 10 Invalidity**. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the other provisions, and this Agreement shall be construed in all respects as if any invalid or unenforceable provisions were omitted.

**SECTION 11 Representation and Warranty of Employee**. Employee represents and warrants that his execution of this Agreement and his fulfillment of his obligations does not and will not violate any term of any agreement, past or present, between Employee and a third party. Employee further represents and warrants that he will not disclose to the Company any third party's trade secrets or other confidential information in his possession.

**SECTION 12 Survival of Obligations After Termination**. The obligations in Sections 5.2, 6, 8, and 13 survive the termination of this Agreement.

**SECTION 13 Miscellaneous Provisions.**

13.1 Governing Law. This Agreement is being executed and is to be performed in the State of Ohio and shall be construed and enforced in accordance with the laws of the State of Ohio. If federal jurisdiction exists for the controversy, the proper venue shall be the United States District Court for the Southern District of Ohio. If federal jurisdiction does not exist, the proper venue is in the Court of Common Pleas for Franklin County, Ohio.

13.2 No Waiver. Failure to insist upon strict compliance with any of the terms or conditions of this Agreement shall not be deemed a waiver of such terms or conditions, nor shall any waiver or relinquishment of any right or power hereunder at any one time or more times be deemed a waiver or relinquishment of such right to power at any other time or times, absent written notice to such effect delivered by the appropriate party to the other parties.

13.3 Captions. The captions of the several sections and subsections of this Agreement are not part of the context thereof, are only guides or labels to assist in locating or reading the several provisions thereof and shall be ignored in construing it.

13.4 Entire Agreement. This Agreement contains the entire understanding between the Parties and supersedes any prior understandings or agreements between

6

them respecting the subject matter. There are no representations, arrangements, understandings, or agreements, oral or written, between the Parties hereto relating to the subject matter of this Agreement, except those fully expressed herein. No changes, alterations, modifications, additions, or qualifications to the terms of this Agreement shall be made or be binding unless made in writing and signed by each of the Parties.

**SECTION 14  409A.** This Agreement is intended to comply with Section 409A of the Code or an exemption thereunder and shall be construed and administered in accordance with this intent. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A of the Code or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A of the Code either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A of the Code to the maximum extent possible. For purposes of Section 409A of the Code, any installment payments provided under this Agreement shall be treated as separate payments. Any payments to be made under this Agreement upon a termination of employment or similar terms shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, Employer makes no representations that the payments and benefits provided under this Agreement comply with Section 409A of the Code and in no event shall Employer be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by Employee on account of non-compliance with Section 409A of the Code.

**IN WITNESS WHEREOF**, the Company has caused this Agreement to be executed by its officers thereunto duly authorized, and the Employee has hereunto set the Employee's hand, all as of the date and year first above written.

7

**PIES & PINTS MANAGEMENT COMPANY, LLC**

By: _____

Its: _Secretary_____

**EMPLOYEE**

_____

Robert Linderman

# EXHIBIT 6

## PIES AND PINTS MANAGEMENT COMPANY, LLC

### ACTION BY WRITTEN CONSENT
### OF THE MANAGERS WITHOUT A MEETING

#### March 16, 2020

THE UNDERSIGNED, being the managers of PIES AND PINTS MANAGEMENT COMPANY, LLC, a Delaware limited liability company (the "Company") collectively constituting a Majority Vote of the Board, do hereby (i) consent to taking action on the following resolutions without a meeting, (ii) indicate the undersigned's vote in favor of adoption of such resolutions, and (iii) direct that this consent be filed with the minutes of the proceedings of the managers of the Company. Capitalized terms used herein and not otherwise defined have the meanings given such terms in the Company's Amended and Restated Limited Liability Company Operating Agreement dated December 31, 2019 (the "Operating Agreement").

#### Termination of Robert Lindeman

RESOLVED, that pursuant to and in accordance with the provisions of Section 5.2 of that certain Employment Agreement dated January 1, 2020 by and between the Company and Robert Lindeman, the Company hereby terminates the employment of Mr. Lindeman as President (and any other officer) of the Company effective March 16, 2020.

#### Hiring of Martin O'Dowd

RESOLVED that Martin O'Dowd is hired as President of the Company, effective as of March 16, 2020, on such terms and conditions as are set forth in the Employment Agreement between Mr. O'Dowd and the Company attached hereto as Exhibit A (the "Employment Agreement"), and the Employment Agreement is hereby authorized, adopted and approved.

#### Appointment of Officers

RESOLVED, that the following persons be, and they hereby are, appointed to serve as Officers of the Company to hold the office set forth opposite their names below, until their successors are duly appointed and qualified:

Martin O'Dowd                   President

1

18615746v1

Kimberly Shingledecker          Secretary

### Further Authorization

RESOLVED, that the Officers of the Company are hereby authorized, from time to time, to do or cause to be done all acts and to make, execute and deliver or cause to be made, executed and delivered, all agreements, certificates, documents and instruments, together with such modifications thereto as such Officer, in the exercise of his or her discretion, may approve (such approval being conclusively evidenced by the execution of such agreement, certificate, document or instrument) in the name and on behalf of the Company, to effect the foregoing actions and carry out the purposes and intent thereof.

FURTHER RESOLVED, that this Action by Written Consent (i) may be executed in counterparts, each of which together shall constitute one and the same document, (ii) may be executed and delivered by electronic mail in PDF or via facsimile; and (iii) shall be delivered to those Managers who have not consented in writing in accordance with Section 6.1(i) of the Operating Agreement.

IN WITNESS WHEREOF, the undersigned Managers of the Company have executed this

Action to be effective as of the date and year first above written.

**MANAGERS:**

Robert Lindeman

Michael Sloane

David Bailey

Kimberly Shingledecker

**EXHIBIT 7**

**PIES & PINTS MANAGEMENT COMPANY, LLC**

**ACTION BY WRITTEN CONSENT
OF THE MEMBERS WITHOUT A MEETING**

April 1, 2020

THE UNDERSIGNED, being the Members of PIES & PINTS MANAGEMENT COMPANY, LLC, a Delaware limited liability company (the "Company") collectively constituting a Majority Vote of Members, do hereby (i) consent to taking action on the following resolutions without a meeting, and (ii) indicate the undersigned's vote in favor of adoption of such resolutions, and (iii) direct that this consent be filed with the minutes of the proceedings of the Members of the Company. Capitalized terms used herein are not otherwise defined have the meanings given such terms in the Company's Amended and Restated Limited Liability Company Operating Agreement dated December 31, 2019 (the "Operating Agreement").

Amendment of Company's Amended and Restated Limited Liability Company Operating Agreement Dated December 31, 2019

RESOLVED, that pursuant to and in accordance with provision Section 6.3(ii) of the Operating Agreement, the Company hereby amends and restates the Operating Agreement Dated December 31, 2019 to the Second Amended and Restated Limited Liability Company Operating Agreement Dated April 1, 2020 (the "Second Amended Operating Agreement"), attached hereto as Exhibit A.

Reduction of Board of Managers

RESOLVED, that pursuant to and in accordance with provision Section 6.3(v) of the Second Amended Operating Agreement, the Company hereby removes Michael Sloane, Kimberly Shingledecker and David Bailey from the Board of Managers and reduces the size of the Board of Managers to one seat which will be occupied by the one remaining Board Manager, Rob Lindeman, effective April 1, 2020.

Termination of Martin O'Dowd

RESOLVED, that pursuant to and in accordance with the provision Section 6(c) of the certain Employment Agreement dated March 16, 2020 by and between the Company and Martin O'Dowd, the Board

hereby terminates the employment of Mr. O'Dowd as President (and any other officer) of the Company effective April 1, 2020.

### Hiring of Robert Lindeman

RESOLVED, that Robert Lindeman is hired as President and Chief Executive Officer of the Company, effective as of March 31, 2020, on such terms and conditions as are set forth in the Employment Agreement between Mr. Lindeman and the Company attached hereto as Exhibit B (the "Employment Agreement"), and the Employment Agreement is hereby authorized, adopted and approved.

### Appointment of Officers

RESOLVED, that the following person be, and they hereby is, appointed to serve as Officer of the Company to hold the office set forth opposite his name below:

Robert Lindeman                     President

### Further Authorization

RESOLVED, that the Members of the Company are hereby authorized, from time to time, to do or cause to be done all acts and to make, execute and deliver or cause to be made, executed and delivered, all agreements, certificates, documents and instruments, together with such modifications thereto as such Member, in the exercise of his or her discretion, may approve (such approval being conclusively evidenced by the execution of such agreement, certificate, document or instrument) in the name and on behalf of the Company, to effect the foregoing actions and carry out the purposes and intent thereof.

FURTHER RESOLVED, that this Action by Written Consent (i) may be executed and delivered by electronic mail in PDF or via facsimile and (ii) shall be delivered to those Members who have not consented in writing in accordance with Section 6.3(g) of the Second Amended Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members of the Company have executed this Action to be effective as of the date and year first above written.

[Signatures on Next Page]

MEMBERS:

_____
Robert A. Lindeman
President & Sole Manager
Pies and Pints Development Partners, LLC


_____
KSDB, LLC, its authorized signatory

# SECOND AMENDED AND

# RESTATED LIMITED

# LIABILITY COMPANY

# OPERATING AGREEMENT

# OF

# PIES & PINTS MANAGEMENT COMPANY, LLC

**April 1, 2020**



EXHIBIT

A

## SECOND AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

## PIES & PINTS MANAGEMENT COMPANY, LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (hereinafter referred to as the "Agreement"), dated as of December 31, 2019 (hereinafter referred to as the "Effective Date"), is entered into by and between Pies & Pints Development Partners, LLC, a Delaware limited liability company, (hereinafter referred to as "PPDP"), and KSDB, LLC, a West Virginia limited liability company, (hereinafter referred to as "KSDB"), as the sole members (hereinafter referred to as the "Members"), and amends and restates in its entirety that certain Limited Liability Company Operating Agreement of Pies & Pints Management Company, LLC dated as of December 31, 2019.

### RECITALS:

WHEREAS, the Members formed PIES & PINTS MANAGEMENT COMPANY, LLC (hereinafter referred to as the "Company") in order to manage operations of a gourmet pizza and craft beer business and to own certain intellectual and other property related thereto in accordance with the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

### ARTICLE 1. DEFINED TERMS

1.1.    Defined Terms. Capitalized terms used in this Agreement shall, unless otherwise noted or unless the context otherwise requires, have the following meanings:

"Act" means the Delaware Revised Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended from time to time.

"Additional Members" has the meaning assigned to such term in Section 7.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account in any amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1

"Affiliate" means, with respect to a specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified. For purposes of this Agreement, the term "control" (including its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Agreement" means this Amended and Restated Limited Liability Company Operating Agreement of PIES & PINTS MANAGEMENT COMPANY, LLC as amended, supplemented, or otherwise modified from time to time.

"Asset Value" means, with respect to any asset of the Company, the adjusted basis of such asset for Federal income tax purposes, except that:

      (a)    the initial Asset Value of any asset contributed by a Member to the Company shall be the Gross Fair Market Value of such asset;

      (b)    upon the distribution in kind of any Company asset, the Asset Value of such asset shall be adjusted immediately prior to such distribution to equal its Gross Fair Market Value;

      (c)    to the extent that Members holding at least a majority of the Percentage Interests agree, the Asset Values of all Company assets shall be adjusted to equal their respective Gross Fair Market Values as of the following times: (i) upon the acquisition of an interest in the Company by a new Member or an additional interest by an existing Member in exchange for more than a de minimis capital contribution; and (ii) upon the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company;

      (d)    if the Asset Value of an asset has been determined or adjusted in accordance with clauses (a), (b) or (c) above, such Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profit and Loss; and

      (e)    to the extent not otherwise provided in this Agreement, the Asset Value of any Company asset shall be adjusted so that the Capital Account of each Member is determined and maintained in accordance with the capital accounting rules in Treasury Regulations Section 1.704-1 (b)(2)(iv).

"Board" means the Company's Board of Managers.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the State of Delaware are authorized or required by law to close.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 3.6.

"Capital Contribution" means, with respect to any Member, the amount of money and the Gross Fair Market Value of any property (other than money) contributed to the Company by such

Member, reduced by the amount of any liabilities of such Member assumed by the Company in connection with the contribution or secured by any contributed property.

"Certificate" has the meaning assigned to such term in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means PIES & PINTS MANAGEMENT COMPANY, LLC, the limited liability company formed under the Act and pursuant to this Agreement.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Gross Fair Market Value" means, with respect to any asset of the Company, the fair market value of such asset determined in the case of any asset contributed by a Member to the Company, by the contributing Member, unreduced by any liabilities.

"Indemnitee" means the officers of the Company, if any, and (b) any other Person (including Affiliates or the Company) as the Board may designate from time to time, in its sole and absolute discretion.

"Interest" means the ownership interest of a Member in the Company, consisting of such Member's (a) Percentage Interest, (b) share of the Profits and Losses and other items of income, gain, deduction and loss of the Company and the Member's right to receive distributions of the Company's assets, (c) right to vote and to grant or withhold consents with respect to Company matters as provided in this Agreement or in the Act, and (d) other rights and privileges as provided in this Agreement.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(a)     such Member makes an assignment for the benefit of creditors;

(b)     such Member files a voluntary petition of bankruptcy;

(c)     such Member is adjudged bankrupt or insolvent or has entered against such Member an order for relief in any bankruptcy or insolvency proceeding;

(d)     such Member files a petition or answer seeking for such Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(e)     such Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding described in clauses (a) through (d) above;

(f)     such Member seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties;

3

or

        (g)    120 days after commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation if the proceeding has not been dismissed, or if within 90 days after the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties, the appointment is not vacated or stayed, or if within 90 days after the expiration of any such stay, the appointment is not vacated.

"Manager" or "Managers" means the individual(s) named as Managers of the Company as set forth in Article 6 hereof.

"Majority Vote of the Board" means the affirmative vote, approval or consent, as the case may be, of more than fifty percent (50%) of the total voting power of all Managers as set forth in Section 6.1(c).

"Majority Vote of the Members" means the affirmative vote, approval or consent, as the case may be, of the holders of more than fifty percent (50%) of the Units of the Company as set forth in "Exhibit A".

"Member" means any Person who (a) is or becomes a Member pursuant to the terms of this Agreement and (b) has not ceased to be a Member.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Net Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any mortgage or other financing or refinancing, or from any sale, exchange, condemnation or other disposition (other than in the ordinary course of business) of the Company's property or interest therein, after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness associated therewith, all as determined by the Board.

"Net Cash Flow" means all cash received from Company operations, other than amounts received as Capital Contributions or Net Capital Proceeds, reduced by all cash paid, or amounts used to establish reasonable reserves, for all Company expenses, debt payments, capital improvements, replacements or other contingencies, all as determined by the Board.

"Percentage Interest" means, with respect to a Member, the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Percentage Interest" in "Exhibit A", as such percentage may be adjusted from time to time in accordance with this Agreement. A Percentage Interest may be evidenced by a certificate issued by the Company, and expressed on a certificate as "Units".

"Permitted Transfer" means a Transfer of an Interest in compliance with Section 9.1, 9.2 or 9.3.

"Person" means any individual, corporation, partnership, limited partnership, firm, joint venture, association, business entity, joint stock company, trust, estate, limited liability company, unincorporated association, government or regulatory body (or any agency or political subdivision hereof) or other entity.

"Profit" and "Loss" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

       (h)     any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such income or loss;

       (i)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from such taxable income or loss;

       (j)     in the event the Asset Value of any Company asset is adjusted in accordance with subsection (b) or (c) of the definition of Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss of the fiscal year in which such adjustment occurs;

       (k)     gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Asset Value;

       (l)     depreciation, amortization and other cost recovery deductions shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g); and

       (m)     any items which are specially allocated pursuant to the provisions of Section 4.2 shall not be taken into account in computing Profit or Loss. Nevertheless, such items shall be taken into account in adjusting Capital Accounts pursuant to Section 3.6.

"Transfer" means any actual or proposed disposition of all or a portion of an interest (legal or equitable) by any means, direct or indirect, absolute or conditional, voluntary or involuntary, including by sale, assignment, put, transfer, pledge, hypothecation, mortgage or other

encumbrance, court order, operation of law, distribution, settlement, exchange, waiver, abandonment, gift, alienation, bequest or disposal.

"Treasury Regulations" means the income tax regulations, including any temporary regulations, promulgated under the Code from time to time.

"Unanimous Vote of the Managers" means the affirmative vote, approval or consent, as the case may be, of one hundred percent (100%) of the total voting power of all Managers as set forth in Section 6.1(c).

"Unanimous Vote of the Members" means the affirmative vote, approval or consent, as the case may be, of one hundred percent (100%) of the Units of the Company as set forth in "Exhibit A".

"Unit" means a measure of ownership interest in the Company. Each Member's Interest may be designated and referred to herein as being a number of Units, and all Units owned by a Member shall constitute such Member's Percentage Interest.

"Voluntarily Withdraw" or "Voluntary Withdrawal" means a Member's dissociation from the Company other than in connection with a Permitted Transfer or Involuntary Withdrawal.

1.2.     Other Defined Terms; Interpretation. Capitalized terms used in this Agreement and not defined in Section 1.1 shall have the meanings assigned to them elsewhere in this Agreement. The definitions shall apply equally to both the singular and the plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE 2. ORGANIZATIONAL MATTERS

2.1.     Formation. The Members have organized the Company as a limited liability company under the Act by the filing of a Certificate of Formation (the "Certificate") with the Secretary of State of Delaware in accordance with the provisions of the Act and hereby (a) confirm the Members' status as all of the existing members of the Company, and (b) execute and enter into this Agreement as the Limited Liability Company Agreement of the Company. The Company's existence began on the date on which the Certificate was filed with and accepted by the State of Delaware and shall continue unless otherwise terminated in accordance with the provisions of this Agreement or the Act.

2.2.     Name. The name of the Company is "PIES & PINTS MANAGEMENT COMPANY, LLC." The Company may do business under that name and any other name as determined by the Board, subject to any restrictions imposed by law. The Board may change the name of the Company at any time and from time to time and shall give prompt notice of any such change to each officer of the Company and all Members, if not already notified.

2.3.     Principal Place of Business. The principal place of business of the Company shall be 8462 Grennan Woods Drive, Powell, Ohio 43065, or such other place as the Members may from time to time designate.

6

24.    Registered Office; Registered Agent. The registered agent of the Company is Capitol Services Inc. and the registered office of the Company within the State of Delaware is 1675 South State Street, Suite B, Dover, Delaware 19901. The Board may change the registered office and/or the registered agent of the Company in accordance with the Act and shall give prompt notice of any such change to each officer of the Company and all Members, if not already notified.

25.    Purposes. The business and purpose of the Company is to manage the operations of a gourmet pizza and craft beer restaurant concept and to own certain intellectual and other property related thereto. The Company may engage in any and all activities necessary, incidental, related or desirable to the foregoing or as may be approved by the Board. The Company shall not engage in any other business or activity inconsistent with this Section 2.5 without first obtaining the approval of the Board.

26.    Powers. Subject to all of the terms, covenants, conditions and limitations contained in this Agreement and any other agreement entered into by the Company, the Company shall have the power and authority to do any and all acts and things necessary, appropriate, proper, advisable, desirable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Company, including all power and authority, directly or through its ownership interest in other entities, to enter into and perform contracts of any kind, and borrow money and issue evidences of indebtedness, whether or not secured by a mortgage, deed of trust, pledge or other lien.

27.    Qualification in Other Jurisdictions. The Board shall take any and all actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware. Before conducting business in any jurisdiction other than the State of Delaware, the Company shall file all forms and take all other actions required under applicable laws, including the tax laws, of that jurisdiction in order to conduct such business.

28.    Members. The name, mailing address and Percentage Interest of each Member is set forth on "Exhibit A," attached hereto. The Members shall update "Exhibit A" from time to time as necessary to reflect changes to the information therein. An amendment or revision to "Exhibit A" made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to "Exhibit A" shall be deemed a reference to "Exhibit A" as it may be amended and in effect from time to time.

29.    Title to Property. The Company shall at all times, hold title to all of its property in the name of the Company and not in the name of any or Member or Manager, and no Member or Manager shall have any ownership interest in such property in such Member's or Manager's individual name. Each Member's Interest shall be personal property for all purposes.

2.10.    Payments of Individual Obligations. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for, or in payment of, any individual obligation of any Member or Manager.

## ARTICLE 3. CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1.    Capital Contributions. The initial Capital Contributions of cash and/or property to the Company by each Member are set forth opposite such Member's name on "Exhibit B" hereto, which were made in exchange for the Percentage Interests of such Member set forth on "Exhibit A" hereto. The Capital Contributions (if any) required to be made by Additional Members shall be determined pursuant to Section 7.1.

3.2.    Additional Contributions. Except as otherwise provided herein or by applicable law, no Member shall be required to lend any funds to the Company or make any additional capital contributions to the Company.

3.3.    Return of Capital Contributions. No Member shall have the right to receive the return of any Capital Contribution except as otherwise provided in this Agreement or the Act.

3.4.    No Interest on Capital Contributions. Except as otherwise provided in this Agreement, the Members shall not be paid interest on their Capital Contributions.

3.5.    Limitation of Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

3.6.    Capital Accounts.

(a)    Establishment and Maintenance of Capital Accounts. A separate Capital Account shall be established and maintained for each Member in accordance with applicable Treasury Regulations as promulgated and in effect on the effective date of this Agreement as well as in accordance with all subsequent amendments to such Treasury Regulations which by their terms are binding on the Company, and to the extent the Company is permitted to elect the manner in which any item affects the Capital Accounts as they are specified in this Section 3.6(a), such election shall, except as otherwise provided in this Agreement, be made by the Members.

(b)    No Restoration. No Member shall have any obligation at any time to restore a deficit balance in such Member's Capital Account.

3.7.    Loans. A Member may, at any time, make a loan or cause a loan to be made to the Company in such amount and on such terms as such Member and the Board may agree. No such loan shall increase a Member's Capital Account or Percentage Interest. Any such loan shall be payable and collectable only out of Company assets, and no other Member shall be personally obligated to repay any part thereof. No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor. Notwithstanding anything herein to the contrary, profit allocations and other distributions to Members shall be subordinate to the repayment of Member loans to the Company.

# ARTICLE 4. ALLOCATIONS

4.1.    Allocations of Profit and Loss.

(a)    Profit. Profit of the Company for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

(b)    Loss. Loss of the Company for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

4.2.    Special Allocation Rules. Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article 4, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(7). This Section 4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 4, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain) shall be allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 4.2(c) were not in the Agreement. This Section 4.2(c) is intended to comply with the qualified income

9

offset requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied consistently therewith.

(d)  Nonrecourse Deductions. Nonrecourse deductions (as defined in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for each taxable year shall be allocated to the Members in proportion to their Percentage Interests.

(e)  Member Nonrecourse Deductions. Member Nonrecourse Deductions for each taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(f)  Curative Allocations.

(i)  General Curative Allocations. The allocations set forth in Sections 4.2(a), (b), (c), (d) and (e) and Section 4.3 (the "Regulatory Allocations") are intended to comply with Treasury Regulations Section 1.704-1(b). It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.2(f)(i). Therefore, the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Members determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.1.

(ii)  Audit Adjustment Curative Allocations. In the event there is a final administrative or judicial determination for Federal income tax purposes for any taxable year that changes the Capital Account balances of the Members from the Capital Account balances for such taxable year as previously computed by the Company (an "Adjustment"), then, notwithstanding anything contained in Section 4.1, Profit, Loss, and other items of income, gain, loss, and deduction for that taxable year and, if necessary, subsequent taxable years, shall be allocated among the Members so that, to the extent possible, the Capital Account balances of the Members (taking into account such Adjustment) for that taxable year, and all subsequent taxable years, are the same as they would have been had such Adjustment not occurred. The reallocation described in the preceding sentence shall not be made to the extent that the Adjustment constitutes the correction of an arithmetic or computational error.

4.3.  Loss Limitation. Losses allocated pursuant to Section 4.1 shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year (or any other period). In the event some but not all Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1, the limitation set forth in this Section 4.3 shall be applied on a Member by Member basis and Losses not allocable to a particular Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

4.4. Allocations with Respect to Contributed Property: Asset Value Adjustments.

(a)     Contributed Property. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction (and any item thereof) with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation at the time of contribution between the adjusted basis of such property to the Company for Federal income tax purposes and the Asset Value of the contributed property ("Section 704(c) Allocations"). The method under which Section 704(c) Allocations will be made for each item of contributed property shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Members.

(b)     Asset Value Adjustments. In the event the Asset Value of any Company property is adjusted pursuant to subparagraph (c) of the definition of Asset Value so as to differ from its adjusted basis for Federal income tax purposes, subsequent allocations of income, gain, loss, and deduction (and any item thereof) with respect to such property shall, in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4), take account of any variation between the adjusted basis of such asset for Federal income tax purposes and the Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder ("Reverse Section 704(c) Allocations"). The method under which Reverse Section 704(c) Allocations will be made for each item of property whose Asset Value is adjusted shall be the "traditional method" as defined in Treasury Regulations Section 1.704-3(b) unless otherwise determined by the Board.

(c)     Tax Allocations Only. Allocations pursuant to this Section 4.4 are solely for tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, share of Profit, Loss, or other items, or distributions pursuant to any provision of this Agreement.

4.5.     Depreciation Recapture. Pursuant to Treasury Regulations Sections 1.1245-1(e) and 1.1250-1(f), to the extent the Company recognizes gain as a result of a sale, exchange, or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members. In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement. Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange, or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

4.6.     Other Allocation Rules.

(a)     Binding Agreement. The Members are aware of the Federal income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their shares of Company income, gain, loss, deduction and credits for Federal income tax purposes.

11

(b) Excess Nonrecourse Liabilities. Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Percentage Interests.

4.7. Tax Savings Clause. The allocations of Company income, gain, loss, deduction, and credits for Federal income tax purposes described in this Agreement are intended to be recognized under Code Section 704(b) or Code Section 704(c). To the extent that any of such allocations are not recognized under Code Section 704(b) or Code Section 704(c), the Company shall make appropriate adjustments to such allocations (and, if necessary, adjustments to any Member's Capital Account) so as to cause all of such allocations to be recognized under Code Section 704(b) or Code Section 704(c), to the extent possible.

## ARTICLE 5. DISTRIBUTIONS

5.1. Net Cash Flow Distributions. Except as otherwise provided in Section 10.4, Net Cash Flow, if any, shall be distributed to the Members at such times as the Board shall determine in proportion to the Members' Percentage Interests.

5.2. Net Capital Proceeds. Except as provided in Section 10.4 hereof or as otherwise determined by the Board, Net Capital Proceeds shall be distributed not more than 90 days following the receipt of such proceeds by the Company to the Members in proportion to their Percentage Interests.

5.3. Tax Distributions. Except as prohibited by applicable law, the Board may, in its sole discretion, cause the Company to distribute to each Member, with respect to any fiscal year of the Company, either during such fiscal year or within 90 days thereafter, in cash an amount equal to (a) forty percent (40.0%) multiplied by (b) the lesser of (i) the taxable income of the Company for such fiscal year allocated to such Member or (ii) the cumulative taxable income of the Company for such fiscal year and all preceding fiscal years of the Company allocated to such Member.

5.4. Restrictions on Making Distributions. No distribution shall be made by the Company if, after giving effect to the distribution, the Company would be unable to pay its debts as they become due in the usual course of business.

## ARTICLE 6. MANAGEMENT AND OPERATIONS

6.1. Management. The business and affairs of the Company shall be managed by its "managers" (as defined in Section 18-101 of the Act) in accordance with the provisions of this Agreement and the Act. Such managers are collectively referred to herein as the "Board of Managers" or the "Board" and each is individually referred to herein as a "Manager."

(a) Board. Except as otherwise specifically provided in this Agreement or by applicable law, the Board will have full, complete and exclusive authority to manage, direct and control the business, affairs and properties of the Company, and to perform any and all other acts or activities customary or incident to the management of the Company's activities; provided, however, the officers of the Company shall be responsible for the day-to-day operation of the

Company, except for actions requiring a Majority Vote of the Board as set forth in Section 6.1(m) or a Majority Vote of the Members as set forth in Section 6.3(b), and except as decided by the Unanimous Vote of the Managers or Unanimous Vote of the Members.

       (b)    Number of Managers. The number of Managers which will constitute the entire Board will be one (1). Managers need not be Members of the Company.

       (c)    Election and Removal of Managers.

       (i)    R&M Advisors, LLC ("R&M") will be entitled to designate and elect one (1) manager to the Board (the "R&M Manager"). The R&M Manager will serve until such time that his or her successor is elected and qualified. The R&M Manager may only be removed, with or without cause, by the affirmative vote of the Members holding a majority of the total Membership Interests of R&M. The R&M Manager shall initially be Robert Lindeman. The R&M Manager shall have five (5) votes on all matters for which Managers shall be entitled to vote.

       (d)    Vacancies. A Manager vacancy on the Board by reason of death, resignation, retirement, disqualification, removal from office, or otherwise will be filled by the Member or other Person entitled to elect such Manager pursuant to Section 6.1(c). The Managers so chosen will hold office until their successors are duly elected and qualified, unless sooner replaced in accordance with Section 6.1(c).

       (e)    Regular Meetings. Regular meetings of the Board shall be held not less frequently than quarterly at such time and place as from time to time may be determined by the Board.

       (f)    Special Meetings. Special meetings of the Board may be called by any Manager on at least ten (10) Business Days prior notice to each Manager, either personally, by facsimile, or by e-mail transmission.

       (g)    Committees. From time to time, the Board may appoint a committee or committees for any purpose or purposes to the extent permitted by law, which committee or committees will have such powers as specified in the resolution of appointment.

       (h)    Quorum; Voting. At all meetings of the Board a majority of the total number of Managers will be necessary and sufficient to constitute a quorum for the transaction of business, and the act of the Managers holding a majority of the total number of votes present at any meeting at which there is a quorum will be the act of the Board, except as otherwise required by applicable law or provided by this Agreement. If a quorum is not present at any meeting of the Board, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. Each Manager shall be entitled to the number of votes specified in Section 6.1(c)(i), (ii) and (iii), respectively, above on all matters voted on by the Board. Unless otherwise required by the express terms of this Agreement or applicable law, actions of the Board shall require a Majority Vote of the Board.

       (i)    Action Without Meeting. Any action which may be taken at any meeting of the Board, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken is signed by the number of members of the Board that would be necessary (in accordance with Section 6.1(h) above) to authorize or take such action at

a meeting at which all Managers entitled to vote thereon were present and voted. Prompt notice of the taking of Board action without a meeting by less than unanimous written consent will be given to those members of the Board who have not consented in writing.

    (j)     Meetings by Telephonic or Other Communications Equipment. Managers may conduct and participate in any meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and such participation in a meeting will constitute presence in person at such meeting.

    (k)     Manager Compensation. Managers shall not be entitled to compensation in their capacity as managers; provided, however, that the managers shall be entitled to reimbursement of travel expenses reasonably incurred in attending any meeting of the Board.

    (l)     Reserved.

    (m)    Actions Requiring Approval of Managers. The Company will not, without a Majority Vote of the Board:

        (i)     make any investment in any joint venture or invest or purchase equity in any similar arrangement with a third party;

        (ii)    make any loans or advances to any Person, including any employee, officer, or Manager, except (A) advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board and (B) loans to subsidiaries of the Company in the ordinary course of business;

        (iii)   guarantee any indebtedness, except for trade accounts of the Company or any subsidiary of the Company arising in the ordinary course of business;

        (iv)   make any investment inconsistent with any investment policy approved by the Board;

        (v)    incur any aggregate indebtedness in excess of $25,000 that is not already included in a Board-approved budget, other than (A) trade credit incurred in the ordinary course of business, or (B) previously Board approved bank lines of credit;

        (vi)   enter into or be a party to any transaction with any Manager, Member, or officer of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Securities and Exchange Act) of any such person;

        (vii)  hire, fire or change in any material respect the compensation of the officers, including approving any grants of equity interests;

        (viii) change the principal business of the Company, enter new lines of business, or exit the current line of business;

        (ix)   sell, assign, license, pledge or encumber any assets of the Company, including without limitation, any material technology or intellectual property, other than the sale

or assignment of assets in a transaction or series of related transactions for an amount not to exceed $25,000;

(x)  enter into any corporate strategic relationship involving the payment, contribution or assignment by the Company or to the Company of assets greater than $25,000;

(xi)  settle any material proceeding in the Company's name, in excess of $50,000;

(xii)  make any donations to the public welfare or for religious, charitable, scientific, literary or educational purposes in excess of $500 per instance or $5,000 per calendar year;

(xiii)  enter into, or cause any subsidiary or Affiliate to enter into, any lease for real property;

(xiv)  purchase insurance on the life any of the Company's Members, officers or employees for the benefit of the Company;

(xv)  purchase or redeem any Units other than (i) purchases or redemptions of Units as expressly authorized herein, or (ii) repurchases of Units from former employees, officers, managers, consultants or other persons who performed services for the Company in connection with the cessation of such employment or service at the lower of fair market value or cost;

(xvi)  create or authorize the creation of any debt security; or

(xvii)  adopt any transaction or agreement between the Company and any Member or any Affiliate or family member of such Member except for transactions contemplated by this Agreement.

6.2.  Individual Member Authority. The President, acting individually, and any other officer of the Company hereafter appointed by the Board, each has and will have the authority to bind the Company as an agent in the ordinary course of business, subject to the limitations set forth in this Agreement. No Member acting solely in such Member's capacity as Member has the authority to bind the Company, unless such action is expressly authorized by this Agreement or by the Board. Any Member of the Company acting in such Member's capacity as a Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any action by such Member of the Company purporting to act for or to undertake any obligation, debt, duty or responsibility on behalf of any other Member or the Company, to the extent such action or undertaking is not in accordance with the express authority of this Agreement or express authority granted by the Board or the Members in accordance with this Agreement.

6.3.    Members.

(a)    Voting. Except as otherwise provided in this Agreement or required by applicable law, the Members will vote together as a single class on all matters submitted to a vote of the Members of the Company, with each such Member entitled to that number of votes equal to the number of Units held by such Members (with fractional Units, if any, rounded up or down to the nearest whole number).

(b)    Events Requiring Member Approval. The Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law, the Articles or this Agreement) a Majority Vote of the Members:

(i)    liquidate, dissolve or wind-up the business and affairs of the Company, or effect any merger or consolidation of the Company or any other liquidating transaction;

(ii)    amend, alter or repeal any provision of this Agreement or the Certificate of Formation;

(iii)    create or authorize the creation of, or issue any additional class or series of Units or other equity security of the Company or any instrument or security that is convertible into or exchangeable for equity securities of the Company, or grant any right for the purchase of any Units;

(iv)    cause or permit any subsidiary of the Company to issue any class or series of equity securities or any other instrument or security directly or indirectly convertible into or exchangeable for equity securities of the Company, or sell, transfer or otherwise dispose of any equity interest of any direct or indirect subsidiary of the Company, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary; or

(v)    increase or decrease the size of the Board.

(c)    Meetings of Members. Meetings of the Members, for any purpose, or purposes, may be called by the President, and will be called by the President upon the request of Members holding greater than ten percent (10%) of the total outstanding Units. Such request will state the purpose or purposes of the proposed meeting. Business transacted at any meeting of the Members will be limited to the purposes stated in the notice. Meetings of Members may be held at any place as set forth in the notice of meeting.

(d)    Notice of Meeting. Whenever Members are required or permitted to take any action at a meeting, a written notice of the meeting will be given by the Company to the Members, which notice must state the place, if any, date and hour of the meeting, the means of remote communication by which Members and proxy holders may be deemed to be present in person and vote at such meeting, and the purpose or purposes for which the meeting is called. The written notice of any meeting must be given to each Member entitled to vote at such meeting not less than ten (10) days before the date of the meeting.

(e)     Quorum. A majority of the total outstanding Units of the Company, the holders of which are present in person or represented by proxy, will constitute a quorum for the transaction of business except as may otherwise be provided by law or by this Agreement.

(f)     Fixing Record Date. In order that the Company may determine the Members entitled to notice of or to vote at any meeting of the Members, or any adjournment thereof, or to express consent to Company action in writing without a meeting, or entitled to receive payment of any distribution or allotment of any rights, or for the purpose of any other lawful action, the President shall fix a record date which will not be less than ten (10) days before the date of such meeting.

(g)     Members Action by Written Consent Without a Meeting. Any action which may be taken at any meeting of the Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by Members holding not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the taking of Member action without a meeting by less than unanimous written consent will be given to those Members who have not consented in writing.

(h)     Proxies. At each meeting of the Members, each Member having the right to vote may vote in person or may authorize another Person or Persons to act for such Member by proxy appointed by an instrument in writing subscribed by such Member and bearing a date not more than eleven (11) months prior to said meeting, unless such instrument provides for a longer period. All proxies must be filed with the Secretary of the Company at the beginning of each meeting in order to be counted in any vote at the meeting.

(i)     Meetings by Telephonic or Other Communications Equipment. Members may conduct and participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and such participation in a meeting will constitute presence in person at such meeting.

6.4.     Officers.

(a)     Generally. Subject to the requirements of Section 6.1(m), Section 6.1(n), and Section 6.3(b), the officers shall be responsible for the day-to-day operations of the Company.

(b)     Designation of Officers. The Board may, from time to time, (i) designate one or more individuals to be officers of the Company, with such titles as the Board may assign to such individuals; (ii) subject to any agreement between the Company and any such officer, remove any such officer, with or without cause; and (iii) fill any vacancy of such offices. As of the Effective Date, the officers are a President (who is Robert Lindeman), and a Secretary (who is Kimberly Shingledecker). The Company may also have, at the discretion of the Board, such other officers as may be appointed by the Board (including, without limitation, the officers set forth in this Section 6.4). Officers so designated will have such authority and perform such duties as this Agreement provides or as the Board may from time to time delegate to them, subject to express limitations in this Agreement. Any number of offices may be held by the same Person. Any officer may resign as such at any time (except as otherwise provided in any agreement between the Company and

17

such officer).

(c) **President.** The President will, subject to the powers and directives of the Board and the provisions set forth in this Agreement, be in general and active charge of the business and affairs of the Company, will be the Company's chief policy-making officer, will have control over the Company's officers, agents and employees, will see that all orders and resolutions of the Board are carried into effect, and will have such other powers and duties customarily exercised by the president of business corporations. Absent a Chairman of the Board, the President will preside at all meetings of the Board and Members. Subject to the authority of the Board, the President shall have authority to make contracts on behalf of the Company in the ordinary course of the Company's business, shall be responsible to effect all orders and resolutions of the Board and the Members, shall sign and deliver in the name of the Company any agreements, documents, certificates, deeds, mortgages, bonds, contracts, or other instruments pertaining to the business of the Company except as otherwise delegated or provided by law. The President will have such other powers and duties as may be prescribed by the Board or as may be provided in this Agreement.

(d) **Vice Presidents.** The Vice Presidents, if any such officers are appointed, will have such other powers and duties as may be prescribed by the President or the Board, or as may be provided in this Agreement. In the absence or disability of the President, the Vice Presidents, in order of their rank as fixed by the Board, shall perform all the duties of the President and when so acting shall have all powers of and be subject to all the restrictions upon the President.

(e) **Secretary.** The Secretary will keep the minutes of all meetings of the Board and Members in appropriate books and will attend to the giving of all notices for the Company. The Secretary will have charge of such books and papers as the Board may direct, will exercise all powers and duties customarily exercised by the secretary of business organizations, and will have such other powers and duties as may be prescribed by the Board or the President, or as may be provided in this Agreement.

(f) **Other Officers and Agents.** The Board may from time to time appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.

(g) **Officer Compensation.** The salaries and other compensation of the officers of the Company shall be as determined by the Board of Managers.

6.5. **Indemnification; Limitation of Liability.**

(a) **Indemnification.** The Company shall indemnify every Person (the "Indemnitee") who is or was a party or is or was threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such Person is or was a Manager or officer of the Company, or, while a Manager or officer of the Company, is or was serving at the request of the Company as a manager, officer, employee, agent or trustee of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against any losses, damages or expenses actually and reasonably incurred by the Indemnitee in connection with such action, suit or proceeding, except for liability (i) for any breach of the Indemnitee's duty of loyalty to the Company or its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for

any transaction from which the Indemnitee derived an improper personal benefit. The right to indemnification conferred in this Section 6.5(a) includes the right of the Indemnitee to be paid by the Company the expenses incurred in defending any such action in advance of its final disposition to the fullest extent permitted by the Act (an "Advancement of Expenses"); provided, however, that the Company will only make an Advancement of Expenses upon delivery to the Company of an undertaking, by or on behalf of such Indemnitee, to repay all amounts so advanced if it is ultimately determined that such Indemnitee is not entitled to be indemnified under this Section 6.5(a) or otherwise.

(b)　　　Limitation of Liability. A Manager of the Company will not be personally liable to the Company or its Members for monetary damages for breach of fiduciary duties as a Manager, provided that the liability of a Manager (i) for any breach of the Manager's loyalty to the Company or its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the manager derived an improper personal benefit will not be eliminated or limited hereby.

(c)　　　Repeal or Modification. Any repeal or modification of this Section 6.5 will not adversely affect any right or protection of any individual existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

## ARTICLE 7. MEMBERS

7.1.　　Additional Members.

(a)　　　Admission. With a Majority Vote of the Members, the Company may at any time admit additional Members ("Additional Members").

(b)　　　Time of Admission. An Additional Member shall be deemed admitted as a Member at the time such Person has executed and delivered to the Company a counterpart to this Agreement.

(c)　　　Required Contribution. The Managers shall determine what, if any, Capital Contribution each Additional Member need make and the Percentage Interest and Units to be issued to such Member. Any admission of an Additional Member shall dilute, pro rata, the Percentage Interests allocated to Members. The Members may provide that the required contribution may be paid prior to, at the time of, or subsequent to, the issuance of an Interest to such Member and that any subsequent contribution may be made from distributions paid or payable in respect of such Interest. If any portion of a required contribution is payable after the issuance of the Interest to such Member, the Company may determine that any rights otherwise incident to such Interest (including voting, distribution, inspection and transfer rights) will not come into effect until such required contribution has been made.

## ARTICLE 8. ACCOUNTING, BOOKS AND RECORDS

8.1.　　Accounting, Books and Records.

(a)　　　Maintenance. The Company shall keep separate books of account, which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits

made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with this Agreement. The books of account and other Company records shall be available for inspection and copying by any Member (or such Member's agent).

(b)     Methodology; Examination. The Members shall select a method of accounting for preparation of the Company's financial reports and for tax purposes and shall keep the Company's books and records accordingly. The books and records of the Company shall be available at the Company's principal office for examination by a Member or the Member's duly authorized representative at reasonable times during normal business hours. The rights granted to a Member pursuant to this Section 8.1(b) are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established or amended from time to time.

8.2.    Reports; Other Tax Information.

(a)     Financial Statements. The Company shall cause to be delivered to each Member the financial statements listed in clauses (i) and (ii) below, prepared, in each case (other than with respect to Members' Capital Accounts, which shall be prepared in accordance with this Agreement), in accordance with GAAP consistently applied (subject to normal year-end audit adjustments).

(i)     As soon as practicable following the end of each fiscal year of the Company (and in any event not later than 90 days after the end of such fiscal year):

(A)     a balance sheet of the Company as of the end of such fiscal year and the related statements of operations, Members' Capital Accounts and changes therein, and cash flows for such fiscal year, together with appropriate notes to such financial statements and supporting schedules, all of which shall be audited and certified by the Company's accountants; and

(B)     necessary tax information for such fiscal year.

(ii)    As soon as practicable following the end of each fiscal quarter of the Company (and in any event not later than 60 days after the end of each such fiscal quarter), an unaudited balance sheet of the Company as of the end of such fiscal quarter and the related statements of operations and cash flows for such fiscal quarter.

(b)     Other Reports. The Company shall cause to be delivered to a Member such other reports as such Member may reasonably request from time to time.

8.3.    Taxation as a Partnership. The Members intend that, pursuant to the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code, the Company shall be treated as a partnership for Federal income tax purposes. None of the Company or the Members shall take any action that would cause the Company to be excluded from the application of any provision of Subchapter K, Chapter 1 of Subtitle A of the Code or any similar provision of any state tax laws. The Company

and the Members shall not elect classification of the Members for Federal tax purposes as other than a partnership under Treasury Regulations Section 301.7701-3. The Members may determine whether to make or fail to make any corresponding election for state or local tax purposes.

8.4.  Tax Elections. The Members shall, in their sole and absolute discretion, (a) determine whether to make any available election (including the election under Section 754 of the Code) or choose any available reporting method pursuant to the Code or state or local tax law, and (b) have the right to seek to revoke any such election (including the election under Section 754 of the Code) or change any reporting method upon the Members' determination. in their sole and absolute discretion. that such revocation is in the best interests of all of the Members.

8.5.  Tax Matters Partner.

(a)  Designation. Pies & Pints Development Partners, LLC (R&M Advisors, LLC (Rob Lindeman)) shall be the "tax matters partner" of the Company for federal income tax purposes for all taxable years of the Company commencing prior to January 1, 2018. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service ("IRS") of the beginning of an administrative proceeding with respect to the Company, the tax matters partner shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

(b)  Authority. The tax matters partner is authorized, but not required:

(i)  to enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the tax matters partner may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (A) that (within the time prescribed pursuant to the Code and Regulations) files a statement with the IRS providing that the tax matters partner shall not have the authority to enter into a settlement agreement on behalf of such Member or (8) that is a "notice partner" (as defined in Section 6231 of the Code) or a Member of a "notice group" (as defined in Section 6223(b)(2) of the Code);

(ii)  in the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the tax matters partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located;

(iii)  to intervene in any action brought by any other Member for judicial review of a final adjustment;

(iv)  to file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request;

21

(v)     to enter into an agreement with the IRS to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

The taking of any action and the incurring of any expense by the tax matters partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the tax matters partner and the provisions relating to indemnification set forth in Section 6.10 of this Agreement shall be fully applicable to the tax matters partner in its capacity as such.

8.6.    Partnership Representative.

(a)     Designation. The "partnership representative" for purposes of Subchapter C of Chapter 63 of Subtitle F of the Code after amendment by the Bipartisan Budget Act of 2015, P.L. 114-74 (the "Revised Audit Procedures") for taxable years of the Company commencing on or after January 1, 2018, shall be selected by a Majority Vote of the Members. Until removed and replaced by a Majority Vote of the Members, the partnership representative shall be Pies & Pints Development Partners, LLC (R&M Advisors, LLC (Rob Lindeman)). The partnership representative, upon the approval of the Board, shall if possible opt out of the Revised Audit Procedures for tax years of the Company.

(b)     Authority and Duties.

(i)     The partnership representative shall have the power and authority granted to the partnership representative under the Code. If any "partnership adjustment" is determined with respect to the Company under the Revised Audit Procedures, the partnership representative shall promptly notify the Members and shall take such actions as he, she or it may deem appropriate including whether to dispute the adjustment prior to payment, cause the Company to pay the amount of any such adjustment or, if available, make the election to push the adjustment to the Members for the reviewed year as set forth in the Revised Audit Procedures. If the Company is assessed an "imputed underpayment" under the Revised Audit Procedures, the partnership representative shall apportion the imputed underpayment, together with any penalties and interest thereon, among the Members and former Members who were Members during the reviewed year in the manner that would, as nearly as possible, result in an apportionment of liability that is the same as the liability such Member or former Member would have had under the Code prior to the adoption of the Revised Audit Procedures. In making such apportionment, the partnership representative shall take into account any amended tax returns for the reviewed year or tax attributes of a Member or former Member that result in a reduction in the imputed underpayment by crediting such Member or former Member with such reduction. The Members shall cooperate with the partnership representative in providing information, including, without limitation, information regarding the direct and indirect owners of a Member, reasonably necessary for the Company to minimize any imputed underpayment or other liabilities of the Members under the Revised Audit Procedures. Each Member and former Member shall indemnify or reimburse the Company for his, her or its allocable share of any imputed underpayment plus any penalties

and interest thereon. The Company may offset distributions, withdrawals and other amounts which any Member is otherwise entitled to receive under this Agreement against a Member's indemnification obligations under this Section 8.6(b)(i). A Member's obligations under this Section 8.6(b)(i) shall survive the Member withdrawing or otherwise disposing of his, her or its interest in the Company and the termination, dissolution, liquidation or winding up of the Company.

(ii)     The partnership representative shall have the authority to extend the statute of limitations for assessment of tax deficiencies with respect to adjustments to the Company's federal, state, local or foreign tax returns, and to represent the Company before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Company with respect to such tax matters or otherwise affect the rights of the Company and the Members; provided that, to the extent any such extension, agreement, election or document might have a material effect on any Member, the partnership representative must reasonably consult with such Member in any discussions or negotiations associated with such agreement or document. Each Member agrees to cooperate with the partnership representative and to do or refrain from doing any or all things reasonably required by the partnership representative to conduct such proceedings.

(iii)     The partnership representative shall keep each Member informed of all administrative and judicial proceedings pursuant to Section 6231 or Section 6234 of the Code and shall furnish each Member in writing a copy of each notice or other communication received by the partnership representative. If any Member intends to file a notice of inconsistent treatment under Section 6222(c) of the Code, such Member shall, prior to the filing of such notice, provide notice to the partnership representative of such intent and the manner in which the Member's intended treatment of the Company item is (or may be) inconsistent with the treatment of that item by the Company.

(iv)     The partnership representative shall not file pursuant to Section 6227 of the Code a request for an administrative adjustment of items of the Company without first notifying all Members. If a Majority agree with the requested adjustment, the partnership representative shall file the request on behalf of the Company.

(v)     The partnership representative intending to file a petition under Sections 6234 of the Code with respect to any item of the Company, or other tax matters involving the Company, shall notify the Members prior to such filing of the nature of the contemplated proceeding within a reasonable time to allow the Members to participate in the choice of the forum for such petition, and the Majority shall agree on an appropriate forum. If the partnership representative intends to seek review of any court decision rendered as a result of such proceeding, the partnership representative shall notify the Members and obtain the approval of a Majority prior to seeking such review.

(vi)     If the Company is terminated for U.S. federal income tax purposes, the provisions of this Section 8.6 shall survive such termination and shall remain binding on the Members for a period of time necessary to resolve with the IRS any and all matters regarding the U.S. federal income taxation of the Company's tax returns.

8.7.   Compensation; Reimbursement. The tax matters partner and partnership representative shall receive no compensation for its services. The Company shall bear all third party costs and expenses incurred by the tax matters partner or partnership representative in performing its duties as such (including legal and accounting fees). Nothing herein shall be construed to restrict the Company from engaging an accounting firm to assist the tax matters partner in discharging his duties hereunder.

8.8.   Withholding. Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of Federal, state, local, or foreign taxes that the Members determine that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including any taxes required to be withheld or paid by the Company pursuant to Sections 1441, 1442, 1445 or 1446 of the Code. Any amount paid on behalf of or with respect to a Member shall constitute a loan by the Company to such Member, which loan shall be repaid by such Member within 15 days after notice from the Members that such payment must be made unless (a) the Company withholds such payment from a distribution that would otherwise be made to the Member, or (b) the Members determine, in their sole and absolute discretion, that such payment may be satisfied out of the available funds of the Company that would, but for such payment, be distributed to the Member. Any amounts withheld pursuant to the foregoing clauses (a) or (b) shall be treated as having been distributed to such Member, and each Member hereby grants to the Company a security interest in the Interest held by such Member to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 8.8. If a Member fails to pay any amounts owed to the Company pursuant to this Section 8.8 when due, the Members may, in their sole and absolute discretion, elect to make the payment to the Company on behalf of such defaulting Member, and in such event shall be deemed to have loaned such amount to such defaulting Member and, until repayment of such loan, shall succeed to all rights and remedies of the Company as against such defaulting Member (including the right to receive distributions). Any amounts payable by a Member hereunder shall bear interest at the base rate on corporate loans at large United States money center commercial banks, as published from time to time in the Wall Street Journal, plus four percentage points (but not higher than the maximum lawful rate) from the date such amount is due (i.e., 15 days after demand) until such amount is paid in full. Each Member shall take such actions as the Company or the Members shall request in order to perfect or enforce the security interest created hereunder.

## ARTICLE 9. TRANSFERS

9.1.   Restrictions on Transfer.

(a)   General Restriction. No Member may Transfer, directly or indirectly, or by operation of law or otherwise, any Interest, except as hereinafter set forth in this Article 9 or upon the prior written consent of each Member and the Company, which consent may be granted or withheld in the sole and absolute discretion of each Member or the Company.

(b)   Transfers to Affiliates. Notwithstanding Section 9.1(a), and notwithstanding anything to the contrary contained in Section 9.2, each Member may, during such Member's lifetime or upon the Member's death or dissolution, Transfer all or any part of the Interest held by such Member to any of the following:

24

          (i)      a spouse, parent, descendant, brother or sister of such Member (or, if such Member is a trust, any of the aforementioned family members as the beneficiaries of such trust);

          (ii)     a trust for the benefit of such Member or any of the permitted persons named in subsection above;

          (iii)    any other Member; or

          (iv)    any Affiliate of a Member,

provided, however, that no Member may Transfer any Interest to any Person that competes, directly or indirectly, with the business of the Company.

        (c)    Transferees. Any transferee of an Interest pursuant to Section 9.1(b) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest and shall be considered an Assignee under Section 9.6 unless all of the conditions set forth in Section 9.5 with respect to such transferee have been satisfied.

    9.2.    Right of First Refusal.

        (a)    Voluntary Transfers of Interests. Except as herein provided, no Member (a "Selling Member") may voluntarily Transfer all or any portion of such Member's Interest except (x) with the prior written consent of each other Member and the Board, which consent may be granted or withheld in the sole and absolute discretion of each such other Member or the Board, or (y) in compliance with the following provisions:

          (i)      Notice. The Selling Member shall first deliver a written notice (a "Voluntary Transfer Notice") to the Company and the other Members stating (A) that the Selling Member desires to Transfer all or a specified portion of the Selling Member's Interest and (B) the price and other material terms of the proposed Transfer. The Voluntary Transfer Notice shall be accompanied by a certificate of the Selling Member certifying that it has received from a third party a bona fide offer to acquire such Interest at such price and on such terms as are set forth in the Voluntary Transfer Notice and shall identify such third party.

          (ii)     Member Right. Within 15 days after receipt of a Voluntary Transfer Notice (the "Member Period"), each Member may elect, by delivering to the Selling Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest specified in the Voluntary Transfer Notice, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Board). If a Member does not respond to the Voluntary Transfer Notice within the Member Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

          (iii)    Company Right. If one or more Members do not exercise their respective right to purchase their pro rata portion of the Interest specified in the Voluntary Transfer Notice within the Member Period, then, within five business days after the expiration of the

Member Period (the "Company Period"), the Company, as determined by a Majority Vote of the Board, may elect, by delivering to the Selling Member written notice of the Company's election, to purchase all of the Interest specified in the Voluntary Transfer Notice that the Members have not elected to purchase, on the same terms and conditions specified in such Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company). If the Company does not respond to the Voluntary Transfer Notice within the Company Period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(a).

        (iv)    Consummation. If the Members and/or the Company elect to acquire all of the Interest specified in the Voluntary Transfer Notice pursuant to this Section 9.2(a), the applicable Members and/or the Company and the Selling Member shall consummate the sale and purchase of such Interest within 30 days after expiration of the Member Period, on the same terms and conditions specified in the Voluntary Transfer Notice (or, if such offer is not all in cash, on economically equivalent terms and conditions as determined in good faith by the Company).

        (v)    Selling Member Right. If the Members and the Company do not exercise their respective rights under this Section 9.2(a) to purchase all of the Interest specified in the Voluntary Transfer Notice within the specified time periods, then, within five days after the expiration of the Company Period, the Selling Member shall deliver to the other Members a copy of the Voluntary Transfer Notice, and such other Members shall be entitled to participate in such Transfer of Interests as provided in Section 9.3. The Selling Member and the Tag-Along Members (as defined below) shall be permitted to sell their Interests to the offeror specified in the Voluntary Transfer Notice within the time and on the terms provided in Section 9.3.

        (b)    Involuntary Transfer of Interests.

        (i)    Notice. Within 15 days of any involuntary Transfer of an Interest or the appointment of a personal representative for a Member who has died, the Member or the Member's personal representative (the "Transferring Member") shall send written notice to the Company and the other Members of such involuntary Transfer (including the nature and details thereon or the Member's death, as applicable (an "Involuntary Transfer Notice").

        (ii)    Member Right. Within 30 days after receipt of an Involuntary Transfer Notice (the "Member Involuntary Transfer Period"), each Member may elect, by delivering to the Transferring Member and the Company written notice of such Member's election, to purchase such Member's pro rata portion (based on such Member's Percentage Interest) of the Interest to which the Involuntary Transfer Notice refers. If a Member does not respond to the Involuntary Transfer Notice within the Member Involuntary Transfer Period, such Member shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

        (iii)    Company Right. If one or more Members do not exercise their respective rights to purchase their pro rata portion of the Interest to which the Involuntary Transfer Notice refers within the Member Involuntary Transfer Period, then, within 30 days after the expiration of the Member Involuntary Transfer Period, the Company, as determined by a Majority Vote of the Managers, may elect, by delivering to the Transferring Member written notice of the Company's election, to purchase all of the Interest to which the Involuntary Transfer Notice refers

that the Members have not elected to purchase. If the Company does not respond to the Involuntary Transfer Notice within such 30-day period, the Company shall be conclusively presumed to have chosen not to exercise its right of first refusal under this Section 9.2(b).

(iv)    Consummation. If the Members and/or the Company elect to acquire all of the Interest to which the Involuntary Transfer Notice refers pursuant to this Section 9.2(b), the applicable Members and/or Company and the Transferring Member shall consummate the sale and purchase of such Interest within 60 days after expiration of the Member Involuntary Transfer Period, at a price equal to (A) the Percentage Interest represented by the Interest specified in the Involuntary Transfer Notice, multiplied by (8) the difference between (x) the aggregate Asset Value of all assets of the Company and (y) the outstanding liabilities of the Company, payable in cash or on such other terms as the applicable Members and/or the Company (as the case may be) and the Transferring Member agree.

(v)    Transferring Member Right. If the Members and the Company do not exercise their respective rights under this Section 9.2(b) to purchase all of the Interest specified in the Involuntary Transfer Notice within the specified time periods, then such Interest may be held by the transferee of such disposed interest (or in case of a trustee in bankruptcy or a deceased Member's personal representative, such Interest may be further disposed of by such trustee or personal representative), provided that (x) no transferee of such Interest shall become a substituted Member without first satisfying the conditions set forth in Section 9.5 and (y) such transferee shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.3.    Tag-Along Rights.

(a)    Exercise of Tag-Along Rights. If the Members and/or the Company do not purchase all the Interest subject to a third party offer pursuant to Section 9.2(a), then the other Members shall be entitled to participate in any Transfer of the Interest by the Selling Member pursuant to such third party offer (a "Tag-Along Right"). Each Member may elect to exercise its Tag• Along Right by delivering written notice to the Selling Member (a "Tag-Along Notice"), within 10 days following receipt of the notice described in Section 9.2(a)(v), that such Member desires to participate in the proposed Transfer upon the price, terms and conditions set forth in the Voluntary Transfer Notice and specifying the Interest such Member desires to include in such Transfer. If any Members elect to exercise Tag-Along Rights (each, a "Tag-Along Member"), each Tag-Along Member shall be entitled to sell an Interest equal to the lesser of (i) the amount specified by such Tag-Along Member in its Tag-Along Notice or (ii) such Tag-Along Member's pro rata portion of the Interests being Transferred based on the ratio which the Percentage Interest held by such Tag-Along Member bears to the aggregate Percentage Interests held by all Tag-Along Members and the Selling Member.

(b)    No Tag-Along Members. If none of the Members gives a timely Tag-Along Notice with respect to the Transfer proposed in the Voluntary Transfer Notice, then the Selling Member shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may have been given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; provided, however, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The purchaser of any Interest so sold (i) must satisfy the conditions set forth in Section 9.5 to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

(c)     Tag-Along Members. If one or more Members gives a timely Tag-Along Notice, then the Selling Member shall use all reasonable efforts to obtain the agreement of the offeror to the participation of the Tag-Along Members in the sale on the terms set forth in the Voluntary Transfer Notice. The Selling Member shall not Transfer any Interest to the offeror if such offeror declines to allow the participation of the Tag-Along Members on such basis. The Selling Member and the Tag-Along Members shall be permitted at any time or times within 60 days after the last date on which a Tag-Along Notice may be given, to sell to the offeror all, but not less than all, of the Interest proposed to be sold; provided, however, that no such sale shall be made at a higher price, on different terms or to any Person other than as specified in the Voluntary Transfer Notice. The Interest to be sold by each Tag-Along Member shall be as determined pursuant to Section 9.3(a), and the Selling Member shall provide the remaining Interest to be sold.

The purchaser of any Interest so sold (i) must comply with the provisions of Section 9.5 in order to be admitted as a substituted Member and (ii) shall be subject to the provisions of this Article 9 with respect to any further Transfer of such Interest.

9.4.    Prohibited Transfers.

(a)     Non-Compliant Transfer. Any purported Transfer of an Interest that is not in compliance with this Article 9 shall be null and void and of no force or effect; provided that if the Company is required to recognize any such Transfer, the Interest Transferred shall be strictly limited to the transferor's right to allocations and distributions as provided by this Agreement with respect to the Transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts or liabilities for damages that the transferor or transferee may have to the Company, and shall not include the right to any information or accounting of the affairs of the Company, the right to inspect the books or records of the Company, and/or any of the other rights of a Member under the Act or this Agreement.

(b)     Indemnity. In the case of a Transfer or attempted Transfer of an Interest that is not in compliance with this Article 9, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability and damage that the Company and any such indemnified Members may incur (including incremental tax liabilities, attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.5.    Admission of Substituted Members. Transferees of Interests pursuant to this Article 9 who are already Members shall be automatically admitted as substituted Members with respect to such acquired Interests. Subject to the other provisions of this Article 9, a transferee of an Interest, other than a transferee who is already a Member, may be admitted to the Company as a substituted Member only upon satisfaction of the following conditions:

(a)     the Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

(b)     the transferee of the Interest shall, by written instrument in form and substance reasonably satisfactory to the Members, (i) accept and adopt the terms and provisions of this Agreement, including this Article 9, and (ii) assume the obligations of the transferor Member under

this Agreement with respect to the Transferred Interest. The transferor Member shall be released from all such assumed obligations, except those obligations or liabilities of the transferor Member arising out of a breach of this Agreement or based on events occurring, arising or maturing prior to the Transfer; and

(c)     the transferee of the Interest pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Interest.

9.6.     Rights of Unadmitted Assignees. A Person who acquires an Interest but who is not admitted as a substituted Member pursuant to Section 9.5 (an "Assignee") shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to become (or exercise any right of) a Member. The Interest of an Assignee shall be deemed to be voted on all matters in the same proportion as the remaining Interest was voted. An Assignee is entitled, to the extent of the Percentage Interest assigned, only to allocations of Profit, Loss and other tax items of the Company and to distributions from the Company.

9.7.     Compliance with Securities Laws. If any Interest is to be transferred, either (a) such Interest shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) at the request of the Members, the transferor shall provide an opinion of counsel, satisfactory to the Members, that the proposed Transfer is exempt from such registration requirements. The Company and the Members have no obligation or intention whatsoever either to register Interests for resale under any Federal or state securities laws or to take any action which would make available to any Person any exemption from the registration requirements of such laws.

9.8.     Hypothecation. Any hypothecation, mortgage, pledge or collateralization of an Interest is expressly prohibited, except (a) as contemplated by Section 8.6, (b) by a Majority Vote of the Members, or (c) as otherwise permitted under this Agreement. Any purported hypothecation, mortgage, pledge or collateralization in any manner by any Person in violation of this Section 9.8 shall be null and void and of no legal effect.

9.9.     Distributions and Allocations with Respect to Transferred Interests. If any Interest is sold, assigned or transferred during any accounting period in compliance with the provisions of this Article 9, Profit, Loss and all other items of income, gain, loss and deduction attributable to the transferred Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Members in good faith. Solely for purposes of making such allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which it is given notice of such transfer and all distributions on or before such date shall be made to the transferor, and all distributions after such date shall be made to the transferee; provided, however, that if the Company does not receive a notice stating the date such Interest was transferred and such other information as the Company may reasonably require within 30 days after the end of the accounting period during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the accounting period during which the transfer occurs, was the owner of the Interest. Neither the Company nor the Members shall incur any liability for making allocations

29

and distributions in accordance with the provisions of this Section 9.9, whether or not the Members or the Company had knowledge of any Transfer of ownership of any Interest.

9.10.   Voluntary Withdrawal. No Member shall have the right to Voluntarily Withdraw from the Company.

9.11.   Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become a transferee of an Interest but shall not become a Member. The successor transferee of an Interest shall have all the rights of a transferee of an Interest but shall not be entitled to receive the fair market value of the Interest as of the date of the Involuntary Withdrawal from the Company except as provided herein. The successor of the withdrawn Member shall have the option to retain the Membership Interest in the Company. Said option must be exercised by written notice delivered by the representative (as the case may be) to the Members of the Company and received within sixty (60) days of the Involuntary Withdrawal event. In the event that the option is not exercised within sixty (60) days, the successor of the withdrawn shall be obligated to sell, and the remaining Members shall have the option to purchase, in the same priority as set forth in Section 9.2 above, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree. The purchase price of a Membership Interest to be purchased in accordance with the provisions of this Section 9.11 shall be as follows:

(a)     The purchase price of the Membership Interest owned by the successor of the withdrawn Member shall be determined as of the last day of the month preceding the month during which the Involuntary Withdrawal occurs, and shall be the fair market value of the Membership Interest to be purchased hereunder.

(b)     The determination of the purchase price shall, unless agreed to between the successor of the withdrawn Member and the remaining Members, be made by an independent appraiser selected as follows:

(i)     Within thirty (30) days after demand by either the remaining Members or the successor of the withdrawn Member, both the remaining Members and the successor of the withdrawn Member shall each submit their estimation of the value of the Company in a sealed envelope to the accountants regularly employed by the Company. The accountants regularly employed by the Company shall open the sealed envelopes and examine the estimated valuations submitted only after they have received both valuations. If the highest estimated value submitted is equal to or less than one hundred ten percent (110%) of the lowest value submitted, the Fair Value shall be the average of the two estimated values. If the highest estimated value submitted is greater than one hundred ten percent (110%) of the lowest value submitted, the Appraised Value shall be determined by the procedure set forth in Section 9.9(b)(ii).

(ii)     The remaining Members and the successor of the withdrawn Member shall jointly select a qualified appraiser or appraisers, and such jointly selected appraiser or appraisers shall value the Company. If the parties cannot so agree on the selection of a qualified appraiser or appraisers, then, within thirty (30) days after demand by either of them, each party shall appoint a qualified appraiser. If any party entitled to appoint an appraiser does not do so, then the appraiser appointed by the other party may act alone. The two (2) appraisers so appointed shall, within thirty (30) days after the appointment of the second of them to be appointed, select a third

appraiser. The appraiser or appraisers shall estimate the value of the Company and submit their estimate or estimates to the accountants regularly employed by the Company. The Appraised Value shall be the estimated value submitted by the Members to the accountants regularly employed by the Company which is closest to the estimate made by the appraiser or the appraisers or, if there are more than one estimate reached by the various appraisers, the average or all such estimates. The cost of the appraisals shall be borne equally by the parties.

(c)     It is understood and agreed that the purchase price determined in accordance with this Section 9.11 is the full agreed value of such portion of the Membership Interest; that except as otherwise provided in this Operating Agreement such value shall in no manner be altered; and that all property, both tangible and intangible, if any, as well as liabilities, including mortgages, liens or other encumbrances of any kind whatsoever, if any, of or upon the property of the Company have been considered in determining such purchase price.

(d)     Unless otherwise agreed by all of the Members, the aggregate purchase price due to any successor of the withdrawn Member shall be paid in the following manner:

(i)     There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such successor of the withdrawn Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the successor of the withdrawn Member.

(ii)     There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Cessation. Such amount is to be determined by the Board.

(iii)     Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in ten (10) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining nine (9) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)     The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Transferring Member, bearing interest at the Wall Street Journal prime rate of then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Membership Interest.

(v)     The closing shall take place upon the date determined by the Remaining Members, but shall occur within six (6) months of the date of the Involuntary Withdrawal.

9.12.   Buy-Sell. Each Member or Members (collectively, the "Offeror") shall have the

31

right at any time to serve upon any one or more of the other Members (collectively, the "Offeree") a notice in writing which shall contain an offer to sell the entire Interest in the Company of the Offeror or to purchase the entire Interest in the Company of the Offeree, as set forth below. Any Transfer of an Interest under this provision is not subject to any of the Transfer restrictions set forth in Article 9.

(a)    No offer shall be subject to the provisions of this Section 9.12 unless such offer is both an offer to sell the entire Interest of the Offeror and an offer to purchase the entire Interest of the Offeree, and such offer must specify the selling or purchase price and that the price of the Interest to be so transferred shall be paid in cash. The selling price and the purchase price specified in such offer must be computed on the basis of the same Interest value. Such offer shall be irrevocable for a period of sixty (60) days (the "Offer Period"), and the Offeree may, on or before the end of the Offer Period, accept either the offer to sell or the offer to purchase (but not both), and upon acceptance, the Offeror shall be required to sell or to purchase, as the case may be.

(b)    If the Offeree fails within said sixty (60) day period to accept either of said offers, then the offers shall automatically expire and be of no further force and effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of said sixty (60) day period, to purchase the Interest of the Offeree, at the applicable price as specified in Section 9.12(a), and if the Offeror exercises such right, the Offeree shall be required to sell. If the Offeror fails to exercise its right to purchase or sell within the time specified, either party may thereafter make a new offer pursuant to this Section 9.12.

(c)    The closing of such purchase and sale shall be held at the time and place and on the date specified by the Offeror by written notice to the Offeree, which date shall be on or before the one hundred twentieth (120th) day after the date of the offer to purchase or sell. Payment of the purchase price shall be made in cash or cashier's check. Each Member shall bear his or her own legal and other closing expenses. The selling Member(s) shall convey his/her/its Interest(s) in the Company and in the assets thereof by appropriate assignment and any other appropriate instrument, subject only to such title defects and encumbrances as existed on the date the offer hereunder was made. Each Member who is now or hereafter becomes a Member, by so becoming a Member, hereby covenants and agrees to execute any and all instruments and to cooperate in giving effect to the provisions of this Section 9.12.

## ARTICLE 10. DISSOLUTION AND WINDING UP

10.1.    Dissolution.

(a)    Dissolution Events. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each, a "Dissolution Event"):

(i)    a unanimous determination by all of the Members to dissolve, wind up and liquidate the Company;

(ii)    the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act;

32

(iii)     the sale of all or substantially all of the assets of the Company; or

(iv)     there being no Members.

10.2.   Continuation. If the event specified in Section 10.1(a)(iv) occurs, the Company shall not dissolve and shall not be required to be wound up if, within 90 days of the date of the event that terminated the continued membership of the last remaining Member, the personal representative of the last remaining Member agrees in writing to continue the Company and to admit the personal representative of such Member or its nominees or designee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

10.3.   Covenant. The Members hereby agree that the Company shall not dissolve prior to the occurrence of a Dissolution Event.

10.4.   Winding Up.

(a)     Liquidation and Distribution. Except as otherwise provided in Section 10.1, upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. The Members and any officers and agents of the Company shall not take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and assets, and the assets (or the proceeds of any liquidation hereof) shall be applied and distributed in the following order:

(i)     first, to creditors, including any Member that is a creditor, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Members;

(ii)     second, to establish such reserves for unknown or contingent liabilities of the Company as the Board may determine in accordance with Section 10.4(b); and

(iii)     the balance, if any, to the Members in proportion to their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods. If a Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

Notwithstanding the provisions of Section 5.1 hereof, in the year of the sale or other disposition of the Company's property, and in the year of liquidation of the Company, items of gross income and deduction shall be allocated to the Members to the extent necessary to produce Capital Accounts for the Members such that the amounts distributed pursuant to Section 10.2(a)(iii) will be in the amounts; sequence and priority set forth in Section 5.1. The Members

shall not receive any additional compensation for any services performed pursuant to this Article 10.

      (b)    Reserves. In the discretion of the Board, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Article 10 may be:

         (i)    distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Members, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

         (ii)    withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that any such withheld amounts, to the extent not used to pay such Company liabilities, shall be distributed to the Members as soon as practicable.

      (c)    Certificate of Cancellation. Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with this Article 10, the Members shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Members deem such filing necessary or advisable.

    10.5.    Certain Terminations. Notwithstanding any other provisions of this Article 10, in the event the Company is terminated within the meaning of Section 708(b)(1)(B) of the Code, but no Dissolution Event has occurred, the Company's property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.

    10.6.    Liquidation of Member's Interest. Except as otherwise specifically provided in this Agreement, any distribution made to a Member as a result of the liquidation of such Member's interest in the Company (within the meaning of Treasury Regulations Section 1.761-1(d)), which liquidation is not a result of dissolution of the Company, shall be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the fiscal year during which such liquidation occurs through the date of such liquidation (other than those adjustments due to distributions pursuant to this Section 10.4), by the end of such year (or, if later, within 90 days after the date of such liquidation). All distributions upon liquidation of a Member's interest in the Company shall be made in accordance with the timing requirements of Treasury Regulations Section 1.704-1 (b)(2)(ii)(b)(2).

    10.7.    Rights of Members. Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of such Member's Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. No Member shall have priority over any other Member as to the return of its Capital Contributions, distributions or allocations.

    10.8.    Records of Liquidation. Each of the Members shall be furnished with a statement prepared by the Company's accountants which shall set forth the assets and liabilities of the Company as of the date of the occurrence of the Dissolution Event and the plans for compliance

with Section 10.2.

10.9.    Form of Liquidating Distributions. For purposes of making the distributions required by Section 10.2, the Members may determine whether to distribute all or a portion of the Company's assets in-kind or to sell all or any portion of the assets and distribute the proceeds therefrom; provided, however, that, in the absence of a determination by the Members with respect to the form of liquidating distributions, the Company's assets shall be sold and the proceeds thereof distributed to the Members; provided, further, however, that if any distributions are made in-kind, the Capital Account of each Member shall be adjusted immediately prior to such distribution for any variation between the adjusted basis of the distributed property for tax purposes and the current fair market value of such property, to the extent not already reflected in the Capital Accounts.

## ARTICLE 11. MISCELLANEOUS

11.1.    Notices. All notices or other communications permitted or required to be given under this Agreement shall be in writing, signed by the party giving such notice or other communication, and shall be delivered personally, telecopied, or sent by certified mail or overnight courier service, to the address of each Member as set forth on "Exhibit A" or as otherwise reflected on the books and records of the Company. The date of personal delivery or telecopy or three business days after the date of mailing (or the next business day after delivery by overnight courier service), as the case may be, shall be the date of receipt of such notice or other communication. Any Member may change its notice address by giving notice, in writing, stating its new address to the Company.

11.2.    Amendments.

(a)    Subject to Section 6.3(b) and Sections 11.2(b) and (c), this Agreement and the Certificate may be amended, waived or modified from time to time only upon a Majority Vote of the Members.

(b)    Notwithstanding anything contained in Section 11.2 or any other provision of this Agreement to the contrary, (1) no Member approval is required for any amendment made by the Board to "Exhibit A" in accordance with Section 2.8, and (2) the Board may, without any Member action, approve any amendment to the Certificate or this Agreement:

(i)    to reflect any change in the registered office or registered agent of the Company; Members;

(ii)    that is of an inconsequential nature and does not adversely affect the Members.

(iii)    that is required by this Agreement; and

(iv)    that clarifies any ambiguity or corrects any provision herein that may be inconsistent with the manifest intent of this Agreement.

(c)    Notwithstanding anything contained in Section 11.2 or any other provision of this Agreement to the contrary, and except in the case of a Unanimous Vote of the Members,

35

Section 6.1(c)(i) shall not be amended without the consent of R&M Advisors, LLC.

11.3.  Binding Effect. Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns.

11.4.  Construction. The terms and provisions of this Agreement shall be construed fairly in accordance with their plain meaning, regardless of which party hereto was responsible for the drafting of such terms and provisions.

11.5.  Headings. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.6.  Severability. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 11.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause a Member to lose the material benefit of such Member's economic bargain.

11.7.  Entire Agreement. This Agreement constitutes the entire agreement, and supersedes all prior agreements or understandings, whether written or oral, between the parties hereto with respect to the subject matter hereof.

11.8.  Governing Law; Costs and Attorney Fees. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles. To the extent that any party to this Agreement prevails against any other party hereto in connection with the prevailing party's enforcement of its rights under this Agreement, the prevailing party shall be entitled to its costs and expenses (including attorney fees) in connection with such dispute.

11.9.  Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

11.10.  Further Assurances. The parties hereto shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purpose of this Agreement.

11.11.  No Third Party Beneficiaries.

(a)     Except as set forth in subsection (b) below, this Agreement is made solely and specifically among and for the benefit of the Members and the Company, and no other Person will have any right, interest or claim hereunder or be entitled to any benefit under or on account of this Agreement as a third party beneficiary or otherwise. In furtherance of and not in limitation of the foregoing, nothing contained in this Agreement is intended to be for the benefit of any creditor or other Person (other than the Members) to whom or which any debts, liabilities or obligations are

owed by (or who or which otherwise has any claim against) the Company or any Member, and no such creditor or other Person shall obtain any right hereunder against the Company or any Member by reason of any debt liability or obligation (or otherwise).

(b) R&M Advisors, LLC is a third party beneficiaries under Sections 6.1(c) and 11.2 of this Agreement and has the specific right to enforce the Company's obligations under such section of this Agreement.

11.12. Confidentiality.

(a) Each Member will hold in confidence, and not use to the detriment of the Company (or for any other purpose except on behalf of the Company), and will cause its representatives and Affiliates to hold in confidence, and not use to the detriment of the Company (or for any other purpose except on behalf of the Company), any confidential or proprietary information it receives regarding the Company (whether relating to the Company or provided to the Company by or relating to a third party subject to the terms of a confidentiality, non-disclosure or similar agreement or with the reasonable expectation that such information would be treated as confidential or proprietary information). Failure to mark information as confidential or proprietary will not adversely affect its status as confidential or proprietary information. The obligations of the Members hereunder will not apply to the extent that they can demonstrate (i) any such information was already known to any such Member on a non-confidential basis or such information becomes publicly available through no fault of such Member, or (ii) the disclosure of such information is required by applicable law; provided, however, that prior to disclosing such confidential information, a Member must notify the Company reasonably in advance, which notice will include the basis upon which such Member believes the information is required to be disclosed.

(b) Each Member acknowledges and agrees that a breach by such Member of Section 11.12(a) cannot be reasonably or adequately compensated in damages in an action at law, and that the Company will be entitled to, among other remedies, and without posting any bond or other undertaking, injunctive relief, which may include, but will not be limited to, the following: (i) restraining such Member from engaging in any action that would constitute or cause a breach or violation of this Agreement, (ii) obtaining specific performance to compel such Member to perform such Member's obligations and covenants hereunder, and (iii) obtaining damages available either at law or in equity.

(c) In the event of the withdrawal of any Member, for any reason whatsoever, the confidentiality obligations and other restrictions on such Member's use of all such information herein described will continue in effect, and such party will immediately return to the Company all documents, records, financial data, and the like, and all copies thereof, which he might have obtained from the Company to the extent permitted by law.

*Signature Page Follows*

     **IN WITNESS WHEREOF,** the Parties have executed and entered into this Agreement as of the day first above written.

**MEMBERS:**

**PIES & PINTS DEVELOPMENT PARTNERS, LLC**

By: _____

Robert Linderman, its authorized signatory

**KSDB, LLC**

_____

Kimberly Shingledecker, its authorized signatory

_____

David Bailey, its authorized signatory

## "EXHIBIT A"

### MEMBERS' NAMES, ADDRESSES AND PERCENTAGE INTERESTS

| MEMBER NAME AND MAILING ADDRESS | PERCENTAGE INTEREST | UNITS |
|---|---|---|
| Pies & Pints Development Partners, LLC<br>8462 Grennan Woods Drive<br>Powell, Ohio 43065 | 60% | 60 |
| KSDB, LLC<br>222 Capital Street, Suite 100<br>Charleston, West Virginia 25301 | 40% | 40 |

A-1

"EXHIBIT B"

CAPITAL CONTRIBUTIONS

| MEMBER NAME | CONTRIBUTED CASH OR PROPERTY | VALUE OF CAPITAL CONTRIBUTION |
|---|---|---|
| Pies & Pints Development Partners, LLC<br>8462 Grennan Woods Drive<br>Powell, Ohio 43065 | $679,859 | $679,859 |
| KSDB, LLC<br>PO BOX 956<br>Fayetteville, West Virginia 25840 | $453,239 | $453,239 |

## PIES & PINTS MANAGEMENT COMPANY, LLC
## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into at Columbus, Ohio as of March 31, 2020 ("Effective Date") by and between Pies & Pints Management Company, LLC, a Delaware limited liability company, hereinafter referred to as the "Company" and Robert Lindeman, hereinafter referred to as the "Employee," collectively the "Parties." The obligations hereunder inure to the benefit of the Company's heirs, successors in interest and assigns.

In consideration of the foregoing and the mutual covenants contained herein, the Parties agree as follows:

**SECTION 1 Appointment and Term.** The Company hereby employs the Employee, and the Employee agrees to serve the Company as its President. The period of this Agreement shall commence as of the Effective Date and shall continue until the fifth anniversary of the date hereof ("Employment Period"). This Agreement and the Employment Period cannot be terminated by Company.

**SECTION 2 Duties.** So long as this Agreement shall continue in effect, the Employee shall:

2.1 Devote substantially all Employee's business time, energies, diligence, efforts and attention to the business and the affairs of the Company as its President, the most senior position in the Company, subject to the terms expressed in the Amended and Restated Limited Liability Company Operating Agreement; provided however, (i) Employee shall be permitted to serve as a director or non- employee manager of other businesses and (ii) Employee shall be entitled to take reasonable vacations and periods of leave and to devote reasonable time to trade, charitable and civic organizations.

2.2 Perform in a professional and diligent manner the responsibilities and duties of the position, which shall include such other responsibilities and duties as may be reasonably assigned by the Company's Board of Directors from time-to-time outside the duties and responsibilities of a President to further the Company's business and interests.

**SECTION 3 Compensation and Benefits.**

3.1 **Base Salary.** As his compensation for Employee's services to be rendered hereunder and for his covenants herein contained, the Company shall pay to Employee an annual gross salary at the rate of Two Hundred Sixty-Five Thousand Dollars ($265,000.00) or such greater amount as may be determined by the Board of Directors from time to time (the "Base Salary"), payable in biweekly installments, less the customary employee tax withholding required to be made by the Company.

3.2 **Additional Compensation.** This Agreement does not interfere or alter in any way with the Second Amended and Restated Limited Liability Company Operating Agreement that establishes Employee's ownership and compensation therefrom.

1


EXHIBIT
B

3.3　Bonus. In addition to Employee's Base Salary, based upon his performance and other metrics as solely determined by the Board of Managers, the Company may

pay a bonus to Employee. The Board of Managers agrees to review Employees' performance annually for determination of a bonus and compensate in accordance with a bonus plan.

3.4　Benefits. The Company will continue to provide health, dental, vision, disability and life insurance for Employee on the same basis as is generally made available to all other management employees in similar positions and/or other managers. Employee will continue to participate in the Company sponsored 401k retirement plan.

**SECTION 4 Expenses.** The Company shall pay or reimburse the Employee for all reasonable travel, meetings and seminars, and other expenses incurred or paid by the Employee in connection with the performance of services under this Agreement, upon presentation of expense statements or vouchers bearing documentation as required under the Internal Revenue Code of 1986, as amended, for business expense deduction, and such other supporting information as the Board of Managers may from time to time request.

**SECTION 5.** This section is intentionally left blank.

**SECTION 6 Confidential Information.** Employee acknowledges, understands and agrees that during the course of the Employee's employment with the Company, the Employee will receive specialized training in the Company's methods, processes and strategies and will have access to and will obtain confidential and/or trade secret information or documents relating to the Company. Employee hereby agrees that he will not during his employment and/or thereafter, directly or indirectly, disclose or use for his own or another's purposes:

6.1　the Company's financial and business information, financial reports, pricing policies, information, including fee schedules set forth in third-party payer contracts, financial management systems, and billing systems relating to the Company, its affiliates, officers and employees;

6.2　the Company's methods of conducting business, recruiting new business opportunities or advertising or promoting the Company's services, or any plans relating thereto;

6.3　any other proprietary or confidential information of the Company; and/or

6.4　any other trade secrets of the Company as set forth in Ohio Revised Code Section 1333.61 et seq.

**SECTION 7 Business Opportunities.** Except as set forth in Section 2.1, (a) Employee is not required to, and will not, devote his entire time and attention to the business of the Company; (b) Employee is permitted to have, and may presently or in the future have, investments or other business relationships, ventures, agreements or arrangements with entities engaged in business activities similar or dissimilar to the business of the Company, as long as such entity's sales from pizza do not exceed twenty-five percent (25%) of gross sales (an "Other Business"); (c) Employee will not be prohibited from pursuing and engaging in any such activities with an Other Business; and (d) Employee will not be obligated to make available or offer to the Company or any Member

2

the right to participate in any such opportunity, relationship or investment with an Other Business (an "Other Opportunity") and the Company hereby renounces any interest in an Other Opportunity and any expectancy that an Other Opportunity will be offered to it. Subject to Employee's obligations under Section 2.1, Employee is authorized to engage in any Other Business; provided, that any transactions between the Company and an Other Business will be on terms no less favorable to the Company than would be obtainable in a comparable arm's-length transaction. Employee shall provide notice to the Board of Directors of his relationship with any person or entity that transacts any business with the Company (regardless of the nature of such other business or Employee's ownership interest

in or other relationship with such person or entity). The parties hereto expressly waive, to the fullest extent permitted by applicable law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed the Company by Employee or to assert that such involvement constitutes a conflict of interest by such persons with respect to the Company and Employee; provided, however, that such waiver shall apply only to claims that are made or could be made under this Section 7.

For the purposes of Section 7(b), (c) and (d), Employee's participation in an Other Business through a company than is owned by or affiliated with Employee or the spouse of Employee, shall be subject the same restrictions as Employee's direct participation in an Other Business.

**SECTION 8 Non-Competition and Non-Solicitation.** Employee acknowledges, understands, and agrees that:

8.1 During the term of Employee's employment by the Company, except as disclosed to the Company and necessary to perform Employee's duties and obligations to the Company, and for a period of one (1) year after leaving employment at the Company, regardless of the reason for the termination of Employee's employment:

(a) Employee will not, directly or indirectly, render services to, engage in, work for or on behalf of, own or have an interest in, solicit, contact, assist in any manner or consult with any company, business, entity or person operating within a three-mile radius from any Company Location which is a Competitor of the Company (provided that Employee cannot be put in breach hereunder by the action of Company and/or its Affiliates opening a new Company Location);

(b) Employee will not, directly or indirectly solicit, contact, assist in any manner or consult with any company, business, entity or person which is/was a Customer or Prospective Customer of the Company or its Affiliates; and

(c) Employee will not directly or indirectly: (1) induce or attempt to induce any employee of the Company or its Affiliates to leave the employ of the Company or in any way interfere with the relationship between the Company or its Affiliates and any employee of the Company or its Affiliates; or (2) induce or attempt to induce any supplier, lessee, lessor or other business relation of the Company to cease doing business with the Company or its Affiliates, or in any way interfere with the relationship between the Company or its Affiliates and any such supplier, lessee, lessor or other business relation.

8.2 Definitions: As used in this Agreement:

3

(a) "Competitor" means any company, business, entity or person who sells the same or similar product and services as the Company and its Affiliates;

(b) During employment "Customer" means any company, business, entity, or person for which the Company ever performed any work or services and "Prospective Customer" means any company, business, entity, or person which contacts or has contacted the Company or is or has been contacted or solicited by the Company regarding the performance of any work or services or providing a proposal or bid on any work or services; and

(c) After termination of the Employee's employment "Customer" means any company, business, entity, or person for which the Company performed any work or services within the 12 months immediately preceding Employee's termination from employment at the Company and "Prospective Customer" means any company, business, entity, or person which contacted the Company or was contacted or solicited by the Company regarding the performance of any work or services or providing a proposal or bid on any work or services within the 12 months immediately preceding Employee's termination from employment at the Company.

(d) "Affiliate" means any direct or indirect subsidiary of the Company in which the Company holds fifty (50%) percent or great equity ownership interest.

(e) "Company Location" means any Pies & Pints restaurant.

8.3 Employee agrees that the nature and extent of the restrictions imposed on Employee by this Agreement are reasonable in time and scope and will not stifle the inherent skill and expertise of Employee or bar Employee's sole means of support.

8.4 Remedies for breach. Employee acknowledges, understands, and agrees that:

(a) If Employee breaches or threatens to breach this Agreement, the Company shall be entitled to an injunction which prevents further breaches or threatened breaches of Employee's promises set forth in this Agreement, in addition to any other legal or equitable remedy to which the Company is entitled; and

(b) If Employee breaches Sections 6 or 8 of this Agreement, such breach will cause irreparable harm to the Company.

**SECTION 9 Notices.** Any notices required or desired to be given to the Parties shall be deemed given when deposited in the United States mail, first class and postage prepaid, at the addresses listed below:

|  |  |
|---|---|
| Employee: | Rob Lindeman<br>8462 Grennan Woods<br>Powell, OH 43065 |
| With a copy to: | Brian Wcislo<br>Wcislo Law Group, PLLC |

4

3333 Lee Parkway, Ste. 600
Dallas, Texas 75219

Company:         Pies & Pints Management Company, LLC
                 8462 Grennan Woods
                 Powell, OH 43065

With a copy to:  Jeremy D. Siegfried
                 Porter, Wright, Morris & Arthur LLP
                 41 S. High Street, Suite 2800
                 Columbus, OH 43215

Any party may change such party's mailing address by serving written notice of such change of such new address upon the other party.

**SECTION 10 Invalidity**. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the other provisions, and this Agreement shall be construed in all respects as if any invalid or unenforceable provisions were omitted.

**SECTION 11 Representation and Warranty of Employee**. Employee represents and warrants that his execution of this Agreement and his fulfillment of his obligations does not and will not violate any term of any agreement, past or present, between Employee and a third party. Employee further represents and warrants that he will not disclose to the Company any third party's trade secrets or other confidential information in his possession.

**SECTION 12 Survival of Obligations After Termination**. The obligations in Sections 6, 8, and 13 survive the termination of this Agreement.

**SECTION 13 Miscellaneous Provisions.**

13.1    Governing Law. This Agreement is being executed and is to be performed in the State of Ohio, and shall be construed and enforced in accordance with the laws of the State of Ohio. If federal jurisdiction exists for the controversy, the proper venue shall be the United States District Court for the Southern District of Ohio. If federal jurisdiction does not exist, the proper venue is in the Court of Common Pleas for Franklin County, Ohio.

13.2    No Waiver. Failure to insist upon strict compliance with any of the terms or conditions of this Agreement shall not be deemed a waiver of such terms or conditions, nor shall any waiver or relinquishment of any right or power hereunder at any one time or more times be deemed a waiver or relinquishment of such right to power at any other time or times, absent written notice to such effect delivered by the appropriate party to the other parties.

13.3    Captions. The captions of the several sections and subsections of this Agreement are not part of the context thereof, are only guides or labels to assist in locating or reading the several provisions thereof and shall be ignored in construing it.

13.4    Entire Agreement. This Agreement contains the entire understanding between the

5

Parties and supersedes any prior understandings or agreements between

them respecting the subject matter. There are no representations, arrangements, understandings, or agreements, oral or written, between the Parties hereto relating to the subject matter of this Agreement, except those fully expressed herein. No changes, alterations, modifications, additions, or qualifications to the terms of this Agreement shall be made or be binding unless made in writing and signed by each of the Parties.

**SECTION 14 409A**. This Agreement is intended to comply with Section 409A of the Code or an exemption thereunder and shall be construed and administered in accordance with this intent. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A of the Code or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A of the Code either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A of the Code to the maximum extent possible. For purposes of Section 409A of the Code, any installment payments provided under this Agreement shall be treated as separate payments. Any payments to be made under this Agreement upon a termination of employment or similar terms shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, Employer makes no representations that the payments and benefits provided under this Agreement comply with Section 409A of the Code and in no event shall Employer be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by Employee on account of non-compliance with Section 409A of the Code.

**IN WITNESS WHEREOF**, the Company has caused this Agreement to be executed by its officers thereunto duly authorized, and the Employee has hereunto set the Employee's hand, all as of the date and year first above written.

**PIES & PINTS MANAGEMENT COMPANY, LLC**

By:_____

Its:_____

**EMPLOYEE**

_____

Robert Lindeman

`

# EXHIBIT 8



**Brian M. Wcislo**
brian@wcislolawgroup.com
214.665.9460 direct

April 1, 2020

**By E-mail**

Blue Fire Capital, LLC
811 Main Street
Paris, KY 40361
nicbuckner@aol.com
msloaneii@aol.com

KSDB, LLC
222 Capital Street, Ste. 100
Charleston, WV 25301
piesandpints@gmail.com
davidthomasbailey@gmail.com

Jeremy Siegfried
Porter Wright Morris & Arthur LLP
41 South High Street, Suite 2800
Columbus, OH 43215
jsiegfried@porterwright.com

Re:    Pies & Pints Management Company, LLC Action by Written Consent of the
Members without a Meeting

All:

My name is Brian Wcislo and I represent Robert Lindeman in his business interests in Pies & Pints
Development Partners, LLC (PPDP) and Pies & Pints Management Company, LLC (PPMC).

This letter is accompanied with PPMC's Action by Written Consent of the Members ("Member
Action") without a Meeting that occurred today, April 1, 2020. Below you will find a brief background
authorizing the Member Action.

### Background

On September 1, 2011, the PPDP Operating Agreement was drafted ("PPDP Operating Agreement"),
attached as Exhibit A. On the same date, PPDP took action by unanimous written consent of the
members to appoint Robert A. Lindeman as the sole manager of the Company. See attached as Exhibit
B.

As sole manager, Mr. Lindeman has the power to do all things or to direct all things necessary or
convenient to carry out the business affairs of PPDP. More specifically, Section 6.3 of the PPDP
Operating Agreement grants Mr. Lindeman the exclusive power to "(o) participate in partnership
agreements, joint ventures, or other associations of any kind with any other Person and (p) any act
that furthers the business and affairs of the Company." See Exhibit A at p. 10.

PPDP's Operating Agreement is silent as to what, if any, decisions or actions need to be voted on by
the Members. Although Mr. Lindeman only owns fifty (50) percent of PPDP, his role as sole manager
grants him the exclusive right to vote on all matters pertaining to PPDP's ownership interest in PPMC.

The Amended and Restated Limited Liability Company Operating Agreement of PPMC dated
December 31, 2019 ("Agreement"), attached as Exhibit C, defines "Majority Vote of the Members"
as the "affirmative vote, approval or consent, as the case may be, of the holders of more than fifty
percent (50%) of the Units in the Company." Id. at p. 4. Exhibit A to the Agreement identifies only
two members of PPMC - PPDP and KSDB, LLC, who each own sixty (60) percent and forty (40)

Wcislo Law Group I 3333 Lee Parkway Suite 600 I Dallas, TX 75219 I 214.665.9400 I wcislolawgroup.com

April 1, 2020
Page 2

percent of PPMC respectively. PPDP's ownership of sixty (60) Percentage Interest in PPMC would constitute a Majority Vote of the Members as defined in the Agreement shall Members vote on any action.

The Agreement identifies express actions that require Member approval. Section 6.3(b) of the Agreement requires a Majority Vote of the Members to "(ii) amend, alter or repeal any provision of this Agreement or the Certificate of formation and ... (v) increase or decrease the size of the Board." *Id.* at ps. 16-17.

The Agreement also grants Members the ability to take action by written consent without a meeting. Section 6.3(g) states "any action which may be taken at any meeting of the Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by the Members holding not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting [50%] at which all Members entitled to vote thereon were present and voted." *Id.* at p. 17.

Today's Member Action was authorized by sixty (60) percent of the Members constituting a Majority, as defined in Article 1.1 of the Agreement, to effectuate the express actions identified in Section 6.3(b)(ii) and (v) of the Agreement, using the mechanism provided in Section 6.3(g) of the Agreement.

Feel free to contact me regarding any questions or concerns related to this letter. Please do not contact Mr. Lindeman regarding the contents of this letter or any questions, concerns, or opinions of the Member action by written consent dated April 1, 2020.

Very Truly Yours,

Brian Weislo
BMW

cc: Martin O'Dowd

Enclosure